## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| STEFANIE ANDERS, Derivatively on behalf of Brookdale Senior Living, Inc., <br><br> Plaintiff <br><br> v. <br><br> LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. STEWARD, DENISE W. WARREN, LEE S. WIELANSKY, VICTORIA L. FREED, and JORDAN R. ASHER, <br><br> Defendants, <br><br> BROOKDALE SENIOR LIVING, INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br><br><br> JURY TRIAL DEMANDED |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Stefanie Anders ("Plaintiff"), by her attorneys, submits this Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, (i) a review of public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) a review of news reports, press releases, and other publicly available sources; (iii) review of news articles, shareholder communications, and postings on Brookdale Senior Living, Inc.'s ("Brookdale" or the "Company") website; (iv) pleadings, papers, and other documents filed with, and publicly available from, the related securities fraud class action lawsuit, *Posey v. Brookdale Senior Living, Inc., et al.*, No. 3:20-cv-00543 (M.D. Tenn.) ("Securities Class Action"), and from the Consumer Class Action (defined herein); and (v) a review of other publicly available information concerning Brookdale and the Individual Defendants (defined below).

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Brookdale against certain of its officers and directors for violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, and which arises from Brookdale's board of directors ("Board") failure to vindicate Brookdale's rights by wrongfully refusing Plaintiff's shareholder litigation demand dated December 16, 2020 ("Demand") that demanded the Board investigate the wrongdoing detailed herein and bring an action against certain current and former directors and officers of the Company for their misconduct. These wrongs have resulted in billions of dollars in damages to Brookdale's reputation, goodwill, and standing

– 1 –

in the business community, as well as in exposing the Company to potential liability for violations of federal law.

2. Brookdale owns and operates over 700 senior living communities and retirement communities in the United States. Brookdale was established in 1978 and is based in Brentwood, Tennessee. As of 2018, Brookdale was the largest operator of senior housing in the United States.

3. Throughout the relevant period, Brookdale painted a vivid picture of its communities as offering only the highest quality of resident care, which focused on a "personalized approach" and provided "24-hour assistance with activities of mid-acuity frail and elderly residents." Brookdale emphasized that its number one priority was "protecting" its senior residents, stating that the senior community "that we serve is our most important priority" and "as you would expect, you can enjoy peace of mind knowing we have staff onsite 24 hours a day, seven days a week, just in case you need us." Thus, "[w]hen you move into a Brookdale assisted living community, you can enjoy a life rich in quality care, genuine friendships and fun activities."

4. In reality, Brookdale intentionally understaffed its facilities using proprietary software called the Service Alignment System ("SAS") that intended to calculate the total number of labor hours required for each community. Even though Brookdale claimed "[w]e will make decisions closer to our customer by empowering our executive directors with more local decision rights," the communities were completely at the mercy of the calculated number, regardless of any other factor, and despite the fact that the program nearly always undercalculated the needed hours to provide adequate resident care. In fact, community staffing decisions required corporate level approval from local executive directors, which meant that requests for additional staffing were repeatedly denied, regardless of need.

– 2 –

5. The reason for intentional understaffing was simple—Brookdale was focused solely on its bottom line and nothing else. The inevitable result of focusing on control rather than providing care was that Brookdale's facilities were chronically understaffed, evidenced by issuance of citations from state and local authorities, incredibly high turnover, and worst of all, plagued by resident injury and death.

6. Despite its best attempts to conceal its chronic understaffing, the truth was revealed on April 30, 2020 when multiple local and national news sources published stories detailing a consumer class action complaint filed in the U.S. District Court for the Middle District of Tennessee, which was brought on behalf of a resident with firsthand knowledge of Brookdale's operations and insufficient staffing practices.

7. On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020, eventually bottoming out at $2.92 on May 5, 2020.

8. Making matters worse, while the Company's stock price was artificially inflated as a result of the Individual Defendants' materially false and misleading statements and omissions regarding Brookdale's quality of care and staffing, certain of the Individual Defendants caused the Company to repurchase its own stock at such artificially inflated prices, resulting in a material overpayment by the Company of *$41.1 million*.

9. In accordance with Delaware law, on December 16, 2020, Plaintiff served the Board with her pre-suit litigation Demand, requesting the Board investigate and take all necessary legal action against those responsible for the damage caused to, and suffered by, the Company. *See* **Exhibit A**. The Board, however, unreasonably refused Plaintiffs' Demand by refusing to investigate or even consider the Demand within a reasonable amount of time, choosing to do

– 3 –

nothing, and the Board's unwarranted and egregious delay in responding to the Demand has unduly prejudiced Plaintiff, the Company, and its claims, and is in direct violation of Delaware law. In light of the Board's unreasonable and wrongful refusal of Plaintiff's Demand to investigate and remediate the harms caused to the Company, Plaintiff was forced to bring this action. Thus, Plaintiff rightfully brings this action to vindicate Brookdale's rights against its wayward fiduciaries and to hold those fiduciaries accountable for the damage they have caused the Company, and this derivative action should be permitted to proceed.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over (a) the contribution claims asserted herein under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f) and (b) over the claims asserted herein for breach fiduciary duty premised upon duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Brookdale maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion

– 4 –

of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Brookdale, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiff

13.    Plaintiff was a stockholder of Brookdale at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Brookdale stockholder.

### B.    Nominal Defendant

14.    Nominal defendant Brookdale is a Delaware corporation with principal executive offices located at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027. Accordingly, Brookdale is a citizen of Delaware and Tennessee. Brookdale is the nation's largest senior-living community operator, owning 350 communities, leasing 301 communities, managing 75 communities on behalf of third parties, and holding an equity interest in three. The Company operates independent living, assisted living, dementia-care communities, and continuing care retirement centers. Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living, and hospice services.

### C.    Defendants

15.    Defendant Lucinda M. Baier ("Baier") has served as Brookdale's President and Chief Executive Officer ("CEO") and as a Company director since February 2018. Previously, Baier served as Brookdale's Chief Financial Officer ("CFO") from December 2015 until February 2018. According to the Company's Schedule 14A filed with the SEC on April 29, 2021 (the "2021 Proxy Statement"), on April 23, 2021, Baier beneficially owned 444,597 shares of the Company's

common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Baier owned over $2.8 million worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Baier received $7,087,470 in compensation from the Company. This included $938,000 in salary, $1,044,698 in bonus, $4,939,153 in stock awards, $158,288 in non-equity incentive plan compensation, and $7,331 in all other compensation. For the fiscal year ended December 31, 2019, Baier received $6,350,901 in compensation from the Company. This included $910,000 in salary, $4,773,420 in stock awards, $657,295 in non-equity incentive plan compensation, and $10,186 in all other compensation. For the fiscal year ended December 31, 2018, Baier received $4,674,255 in compensation from the Company. This included $782,248 in salary, $50,000 in bonus, $3,551,872 in stock awards, $281,023 in non-equity incentive plan compensation, and $9,112 in all other compensation. For the fiscal year ended December 31, 2017, Baier received $2,407,188 in compensation from the Company. This included $550,000 in salary, $1,500,013 in stock awards, $196,150 in non-equity incentive plan compensation, and $161,025 in all other compensation. For the fiscal year ended December 31, 2016, Baier received $2,492,367 in compensation from the Company. This included $552,115 in salary, $1,500,005 in stock awards, $222,750 in non-equity incentive plan compensation, and $217,497 in all other compensation.

16.     Defendant T. Andrew Smith ("Smith") served as the Company's CEO from February 2013, as President from March 2016, and as a Company director from June 2014 until he resigned from all of his positions with the Company on February 28, 2018. Previously, he had served as Executive Vice President, General Counsel, and Secretary from October 2006 until February 2013. For the fiscal year ended December 31, 2018, Smith received $2,709,314 in

compensation from the Company. This included $157,115 in salary and $2,552,199 in all other compensation. For the fiscal year ended December 31, 2017, Smith received $1,315,829 in compensation from the Company. This included $950,000 in salary, $356,709 in non-equity incentive plan compensation, and $9,120 in all other compensation. For the fiscal year ended December 31, 2016, Smith received $6,608,594 in compensation from the Company. This included $953,654 in salary, $5,225,007 in stock awards, $418,594 in non-equity incentive plan compensation, and $11,339 in all other compensation.

17.     Defendant Steven E. Swain ("Swain") has served as the Company's CFO since September 2018. According to the 2021 Proxy Statement, on April 23, 2021, Swain beneficially owned 67,207 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Swain owned over $435,501 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Swain received $2,841,756 in compensation from the Company. This included $575,00 in salary, $474,375 in bonus, $1,713,588 in stock awards, $71,875 in non-equity incentive plan compensation, and $6,918 in all other compensation. For the fiscal year ended December 31, 2019, Swain received $2,117,449 in compensation from the Company. This included $515,000 in salary, $1,306,414 in stock awards, $275,545 in non-equity incentive plan compensation, and $20,490 in all other compensation. For the fiscal year ended December 31, 2018, Swain received $1,272,135 in compensation from the Company. This included $161,538 in salary, $100,000 in bonus, $802,324 in stock awards, $46,038 in non-equity incentive plan compensation, and $162,235 in all other compensation.

18.     Defendant Marcus E. Bromley ("Bromley") has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. According to the 2021 Proxy Statement, on April 23, 2021, Bromley beneficially owned 101,693 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Bromley owned over $658,970 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Bromley received $211,033 in compensation from the Company. This included $111,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Bromley received $256,995 in compensation from the Company. This included $157,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Bromley received $230,831 in compensation from the Company. This included $187,000 in fees earned and cash paid and $43,831 in stock awards. For the fiscal year ended December 31, 2017, Bromley received $203,472 in compensation from the Company. This included $103,478 in fees earned and cash paid and $99,993 in stock awards.

19.     Defendant Frank M. Bumstead ("Bumstead") has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, on April 23, 2021, Bumstead beneficially owned 326,746 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Bumstead owned over $2.1 million worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Bumstead received $228,003

– 8 –

in compensation from the Company. This included $128,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Bumstead received $289,995 in compensation from the Company. This included $190,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Bumstead received $315,994 in compensation from the Company. This included $216,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Bumstead received $379,992 in compensation from the Company. This included $280,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Bumstead received $320,995 in compensation from the Company. This included $221,000 in fees earned and cash paid and $99,995 in stock awards.

20.     Defendant Jackie M. Clegg ("Clegg") served as a Company director from November 2005 until October 29, 2019. She also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and as a member of the Audit Committee. For the fiscal year ended December 31, 2019, Clegg received $349,047 in compensation from the Company. This included $249,052 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Clegg received $322,994 in compensation from the Company. This included $223,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Clegg received $390,992 in compensation from the Company. This included $291,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Clegg received $339,995 in compensation from the Company. This included $240,000 in fees earned and cash paid and $99,995 in stock awards.

21.     Defendant Daniel A. Decker ("Decker") served as Executive Chairman of the Board from November 1, 2016 until he resigned effective March 1, 2018.  Previously, he served as Non-Executive Chairman of the Board from October 2015 until October 31, 2016.  He also served as a member of the Investment Committee.  For the fiscal year ended December 31, 2018, Decker received $221,656 in compensation from the Company.  This included $138,077 in fees earned and cash paid, $80,047 in stock awards, and $3,532 in all other compensation.  For the fiscal year ended December 31, 2017, Decker received $705,966 in compensation from the Company.  This included $687,500 in fees earned and cash paid and $18,466 in all other compensation.  For the fiscal year ended December 31, 2016, Decker received $1,082,164 in compensation from the Company.  This included $479,167 in fees earned and cash paid, $591,313 in stock awards, and $11,685 in all other compensation.

22.     Defendant Rita Johnson-Mills ("Johnson-Mills") has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee.  According to the 2021 Proxy Statement, on April 23, 2021, Johnson-Mills beneficially owned 74,591 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date.  Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Johnson-Mills owned over $483,349 worth of Brookdale stock as of that date.  For the fiscal year ended December 31, 2020, Johnson-Mills received $228,003 in compensation from the Company.  This included $128,000 in fees earned and cash paid and $100,003 in stock awards.  For the fiscal year ended December 31, 2019, Johnson-Mills received $211,976 in compensation from the Company.  This included $170,609 in fees earned and cash paid and $41,367 in stock awards.  For the fiscal year ended December 31, 2018, Johnson-

– 10 –

Mills received $155,024 in compensation from the Company. This included $55,033 in fees earned and cash paid and $99,991 in stock awards.

23.    Defendant Jeffrey R. Leeds ("Leeds") served as a Company director from November 2005 until his resignation effective October 4, 2018. He also served as Non-Executive Chairman of the Board from June 2012 until September 2015. Leeds also served as a member of the Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2018, Leeds received $273,081 in compensation from the Company. This included $173,087 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Leeds received $373,992 in compensation from the Company. This included $274,000 in fees earned and cash paid and $99,992 in stock awards.

24.    Defendant Mark J. Parrell ("Parrell") served as a Company director from April 2015 until his resignation effective July 24, 2017 at the Company's annual meeting. He also served as a member of the Audit Committee and Investment Committee. For the fiscal year ended December 31, 2017, Parrell received $213,514 in compensation from the Company. This included $113,522 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Parrell received $259,306 in compensation from the Company. This included $190,000 in fees earned and cash paid and $69,306 in stock awards.

25.    Defendant William G. Petty, Jr. ("Petty") served as a Company director from December 2014 until his resignation effective February 21, 2018. He also served as the Chair of the Investment Committee and as a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2018, Petty received $115,883 in compensation from the Company. This included $15,889 in fees earned and cash paid and $99,994

– 11 –

in stock awards. For the fiscal year ended December 31, 2017, Petty received $214,992 in compensation from the Company. This included $115,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Petty received $308,995 in compensation from the Company. This included $209,000 in fees earned and cash paid and $99,995 in stock awards.

26.     Defendant Guy P. Sansone ("Sansone") has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. According to the 2021 Proxy Statement, on April 23, 2021, Sansone beneficially owned 43,740 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Sansone owned over $283,435 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Sansone received $226,537 in compensation from the Company. This included $209,000 in fees earned and cash paid and $17,537 in stock awards. For the fiscal year ended December 31, 2019, Sansone received $120,387 in compensation from the Company. This included $20,391 in fees earned and cash paid and $99,996 in stock awards.

27.     Defendant James R. Seward ("Seward") served as a Company director from November 2008 until his resignation effective October 29, 2019. He also served as a member of the Audit Committee as the Chair of the Investment Committee. For the fiscal year ended December 31, 2019, Seward received $327,403 in compensation from the Company. This included $227,408 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Seward received $326,161 in compensation from the Company. This included $226,167 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year

– 12 –

ended December 31, 2017, Seward received $367,159 in compensation from the Company. This included $267,167 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Seward received $309,995 in compensation from the Company. This included $210,000 in fees earned and cash paid and $99,995 in stock awards.

28.     Defendant Denise W. Warren ("Warren") has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, on April 23, 2021, Warren beneficially owned 75,128 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Warren owned over $486,829 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Warren received $231,033 in compensation from the Company. This included $131,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Warren received $196,882 in compensation from the Company. This included $172,500 in fees earned and cash paid and $24,382 in stock awards. For the fiscal year ended December 31, 2018, Warren received $132,181 in compensation from the Company. This included $32,185 in fees earned and cash paid and $99,996 in stock awards.

29.     Defendant Lee S. Wielansky ("Wielansky") has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. According to the 2021 Proxy Statement, on April 23, 2021, Wielansky beneficially owned 127,860 shares of the Company's common stock which represented less than 1% of the Company's

– 13 –

outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Wielansky owned over $828,532 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Wielansky received $226,003 in compensation from the Company. This included $126,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Wielansky received $506,604 in compensation from the Company. This included $406,609 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Wielansky received $553,577 in compensation from the Company. This included $453,583 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Wielansky received $361,992 in compensation from the Company. This included $262,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Wielansky received $274,306 in compensation from the Company. This included $205,000 in fees earned and cash paid and $69,306 in stock awards.

30.     Defendant Victoria L. Freed ("Freed") has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, on April 23, 2021, Freed beneficially owned 43,740 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Freed owned over $238,435 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Freed received $130,537 in compensation from the Company. This included $113,000 in fees earned and cash paid and $17,537 in stock awards. For

the fiscal year ended December 31, 2019, Freed received $124,387 in compensation from the Company. This included $24,391 in fees earned and cash paid and $99,996 in stock awards.

31. Defendant Jordan R. Asher ("Asher") has served as a Company director since February 2020. Asher also currently serves on the Audit Committee and Investment Committee. According to the 2021 Proxy Statement, on April 23, 2021, Asher beneficially owned 49,857 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Asher owned over $323,073 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Asher received $191,165 in compensation from the Company. This included $91,165 in fees earned and cash paid and $100,000 in stock awards.

32. The defendants identified in paragraphs 15–32 above are referred to herein as the "Individual Defendants."

33. The "Audit Committee Defendants" refers to the defendants identified in paragraphs 18, 23–24, 27–29, 31.

## IV.    FACTUAL BACKGROUND

### A.    Company Background

34. Brookdale is headquartered in Brentwood, Tennessee. According to its public filings, Brookdale is the nation's largest senior-living community operator, with $4 billion in reported revenue in 2019 alone. As of April 30, 2021, Brookdale owned 350 communities, leased 301 communities, managed 75 communities on behalf of third parties, and had an equity interest in three communities. The Company operates independent living, assisted living, dementia-care communities, and continuing care retirement centers. Through its ancillary services programs, the

– 15 –

Company also offers a range of outpatient therapy, home health, personalized living and hospice services.

35.    Brookdale's ascension to its position as the largest senior-living community operator in the United States was solidified by: (1) its acquisition of Horizon Bay, the then-ninth largest operator of senior living communities in the United States, on September 1, 2011, and (2) its acquisition by merger of Emeritus Corporation, the then-second largest operator of senior living communities in the United States, for $2.8 billion on July 31, 2014.

36.    According to representations made by Brookdale in annual filings with the SEC between 2014 and 2018, Brookdale's aggressive growth and purchase strategy required massive financing and infusions of cash.  As a result, Brookdale shackled itself with enormous loan obligations, debt, and lease obligations to financing institutions and real estate investment companies.

37.    To secure such significant loans, financing agreements, and lease contracts, Brookdale agreed to designate profit and financial performance thresholds for its assisted living facilities both on an individual basis and on a consolidated, portfolio-wide and multi-community basis, as stated in Brookdale 10-K filings with the SEC between 2014 and 2018:

> Our outstanding indebtedness and leases contain restrictions and covenants and require us to maintain or satisfy specified financial ratios and coverage tests, including maintaining prescribed net worth levels, leverage ratios and debt service and lease coverage ratios on a consolidated basis, and on a community or communities basis based on the debt or lease securing the communities.  In addition, certain of our leases require us to maintain lease coverage ratios on a lease portfolio basis (each as defined in the leases) and maintain stockholders' equity or tangible net worth amounts.
>
> *        *        *
>
> Certain of our debt and lease documents contain restrictions and financial covenants, such as those requiring us to maintain prescribed minimum net worth and stockholders' equity levels and debt service and lease coverage ratios, and

– 16 –

requiring us not to exceed prescribed leverage ratios, in each case on a consolidated, portfolio-wide, multi-community, single-community and/or entity basis.

*      *      *

We operate certain of our communities pursuant to management agreements. . . . . In addition, in some cases, subject to our rights, if any, to cure deficiencies, community owners may terminate us as manager if . . . we do not satisfy certain designated performance thresholds[.]

38.     In addition, Brookdale guaranteed and pledged the individual and aggregate assets and revenues of its assisted living facilities as collateral for such loan and lease agreements. Therefore, to meet its enormous debt obligations, financial covenants, and financial performance thresholds and to minimize the risk of defaulting on widespread portions of its portfolio of assisted living facilities and other communities, Brookdale closely monitored and tightly controlled every aspect of the operations and management of its assisted living facilities, including the largest line-item expense—day-to-day staffing.

**B.     Brookdale Regulated Staffing Needs from Company Headquarters, Prohibiting Local Facility-Level Staffing Decision-Making**

39.     Indeed, Brookdale represented in various court filings that a majority of its executive and administrative functions are located at its Tennessee headquarters and all final decisions regarding the Company's operations of its communities are made from Brookdale's corporate headquarters: "Brookdale's corporate officers, based out of Brentwood, TN, direct, control, and coordinate Brookdale's services and overall business operations for its locations throughout the United States."[1]

---

[1] *See Edwards v. Brookdale Senior Living, Inc., et al.*, No. 2:16-cv-08191-BRO-JPR (C.D. Cal.), Dkt No. 1, Defendants' Notice of Removal of Action to Federal Court, ¶11.

– 17 –

40.     For instance, the Company makes all decisions regarding staffing, budgets, and marketing materials at the corporate level.  The Company's 2020 Definitive Proxy Statement, confirmed that the "Board and management" were in charge of the "budgeting process."

41.     Brookdale's method of determining and limiting staffing levels at its facilities is done via a staffing algorithm known as its SAS.  As described by Brookdale, its SAS Software consists of two main categories of data.  First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies Brookdale itself conducted; and the aggregate assess care needs of all residents.  Second, the SAS Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents, and other parameters and factors" to set the number of staffing hours on a daily basis.  In other words, the SAS Software determines the number of staffing hours in each of its facilities by multiplying (1) the aggregate assessed care needs to be delivered by staff to residents by and (2) the associated task times Brookdale claims are required for each assessed care need.

42.     Brookdale's design, methodology, and use of its SAS Software are faulty and flawed.  Specifically, because Brookdale's insufficient staffing is the product of the two critical variables described in the paragraph above, namely (1) the number and types of services to be provided to each of its collective resident populations and (2) the time required to deliver each type of service, Brookdale reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit benchmarks.  In other words, Brookdale's SAS Software systematically underestimates the staffing needs at each facility by, *inter alia*, deliberately embedding false and inaccurate assumptions about the time

required to carry out personal need services and services provided to its collective resident populations.

43.     Moreover, to accurately and reliably determine the number of staff and labor time required to deliver services in industries like Brookdale's, industrial engineers recognize that certain engineering principles and critical variables must be taken into account and applied. The SAS Software is also flawed and faulty because it fails to take into account these engineering principles and critical variables, thereby resulting in chronically insufficient staffing.

44.     Indeed, Brookdale's use of its SAS Software results in willfully and chronically understaffed facilities. Brookdale purposefully uses its SAS Software to justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, Brookdale deliberately fails to properly, accurately, and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of the improper conduct.

45.     Of course, Brookdale maintained the confidentiality of its staffing methods, even from its own facility-level employees. Indeed, at all relevant times, Brookdale's staffing decisions were not made at the facility level, but at the corporate level. From its corporate headquarters in Brentwood, Tennessee, Brookdale exercised absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budget on a frequent or daily basis.

46.     Moreover, Brookdale prohibited its facilities from making staffing decisions at the local level or modifying Brookdale's corporate predetermined staffing levels without corporate approval. That is, executive directors and facility level staff could not modify the corporate-

– 19 –

predetermined staffing levels without express permission from several layers of Brookdale corporate management. Any such request for permission to modify or customize must be documented.

47. The Company's centralized operation as a single enterprise is further evidenced by Brookdale's annual and quarterly reports that Individual Defendants caused the Company to file with the SEC, as referenced in detail below. For example, the Company's annual report for the periods ended December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017 state that "we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing."

## C. Brookdale Strictly Enforced Its Pre-Determined Staffing Levels

48. At all relevant times, Brookdale oversaw, managed, and ultimately dictated the Company's operating budgets at each one of Brookdale's facilities around the country, including expense limits dedicated to staffing.

49. Indeed, according to the Company's annual report filed with the SEC on February 22, 2018 for the quarter and year ended December 31, 2017 on a Form 10-K "[w]e have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections. Our operating procedures include . . . implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures."

50. The Company's annual reports filed with the SEC for the quarter and year ended December 31, 2014, December 31, 2015, and December 31, 2016 contained substantively the same statements.

– 20 –

51.     Brookdale begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal server with near final amounts.  Once preloading is complete, each assisted living facility has one week to review the budget and respond to the Brookdale Regional Vice President, Regional Director of Operations, and corporate FP&A with comments and any requests for change.

52.     The employees working at each assisted living facility only have read-only access to the budgets, meaning they cannot change any of the preloaded amounts.  All changes and final approval of the budgets are made by Brookdale.

53.     At all relevant times, once the budgets have been approved by Brookdale, they are locked in for the entire year.  In addition, the employees working at each assisted living facility are not able to make changes to the budget.

54.     Brookdale has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings.  As alleged in the Consumer Class Action (defined herein) filed against the Company, the executive directors at each of Brookdale's assisted living facilities have been routinely admonished by corporate officers in emails demanding that: a) they strictly comply with the staffing budget; b) they make reductions in staffing needed to eliminate budget variances; c) they comply with each facility's staffing expense savings commitment; d) they "do a better job managing our labor, as this is by far our largest expense"; e) they make the necessary adjustments to get staffing within budget or be forced to make reductions; f) everyone will be held accountable for labor control; g) Brookdale does not tolerate an assisted living facility running over its approved staffing budget; h) Brookdale management strenuously emphasizes the importance of managing labor and eliminating overtime; and i) Brookdale does not tolerate an assisted living facility "dropping the ball" on labor controls.

– 21 –

55.     To entice its employees to stay at or below Brookdale's limits for staffing and expenses, Brookdale also created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale's financial performance targets. These programs provided facility department heads and Brookdale's senior management significant bonuses for staying at or below Brookdale's budgeted expense limits—the largest of which was staffing.

## D.     Brookdale's Form Residency Agreements Misrepresented and Mislead Potential Residents Regarding Brookdale's Inhumane Understaffing

56.     The Company's standard form Residency Agreements advertise Brookdale's commitment to personalized care. Specifically, Brookdale mandates that each of its facilities conduct what Brookdale refers to as a Personal Service Assessment ("PSA") upon each resident, which assesses a resident's care needs.

57.     Afterwards, according to the level of care required, residents are assigned to one of two "Care Groups": (1) Choice Personal Services—care includes services related to, among other things, medication, nutrition, dressing and grooming, showering or bathing, bathroom assistance, escort, and mobility and service coordination; or (2) Comprehensive Care Options—care includes services related to, among other things, chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand upright, bathroom assistance needs for residents who are catheterized, incontinent, or cannot stand upright, two person or mechanical lifts, cognitive and psychological needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance, and pet care.

58.     In its form contract, Brookdale also pledges to regularly reassess the level of care needed to meet residents' needs.

59. Each service need is broken down by particular and granular needs and ascribed a cost. The Company charges its residents a monthly "Personal Service Rate" in exchange for meeting the evaluated level of care and specific needs documented in the "Personal Service Plan," which includes the "Basic Service Rate" and together with the lesser of: (1) the total cost for meeting each assessed need with each category; or (2) a "Predictable Maximum Total" the Company assigns to each Care Group.

60. Personal Service Rates are amended from time to time depending on re-evaluations of residents' needs and updates to their Personal Service Plans.

61. According to the standardized letters the Company sends to Brookdale residents who are subject to rate increases, the Company attributes the increased rate, in large part, to the increased staffing costs to "take care of your senior living needs."

62. Further anchoring consumers' reasonable belief that Brookdale would have staff sufficient to provide these contracted services was the claim set forth in Brookdale's uniform Residency Agreement that "associates are available 24 hours a day, 7 days a week."

**E.     Brookdale's Marketing Materials Further Misled Potential Residents Regarding the Truth Behind Brookdale's Abhorrent Care and Services Resulting from Its Purposeful Understaffing**

63. It was not just Brookdale's form Residency Agreements that misrepresented staffing and services provided to Brookdale's residents; the same or similar misrepresentations were contained in the Company's marketing materials as well, including the Company's website, brochures, and presentations, which induced residents to enter into the Company's form Residency Agreements.

64. For instance, in certain Company presentations available on Brookdale's social media platforms, such as a video presentation uploaded to YouTube on December 1, 2017, Brookdale marketed its senior living facilities to individuals and their families on a promise of

tailored services that meet the individualized and personal needs of residents, and by touting an army of "***passionate associates ready to work for you***."

65.     Deliberately woven through the Company's sales and marketing materials on its website was/is language assuring elderly and dependent individuals and their families that caring for and meeting the needs of residents was of paramount importance to Brookdale. Specifically, the Company's website promoted and/or promotes such care:

- "At Brookdale, we believe in delivering senior care that's ***tailored to you and your loved one based on those unique needs*** and desires. That's why we provide a variety of options. This ***personalized approach*** ensures that you and your family get exactly what you need without paying for what you don't."

- "[W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, offering individually tailored personal care options to perfectly suit their needs."

- "***Your health is our top priority***, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A ***personalized service assessment and plan*** where we evaluate ***your individual needs*** and then create a ***custom care plan tailored to you***."

- "Brookdale will ***assess your needs*** and help you chose the ***services you need***."

- "***Our trained caregivers provide attention and assistance*** with medication support, bathing, dressing, cooking and other tasks throughout the day. Our staff will also coordinate services with outside healthcare providers and monitor

– 24 –

residents to ensure they are healthy. So your loved one gets the care they need while enjoying the quality of life they've earned."

- "***Trained caregivers provide assisted living care*** by providing assistance with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers."

- "At an assisted living community, ***caring staff members*** are available to help them accomplish these tasks, making life a lot easier than if they were living alone. This service provides peace of mind for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day***."

- "The Brookdale approach provides ***services that are tailored to each individual's unique needs***, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, by ***offering the desired service and care as their needs and preferences dictate***. By ***customizing personal care offerings for the individual***, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go."

- "At Brookdale, we are ***committed to listening to your needs***, understanding the life you want for yourself or your loved one, and then partnering with you to ***customize a solution*** for all the places you still want your life to go."

– 25 –

- "The first step towards determining the right senior living option is to **understand you and your family's needs**."

- "[We] cannot provide exceptional care and service until we find out exactly what it is that your loved one needs."

- "We start with a detailed assessment, listing the specifics of your loved one's level of care."

66.     Brookdale's website also advertised that the Company would "[r]ecognize and [i]ntegrate" the results of each resident's Personal Service Assessment by ensuring that Brookdale's "professional staff is trained to recognize the specific needs . . . of each individual" and that a "continuous assessment process" "ensures" the Company would be able to satisfy its residents' care needs.

67.     Moreover, certain of the Company's marketing materials advertised that at Brookdale facilities:

> ***Carefully selected and trained associates do more than assist with activities of daily living*** such as dressing, bathing and dispensing of medications; ***they implement custom care plans designed to meet the individual needs of each resident*** … It all begins with a Personal Service Assessment.  We take the time to listen to our residents so that ***we understand how to establish clinical, dining and program support that works for them in a meaningful way***.  We recognize their individual needs and preferences and respond to them accordingly.

68.     Additionally, the Company proclaimed that it:

> ***[p]rovide[s] customized care solutions to meet residents' unique needs*** and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, ***we strive to offer personalized care and exceptional service*** at competitive and affordable rates.  ***Fees for care and services are based on each resident's needs and preferences***, as determined by the Living Accommodation selected and their Personal Service Plan.

**F.     Brookdale Intentionally Understaffed Its Facilities, Sacrificing Care for Profit, and Actively Concealed Its Misconduct**

69.     At all relevant times, Individual Defendants caused the Company to fail to provide adequate staffing at its facilities, and as such, despite its representations of "tailored" and "customized" "exceptional care and service," Individual Defendants caused the Company to routinely fail to satisfy residents' needs as determined by the PSA, and thus violate the terms of the Company's form Residency Agreements, as well as various other state laws and regulations.

70.     Specifically, to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed herein, Individual Defendants caused the Company to set staffing figures, including the amount of time estimated to fulfill certain tasks and levels of care, greatly beneath the actual required duration.

71.     As a result, the collective amount of labor time required to deliver the daily services for Brookdale's resident population exceeded the daily amount of staff time the Company allotted to its facilities.

72.     Moreover, to ensure staffing costs would not rise, Individual Defendants caused the Company to assert tight control over the facility staffing and adopt a policy that precluded local facility-level employees from adjusting staffing, or critical factors and data that was entered into the Company's SAS Software (such as task counts, task times, logic algorithms, and source code), based upon known staffing demands to meet the daily care needs of Brookdale's residents.

73.     Furthermore, the Company itself failed to appropriately adjust staffing despite the fact that Individual Defendants knew Brookdale's staffing figures were inadequate to meet residents' assessed care needs, Brookdale's contractual obligations, and to comply with adult care home laws, rules, and regulations.

– 27 –

74.     This misconduct resulted in extreme wait times for service care needs that were already paid for, and worse still, subjected dependent, disabled, and/or vulnerable residents to the risk of actual service deprivations.  As a result, Individual Defendants' misconduct violated state laws and regulations and exposed the Company to a substantially increased risk of litigation.

75.     Despite receiving a wave of complaints arising out of the Company's purposeful understaffing of its facilities from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, Brookdale intentionally and knowingly refused to address well-founded complaints, continued to engage in or permit the understaffing to continue to occur, failed to disclose it, and actively concealed it, so that the Company would not default on its massive debt and lease obligations.

76.     Moreover, numerous reports generated by the Company's own facilities, corporate audits of each facilities' performance, and internal emails and communications demonstrate that Brookdale engaged in or permitted this misconduct.

**G.     Individual Defendants Issued Numerous Materially False and Misleading Statements**

77.     On August 9, 2016, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2016 on Form 10-Q (the "2Q16 10-Q").

78.     The 2Q16 10-Q was signed by Baier and contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

79.     For the quarter, Brookdale reported net loss of $35.45 million attributable to Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion, compared to a net loss of approximately $84.54 million attributable to Company stockholders, or

– 28 –

$0.46 per diluted share, on total revenue of approximately $1.24 billion for the same quarter in the prior year.

80.    Regarding "Resident Fees" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Resident fee revenue increased $10.6 million, or 1.0%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 1.6% at the 933 communities we owned or leased during both full periods with a 3.0% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue).

81.    Regarding "Facility Operating Expense" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Facility operating expense decreased over the prior year period primarily due to the impact of disposition and lease termination activity since the beginning of the prior year period and a $13.7 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The decrease was partially offset by increases in salaries and wages due to wage rate increases.

82.    Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> General and administrative expense increased $1.2 million, or 1.3%, over the prior year period primarily as a result of an increase in salaries and wages due to wage rate and bonus accrual increases and an increase in non-cash stock-based compensation expense. The increase was partially offset by a decrease in integration, transaction, transaction-related and strategic project costs.

83.    Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $6.7 million, or 3.7%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

– 29 –

84. The 2Q16 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2016, the Company had "the ability to serve approximately 107,000 residents."

85. Further, the 2Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]"

86. Moreover, the 2Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

87. The 2Q16 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO]and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our [CEO]and [CFO]each concluded that, as of June 30, 2016, our disclosure controls and procedures were effective.

88. The 2Q16 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

89. Defendants continued to make similar false and misleading representations regarding Brookdale's purported high quality of care throughout the Class Period. For example,

– 30 –

Brookdale also held an investor conference call to discuss the Company's second quarter 2016 financial results (the "2Q16 Call"). Defendants Baier and Smith participated on the call.

90. During the 2Q16 Call, Defendant Smith emphasized that Brookdale was investing in its associates and focusing on its residents:

> **Our primary focus is on operational excellence**, further developing our competitive advantages to improve performance in the fundamental drivers of our business. **Operationally, we're focused on three key elements. First, consistently delivering a great resident and family experience. We have recently enhanced our resident experience programming, which we call the Brookdale Experience. This program includes operational and customer service standards**, technology, training, programming and net from other score measurement. **The goal of this program is to provide our associates with the tools for delivering a great resident and family experience. Along with the method for measurement and feedback to ensure that we're delivering on that promise.**

> **Our second area of operational focus is attracting and retaining the best talent. The quality and longevity of community-level leadership drives each community success.** And so we are very excited about work that is underway to formalize proprietary customized leadership model and leadership development program throughout the Company. The program is the result of extensive in-depth investigation and analysis related to Brookdale's culture and thought leadership, and its design will connect leaders at all levels with the Company's strategy and is still a common focus.

> In the last quarter, we formalized the process to nurture our internal leaders. We are identifying our high potential performers and surrounding them with mentors, coaches and development plans to help them succeed not only today, but also at higher levels in the organization. This will help ensure that we are developing our leaders and creating better engagement with those associates, which, as I am sure you know, leads to better job satisfaction and better retention.

> **The third element of our operations is to sell the value that we offer**, so we're focused on sales. In April, we enhanced our Brookdale school of sales, and over 150 sales associates have already participated in it. **This new training focuses on the customer, of course, and on the customer's journey. People do not make snap judgments when it comes to senior living.** In this training program, our sales associates are challenged to identify where customers are in their journey and then to work with them to build a tangible and practical plan that meets their needs.

> We know that moving into seniors' housing is a difficult decision for seniors and their families. Helping to clarify the solution and working as a partner increases comfort levels for all involved.

– 31 –

91.     On November 3, 2016, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2016 on Form 10-Q (the "3Q16 10-Q").

92.     The 3Q16 10-Q was signed by Baier and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

93.     For the quarter, Brookdale reported net loss of $51.69 million attributable to Company stockholders, or $0.28 per diluted share, on total revenue of approximately $1.25 billion, compared to a net loss of approximately $68.22 million attributable to Company stockholders, or $0.37 per diluted share, on total revenue of approximately $1.24 billion for the same quarter in the prior year.

94.     Regarding "Resident Fees" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

> Resident fee revenue increased $2.7 million, or 0.3%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period.   During the current period, revenues grew 2.0% at the 896 communities we owned or leased during both full periods with a 3.2% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue).     The increase was partially offset by the impact of disposition activity since the beginning of the prior year period and a 110 basis point decrease in weighted average occupancy in the 896 communities we owned or leased during both full periods.   The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, generated $15.1 million of revenue during the current year period compared to $31.5 million of revenue in the prior year period.

95.     Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

> Facility operating expense increased $4.5 million, or 0.6%, over the prior year period primarily due to the impact of increases in salaries and wages due to wage rate increases.   This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year period and a $13.9

– 32 –

million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, incurred $13.0 million of facility operating expenses during the current year period compared to $26.8 million of facility operating expenses in the prior year period.

96.     Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

General and administrative expense decreased $36.1 million, or 36.3%, over the prior year period primarily due to a $29.4 million decrease in integration, transaction, transaction-related and strategic project costs, a decrease in bonus expense and a decrease in stock-based compensation expense.

97.     Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $3.7 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

98.     The 3Q16 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 105,000 residents."

99.     Further, the 3Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]"

– 33 –

100.    Moreover, the 3Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

101.    The 3Q16 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report.  Based on such evaluation, our [CEO] and [CFO] each concluded that, as of September 30, 2016, our disclosure controls and procedures were effective.

102.    The 3Q16 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

103.    During the Company's November 1, 2016 third quarter earnings call ("3Q16 Call"), Defendant Smith explained that the competition was the cause for a reduction in Brookdale's guidance:

> Good morning, and thanks for joining us.  As always, we appreciate your interest in Brookdale.  We're disappointed with our results for the quarter and with the fact that we have revised our guidance for the year.  While we made progress in occupancy, rate, cash generation and on a number of fronts, we misjudged the effect of new competition in certain of our markets and our results were lower than we expected.  Our management team and our Board are laser-focused on and acting with urgency to improve our operating results and to optimize our portfolio.

> *       *       *

> While we have achieved a number of milestones in our turnaround strategy, it is taking longer than we expected to generate our planned level of improvement.  As the second half of the year has unfolded, it has become increasingly clear that there have been several unfavorable developments in the competitive environment that have slowed our progress.  During the third quarter, we experienced the highest

– 34 –

amount of new competitors opening within 20 minutes of our communities than we have seen in many years. The number of openings in the quarter, since timing can be difficult to predict, exceeded our projections. Importantly, the market mix of new openings also changed. New openings in our larger metropolitan markets were consistent with recent averages, but new openings in our mid-sized markets were at the highest level in over a decade. For example, in the third quarter, using the markets defined by [National Investment Center] as secondary or additional markets, new competitor openings within 20 minutes of a Brookdale community were more than double the level that we saw last year. At the same time, the number of our communities that faced multiple competitor openings in these mid-sized markets impacted us more than we anticipated. Our occupancy in markets like the [National Investment Centers]'s secondary and additional markets, which represent more than 30% of our total units, only increased a little north of 10 basis points sequentially, which is well below our seasonal norms. We also did not get as much great rate growth in the quarter as we anticipated. In the markets with new competition, we were compelled to use more discounts and incentives to maintain occupancy. Although our same community revenue per unit increased 3.2%, it nevertheless fell short of our expectations, due to this increased use of incentives. Based on our history, we fully expect that these mid-sized markets will regain strength. New competition is generally an intermediate term headwind, and we are normally able to recorder within 12 months or so.

104.    As a result of increased competition adversely affecting Brookdale's bottom line,

there was a huge push towards bringing in new residents and increasing occupancy.

105.    Nonetheless, Defendant Smith represented on the 3Q16 Call that Brookdale

delivered a "great customer experience":

As we look to our near term outlook, we are disappointed that our progress, while still positive, is slower than we anticipated. However, we are confident that the initiatives that we have in place are taking us down the right path. The long-term opportunity is obvious. The need for seniors to use services like ours will only grow. We believe in our plan because, first, it delivers a great customer experience. **We are continuing and expanding our market segmentation efforts to create the right product for different customer needs.** We are continuing to differentiate the programming in our communities to better meet the marketplace. Second, we are simplifying and streamlining the business. As I just discussed, we are making good progress on our asset disposition program and in our efforts to exit or restructure leases. Again, we intend to aggressively pursue these opportunities as we move forward. We are also beginning to make headway on reducing our overhead as we previously committed. And third, our plan is to attract and retain the best talent. We are excited with the hiring of Cedric Coco as our new Chief People Officer. He comes with a background in large, diverse organizations. And he will enhance our capabilities to attract, retain and develop our organization's human resources. We are showing progress with the initiative to reduce associate

– 35 –

turnover. For example, health and wellness director turnover declined from the second quarter to the third quarter, based on some adjustments we have made around that posit ion. But we recognize the need to improve our performance even further and we remain confident that will do so.

106. Furthermore, Defendant Baier admitted that the Defendants were the ones working in SAS:

> *We are continuing to work on our service alignment labor model which help us make sure that we've got the right labor in the communities to match to the acuity of the residents' needs and that helps us offset some of the labor pressure, to make sure that you're matching labor appropriately to need*.

107. On February 15, 2017, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2016 on a Form 10-K (the "2016 10-K").

108. The 2016 10-K was signed by Baier, Smith, Bumstead, Clegg, Decker, Parrell, Petty, Seward, and Wielansky, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109. For the 2016 fiscal year, the Company reported a net loss of $404.4 million attributable to Company stockholders, or $2.18 per diluted share, on total revenue of $4.98 billion, compared to a net loss of $457.5 million attributable to Company stockholders, or $2.48 per diluted share, on total revenue of $4.96 billion for the prior year.

110. Regarding "Resident Fees" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $8.5 million, or (0.2%), compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year and a 130 basis point decrease in occupancy at the 876

– 36 –

communities we owned or leased during both full periods. The decrease in resident fees was partially offset by a 3.1% increase in RevPOR$^2$ at these communities compared to the prior year. Total RevPAR for the consolidated portfolio also increased by 3.0% compared to the prior year. The 81 communities disposed of subsequent to the beginning of the prior year generated $126.2 million of revenue during 2016 compared to $202.0 million of revenue in the prior year.

111. Regarding "Facility Operating Expense" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

Facility operating expense increased $10.5 million, or 0.4%, over the prior year primarily due to a $46.5 million increase in salaries and wages due to wage rate increases at the 876 communities we owned or leased during both full periods and $18.4 million of expense increases for our ancillary services in connection with higher home health and hospice average daily census. This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year and a $35.4 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The 81 communities disposed of subsequent to the beginning of the prior year, either through sales or lease terminations, incurred $99.6 million of facility operating expenses during 2016 compared to $164.5 million of facility operating expenses in the prior year.

112. Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

General and administrative expense decreased $57.2 million, or 15.4%, over the prior year primarily due to a $61.5 million decrease in integration, transaction-related and strategic project costs.

\*     \*     \*

This decrease was partially offset by an increase in salaries and wages due to wage rate increases.

---

$^2$ RevPOR or average monthly senior housing resident fee revenues per occupied unit, is defined by the Company as resident fee revenues, excluding the Company's health care services segment revenue and entrance fee amortization, for the corresponding portfolio for the period, divided by the weighted average number of occupied units in the corresponding portfolio for the period, divided by the number of months in the period.

113.    Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $14.3 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full years.

114.    Like the 2Q16 10-Q, the 2016 10-K also flaunted the Company's purportedly first-rate services and facilities, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of December 31, 2016, the Company had "the ability to serve approximately 103,000 residents." Further, the 2Q16 10-K stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]"

115.    Moreover, the 2Q16 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

116.    Regarding the Company's "Operations," the 2016 10-K stated:

> ***We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service.  We have centralized accounting, finance and other operating functions in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations.***  Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, energy and insurance, ***implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures.  We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and

– 38 –

accounting; *risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]*

117.    Regarding "Community Staffing and Training" the 2016 10-K stated, in relevant part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

118.    And further:

Depending upon the size of the community, each Executive Director is supported by a community staff member who is directly responsible for day-to-day care of the residents and either community staff or regional support to oversee the community's sales, marketing and community outreach programs.   Other key positions supporting each community may include individuals responsible for food service, healthcare services, therapy services, activities, housekeeping, and engineering.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

119.    Regarding "Quality Assurance" the 2016 10-K stated, in relevant part, the following:

*We maintain quality assurance programs at each of our communities through our corporate and regional staff.  Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide.  Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.* These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities; and compliance with government regulations.  Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.*

120.    In the "Risk Factors," section the 2016 10-K contained nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including

– 39 –

increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, [which] would have an adverse effect on [the Company's] business, results of operations and cash flow." The risk warnings contained in the 2016 10-K were broad catch-all clauses that were not designed to disclose the Company's known risks regarding the Misconduct.

121. Specifically, the 2016 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective

– 40 –

bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

122. The 2016 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of December 31, 2016, our disclosure controls and procedures were effective.

123. The 2016 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our [CEO] and [CFO], we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
> \*       \*       \*
>
> Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016. Management reviewed the results of their assessment with our Audit Committee.
>
> \*       \*       \*
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

– 41 –

124.    On May 8, 2017, Brookdale also held an investor conference call on May 9, 2017 to discuss the Company's first quarter 2017 financial results (the "1Q17 Call").  Defendants Baier and Smith participated on the call.

125.    During the 1Q17 Call, Defendant Smith similarly highlighted Brookdale's purported "high quality" care:

> Right.  Thank you, Dan.  As Dan mentioned, our management and [B]oard are focused on maximizing shareholder value.  While we are exploring the options and alternatives available to us, we are also fully committed to driving the operational improvements in our business that will increase shareholder value, **while also providing high-quality care to our residents** and strong opportunities for our associates.
>
> *       *       *
>
> And finally, we continue our portfolio-optimization work to dispose of communities that aren't consistent with our strategy or our return expectations.  **Our goal is to have a portfolio that will enrich the lives of our residents** while providing strong long-term returns for our shareholders.

126.    On May 10, 2017, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "1Q17 10-Q").

127.    The 1Q17 10-Q was signed by Baier and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

128.    For the quarter, Brookdale reported net loss of $126.3 million attributable to Company stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion, compared to a net loss of approximately $48.78 million attributable to Company stockholders, or $0.26 per diluted share, on total revenue of approximately $1.26 billion for the same quarter in the prior year.

– 42 –

129.     Regarding "Resident Fees" for the third fiscal quarter, the 1Q17 10-Q also reported,

in relevant part, that:

> Resident fee revenue decreased $44.2 million, or 4.2%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period.    Weighted average occupancy decreased 100 basis points at the 816 communities we owned or leased during both full periods.     Additionally, Brookdale Ancillary Services segment revenue decreased $10.2 million, or 8.4%, primarily due to a decrease in outpatient therapy service volume.  The 59 communities disposed of subsequent to the beginning of the prior year period (excluding the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $0.7 million of revenue during the current year period compared to $43.5 million of revenue in the prior year period.  The decrease in resident fee revenue was partially offset by a 2.0% increase in RevPOR at the 816 communities we owned or operated during both full periods compared to the prior year period.  Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period.  Resident fee revenue for the three months ended March 31, 2017 includes $64.0 million of revenue for the 62 communities acquired by the Blackstone Venture.

130.     Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q17 10-Q

also reported, in relevant part, that:

> Facility operating expense decreased $41.4 million, or 5.8%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 59 communities since the beginning of the prior year period, which incurred $1.3 million of facility operating expenses during the three months ended March 31, 2017 compared to $33.8 million of facility operating expenses in the three months ended March 31, 2016.  Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $11.3 million, or 10.5%, primarily due to a decrease in outpatient therapy services volume.

131.     Regarding "General and Administrative Expense" for the first fiscal quarter, the

1Q17 10-Q also reported, in relevant part, that:

> General and administrative expense decreased $27.1 million, or 29.2%, over the prior year period primarily due to a $19.0 million decrease in integration, transaction-related and strategic project costs.  Integration, transaction-related and strategic project costs were $0.2 million during the current period compared to $19.1 million in the prior year period.  Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and

– 43 –

synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended March 31, 2017.

132.    Regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that "[c]osts incurred on behalf of managed communities decreased $1.3 million, or 0.7%, primarily due to terminations of management agreements subsequent to the beginning of the prior year period."

133.    The 1Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 103,000 residents."

134.    Further, the 1Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]"

135.    Moreover, the 1Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

– 44 –

136.    The "Risk Factors" section of the 1Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

137.    The 1Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of March 31, 2017, our disclosure controls and procedures were effective.

138.    The 1Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

139.    On August 8, 2017, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2017 on Form 10-Q (the "2Q17 10-Q").

140.    The 2Q17 10-Q was signed by Baier and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

141.    For the quarter, Brookdale reported net loss of $46.29 million attributable to Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion, compared to a net loss of approximately $35.45 million attributable to Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion for the same quarter in the prior year.

– 45 –

142.    With respect to "Resident Fees" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $120.5 million, or 11.4%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 150 basis points at the 818 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $13.1 million, or 10.7%, primarily due to decreases in volume for outpatient therapy services and home health services. The 130 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $6.3 million of revenue during the current year period compared to $116.2 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.8% increase in RevPOR at the 818 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period.

143.    With respect to "Facility Operating Expense" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $50.7 million, or 7.3%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 130 communities since the beginning of the prior year period, which incurred $7.5 million of facility operating expenses during the three months ended June 30, 2017 compared to $88.5 million of facility operating expenses in the three months ended June 30, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $7.2 million, or 6.9%, primarily due to decreases in volume for outpatient therapy services and home health services. These decreases were partially offset by an $11.3 million increase in insurance expense related to positive changes in the three months ended June 30, 2016 to estimates in general liability and professional liability and workers compensation expenses and an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods.

144.    Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

> General and administrative expense decreased $23.6 million, or 26.0%, over the prior year period primarily due to a $16.1 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and

– 46 –

strategic project costs were $0.6 million during the current period compared to $16.7 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended June 30, 2017.

145.    With respect to "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that "[c]osts incurred on behalf of managed communities increased $43.9 million, or 23.6%, primarily due to our entry into management agreements with the Blackstone Venture."

146.    The 2Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2017, the Company had "the ability to serve approximately 102,000 residents."

147.    Further, the 2Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]"

– 47 –

148. Moreover, the 2Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

149. The "Risk Factors" section of the 2Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

150. The 2Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of June 30, 2017, our disclosure controls and procedures were effective.

151. The 2Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

152. On November 7, 2017, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2017 on Form 10-Q (the "3Q17 10-Q").

153. The 3Q17 10-Q was signed by Baier and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

154. For the quarter, Brookdale reported net loss of $413.89 million attributable to Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion, compared to a net loss of approximately $51.69 million attributable to Company stockholders, or

– 48 –

$0.28 per diluted share, on total revenue of approximately $1.25 billion for the same quarter in the prior year.

155.    With respect to "Resident Fees" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $119.9 million, or 11.5%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 160 basis points at the 809 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $6.7 million, or 5.7%, primarily due to a decrease in volume for outpatient therapy services and a decrease in reimbursement rates for home health services. The 136 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $4.0 million of revenue during the current year period compared to $115.1 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.4% increase in RevPOR at the 809 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 1.1% compared to the prior year period.

156.    Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $53.6 million, or 7.6%, over the prior year period. For the three months ended September 30, 2017, facility operating expense includes $5.3 million of costs related to our response to Hurricanes Harvey and Irma. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 136 communities since the beginning of the prior year period, which incurred $3.3 million of facility operating expenses during the current year period compared to $87.4 million of facility operating expenses in the prior year period. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $1.9 million, or 1.8%, primarily due to a decrease in volume for outpatient therapy services. These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods and an $8.1 million increase in insurance expense related to positive changes in the three months ended September 30, 2016 to estimates in general liability and professional liability and workers compensation expenses.

– 49 –

157. With respect to "General and Administrative Expense" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

> General and administrative expense increased $0.4 million, or 0.6%, over the prior year period primarily due to increased legal fees. This increase was partially offset by a $5.6 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.8 million during the current period compared to $6.4 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale.

158. With respect to "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that "[c]osts incurred on behalf of managed communities increased $49.2 million, or 26.2%, primarily due to our entry into management agreements with the Blackstone Venture."

159. The 3Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2017, the Company had "the ability to serve approximately 101,000 residents."

160. Further, the 3Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a

– 50 –

supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]"

161. Moreover, the 3Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

162. The "Risk Factors" section of the 3Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

163. The 3Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of September 30, 2017, our disclosure controls and procedures were effective.

164. The 3Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

165. On February 22, 2018, Brookdale filed a Form 8K with the SEC, attaching as an exhibit a press release dated February 22, 2018 ("February 22, 2018 Press Release") as well as a presentation with "Supplemental Information" ("4Q17 Presentation").

166. In connection with the February 22, 2018 Press Release, Brookdale held an investor conference call on February 22, 2018 to discuss the Company's fourth quarter and full year 2018 financial results (the "4Q17 Call"). Defendant Baier participated on the call as CFO and falsely

– 51 –

reiterated Brookdale's purported focus on high quality care and investment in retaining associates, adding that Brookdale was focusing on its residents by giving local executive directors more control over decisions when, in fact, executive directors had no control over the most important decisions such as the budget and staffing:

> Let me turn to the operations next. Our operating focus will be based on 3 tenets: first, **attract, engage, develop and retain the best associates**. Second, **our resident and family trust and endorsement by providing valued, high quality care and personalized service**, which in turn leaves us to our third tenet, which is to drive attractive long-term returns for our shareholders. We plan to return to our strong foundation, while we will differentiate ourselves based on caring associates who create passionate advocates and generate referrals. It's about winning locally while leveraging our industry-leading scale and experience.
>
> **On the surface, you may not see this as a big change from what we said in the past, but the reality is, our focus is very different. We will make decisions closer to our customers by empowering our executive directors with more local decision rights.** We are also changing how we allocate our resources. This is about improving our ability to operate by narrowing our focus. You can't be the best of anything when you're trying to do everything. But we will stop trying to do so much and we will eliminate anything that distracts us from our mission. **We will make sure that our associates are able to focus only on what matters most, our residents.**
>
> \*     \*     \*
>
> **Second, our strategy improved our focus on our residents and patients. Our unwavering commitment is to our customers. We will continue our work on enhancing our customer value proposition, differentiating based on quality, choice, personalized services and associates who care.** We will raise Brookdale's profile on a local level with potential customers and their adult children. We will concentrate on customer satisfaction because we know through improving [n]et [p]romoter [s]core, work that delighted our residents, correlates with higher performance. We've identified the need to change our sales and marketing national versus local mix and intend to implement other changes we've identified to improve our performance. For example, we have initiatives to improve our lead management, pursuing the most productive channels, improving our initial response and follow up on those leads and marketing in a local targeted manner. At the same time, we are discontinuing well-meaning initiatives that distract from the things that matter most.

– 52 –

167.    Also on February 22, 2018, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2017 on a Form 10-K (the "2017 10-K").

168.    The 2017 10-K was signed by Baier, Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Seward, and Wielansky, and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

169.    For the 2017 fiscal year, the Company reported a net loss of $571.4 million attributable to Company stockholders, or $3.07 per diluted share, on total revenue of $4.75 billion, compared to a net loss of $404.4 million attributable to Company stockholders, or $2.18 per diluted share, on total revenue of $4.98 billion for the prior year.

170.    With regard to "Resident Fees" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $388.5 million, or 9.3%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year.  Weighted average occupancy decreased 130 basis points at the 766 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets.

> \*        \*        \*

> The 165 communities disposed of subsequent to the beginning of the prior year (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $172.6 million of revenue during the current year period compared to $543.3 million of revenue in the prior year period.  The decrease in resident fee revenue was partially offset by a 2.5% increase in RevPOR. Total RevPAR for the consolidated portfolio also increased by 1.6% compared to the prior year.

– 53 –

171.    With respect to "Facility Operating Expense" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

Facility operating expense decreased $197.2 million, or 7.0%, over the prior year.

*       *       *

The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 165 communities since the beginning of the prior year period, which incurred $135.0 million of facility operating expenses during the current year compared to $413.1 million of facility operating expenses in the prior year.

*       *       *

These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full years and a $23.3 million increase in insurance expense related to positive changes in the prior year to estimates in general liability and professional liability and workers compensation expenses.

172.    Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

General and administrative expense decreased $58.0 million, or 18.5%, over the prior year primarily due to a $47.4 million decrease in integration, transaction-related and strategic project costs.

*       *       *

Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out projects) and reducing costs and achieving synergies by capitalizing on scale.  Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expenses in the current year.

173.    With regard to the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that "[c]osts incurred on behalf of managed communities increased $153.5 million, or 20.8%, primarily due to our entry into management agreements with the Blackstone Venture."

– 54 –

174.     Like the 2Q16 10-Q and the 2016 10-K, the 2017 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of December 31, 2017, the Company had "the ability to serve approximately 101,000 residents."

175.     Further, the 2Q17 10-K stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]"

176.     Moreover, the 2Q17 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

177.     Regarding the Company's "Operations," the 2017 10-K stated:

*We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service*.  Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections*.   Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, supplies and insurance, *implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures.  We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations*; billing and collections; accounts payable; finance and accounting; *risk management; development of employee training materials and programs*; marketing activities; *the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]*

178.     Regarding "Community Staffing and Training" the 2017 10-K stated, in relevant part, the following:

– 55 –

Each community has an [e]xecutive [d]irector responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

*       *       *

Depending upon the size of the community, each [e]xecutive [d]irector is supported by a community staff member (health and wellness director or nursing director) who is directly responsible for day-to-day care of residents and community marketing and sales staff with regional support to oversee the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

179.    Regarding "Quality Assurance" the 2017 10-K stated, in relevant part, the following:

> ***We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.*** These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; ***quality of resident care*** (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.***

180.    In the "Risk Factors," section the 2017 10-K contained nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, could have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2017 10-K were generic catch-all clauses that were not tailored to reveal the known risks related to the misconduct detailed herein.

– 56 –

181. Specifically, the 2017 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

– 57 –

182.     The 2017 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of December 31, 2017, our disclosure controls and procedures were effective.

183.     The 2017 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our [CEO] and [CFO], we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
> *     *     *
>
> Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2017. Management reviewed the results of their assessment with our Audit Committee.
>
> *     *     *
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

184.     On May 8, 2018, Brookdale held an investor conference call to discuss the Company's first quarter 2018 financial results (the "1Q18 Call"). Defendant Baier participated on the call as well as Teresa Sparks ("Sparks"), Brookdale' interim CFO.

185.     During the 1Q18 Call, Defendant Baier reiterated that executive directors were "empowered" with local decision making:

– 58 –

I'll now turn to some drivers to reduce controllable move outs. Our goal is to make decisions as close to the customer as we can, while capturing the benefits of scale. **Our operations leadership team is empowering our [e]xecutive [d]irectors with more local decision [rights] so that they can take care of the community as if they owned it. For example, they're reallocating resources during low-contact time periods to look at ways to enhance our facility's focus. I'm committed to spending time in our communities every month to ensure that our communities have what they need to succeed. During my visits, I've seen evidence** that out culture of winning locally is starting to be revitalized with a focus on differentiating Brookdale, **based on caring, quality, personalized service to our residents**. The Brookdale team is actively pursuing all 3 of our strategic priorities. So let me provide the highlights for the third priority, our shareholders.

186.    Defendant Baier further emphasized Brookdale's purported focus on quality care

during the 1Q18 Call, stating:

> Turning to our second strategic priority. **We believe that providing quality care to our residents will improve RevPAR.[3]** As covered widely by the media, this was an extremely difficult flu season, especially for more frail seniors. While you can't directly correlate to flu specific deaths, in the first quarter 2018, death rates were up compared to a more normal flu season. Teresa will provide more details in the financial section.
>
> **Taking care of our residents is paramount. Because Brookdale is the leader, we have robust and industry-leading protocols to appropriately protect our residents.** This includes infection control processes, vaccination programs, containment of illnesses when they occur and temporarily stopping visits and new move-ins if there is a concern in a community. Our teams work diligently to maintain [inaudible] during this time and went out to future resident homes to do the initial assessment. This is an example of how we focus on what we control, which leads me to our sales and marketing efforts.

187.    During the 1Q18 Call, Defendant Baier again reiterated Brookdale's focus to retain

staff and provide high quality and personalized care:

> I've now been in the CEO seat for just over 2 months and want you to know that our strategy is consistent with what I announced in late February. Our top priority remains the operational turnaround based on 3 strategic priorities: First, attract, engage, develop and retain the best associates; **second, earn resident and family**

---

[3] RevPAR or average monthly senior housing resident fee revenues per available unit, is defined by the Company as resident fee revenues, excluding the Company's health care services segment revenue and entrance fee amortization, for the corresponding portfolio for the period, divided by the weighted average number of available units in the corresponding portfolio for the period, divided by the number of months in the period.

– 59 –

**trust and endorsement by providing valued, high-quality care and personalized service**, which, in turn, will lead us to our third priority, to drive attractive, long-term returns for our shareholders.

188.   On May 8, 2018, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2018 on Form 10-Q (the "1Q18 10-Q").

189.   The 1Q18 10-Q was signed by Baier and contained SOX certifications signed by Baier and Sparks attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

190.   For the quarter, Brookdale reported net loss of $457.19 million attributable to Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion, compared to a net loss of approximately $126.30 million attributable to Company stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion for the same quarter in the prior year.

191.   Regarding "Resident Fees" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $110.7 million, or 10.9%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period.  Weighted average occupancy decreased 130 basis points at the 769 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets.  Additionally, Brookdale Ancillary Services segment revenue decreased $1.5 million, or 1.3%, primarily due to a decline in volume for home health visits. The 111 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $2.2 million of revenue during the current year period compared to $107.6 million of revenue in the prior year period.  The decrease in resident fee revenue was partially offset by a 1.0% increase in RevPOR at the 769 communities we owned or operated during both full periods compared to the prior year period.  Total RevPAR for the consolidated portfolio also increased by 2.8% compared to the prior year period.

– 60 –

192. Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $42.2 million, or 6.3%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 111 communities since the beginning of the prior year period, which incurred $2.1 million of facility operating expenses during the current year period compared to $81.0 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in employee compensation costs at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. Additionally, insurance expense increased related to positive changes in the prior year period to estimates in general liability and professional liability and workers compensation expenses. Additionally, Brookdale Ancillary Services segment facility operating expenses increased $5.9 million, or 6.1%, primarily due to an increase in salaries and wages for the expansion of our hospice services.

193. With respect to "General and Administrative Expense" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> General and administrative expense increased $11.2 million, or 17.0%, over the prior year period primarily due to increased costs associated with organizational restructuring, including severance and retention costs related to our efforts to reduce general and administrative expense and senior leadership changes. During the current year period, general and administrative expense included severance costs and retention costs of $10.7 million and $1.7 million, respectively.

194. Regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that "[c]osts incurred on behalf of managed communities increased $78.3 million, or 42.6%, primarily due to our entry into management agreements with the Blackstone Venture."

195. The 1Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for

– 61 –

residents" and that as of March 31, 2018, the Company had "the ability to serve approximately 99,000 residents."

196.     Further, the 1Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]"

197.     Moreover, the 1Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

198.     The "Risk Factors" section of the 1Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

199.     The 1Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report.  Based on such evaluation, our [CEO] and [CFO] each concluded that, as of March 31, 2018, our disclosure controls and procedures were effective.

200.     The 1Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

201.     On May 16, 2018, Defendant Baier presented at the Bank of America Merrill Lynch 2018 Healthcare Conference ("2018 BofA Presentation").  Defendant Baier once again

emphasized Brookdale's purported focus on providing high-quality care and the best service to

residents:

> **We're very pleased to be the largest senior living provider in the U.S., and we have a mission that is all around serving seniors.** So it's a fabulous business to be a part of. Our objective is to be the nation's first choice in senior living. **That's about providing the best service for seniors to help them live the best lives possible**, and we have recently made a pivot in our strategy.

*    *    *

> Our intention is to win based on having the best team in the business. **So our first strategic priority is about attracting, engaging, retaining and developing the best team in the industry.** That matters because this is a relationship driven business. When we have the best people in the industry, it results in the best results in the industry. **The second part of the plan is around earning resident and family trust and endorsements by providing valued high-quality care.** Now trust is really important when you're dealing with seniors. The best seniors refer their friends, which is good for occupancy and also good for our investors. That brings us to the third leg of our strategy to take action to provide attractive long-term returns to our shareholders, and we'll talk about that in just a minute.

202.    Defendant Baier also stated at the 2018 BofA Presentation:

> Our focus is on trying to lock out teams down to make sure that they are paid appropriately, **to make sure that we remove any barriers to them doing their jobs** and that they are very engaged with us. Now that's not to say that somebody won't be attracted to a brand new-shiny building and a really high, above-market pay package, but we are doing everything we can to protect our people.

203.    On June 5, 2018, Defendant Baier presented at the Jefferies 2018 Global Healthcare

Conference ("2018 Jefferies Presentation"). At the 2018 Jefferies Presentation, Defendant Baier

stated:

> But what we're really excited about is the fact that we've been able to energize our local teams, our executive directors, our [h]ealth & [w]ellness directors, our sales directors and to win locally. So we've told our CEO - - our EDs that they are the CEO of their own community. And what that allows them to do is to win in an ultra-local business while capitalizing on the benefits that Brookdale has. **Some of the scale that we have allows them to have best-in-class programming for memory care.** It allows them to buy food cheaper, **it allows them to take care of their residents better, because we can take all of the learning of our company and get the best outcomes for our seniors.**

– 63 –

204.     On August 7, 2018, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2018 on Form 10-Q (the "2Q18 10-Q").

205.     The 2Q18 10-Q was signed by Baier and contained SOX certifications signed by Baier and Sparks attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

206.     For the quarter, Brookdale reported net loss of $165.49 million attributable to Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion, compared to a net loss of approximately $46.29 million attributable to Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion for the same quarter in the prior year.

207.     Regarding "Resident Fees" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $38.1 million, or 4.1%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 94 communities, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 758 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. The communities disposed of subsequent to the beginning of the prior year period generated $50.0 million of revenue during the current year period compared to $94.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 0.9% increase in RevPOR at the 758 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.5% compared to the prior year period.

208.     With respect to "Facility Operating Expense" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $15.3 million, or 2.4%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 94 communities since the beginning of the prior year period, which incurred $31.8 million of facility

– 64 –

operating expenses during the current year period compared to $68.7 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period.

209. Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that "[g]eneral and administrative expense decreased $6.8 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year."

210. With regard to "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $12.2 million, or 5.3%, primarily due primarily due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.3 million for the three months ended June 30, 2018, respectively.

211. The 2Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of June 30, 2018, the Company had "the ability to serve approximately 95,000 residents."

212. Further, the 2Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]"

– 65 –

213. Moreover, the 2Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

214. The "Risk Factors" section of the 2Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

215. The 2Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of June 30, 2018, our disclosure controls and procedures were effective.

216. The 2Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

217. On August 7, 2018, Brookdale held an investor conference call to discuss the Company's second quarter 2018 financial results (the "2Q18 Call"). Defendant Baier and Sparks participated on the call.

218. Defendant Baier reiterated during the 2Q18 Call that Brookdale's focus on quality care:

> Now let's turn to discuss the progress we're making to turn around our business by winning locally. Let me remind you of our 3 strategic priorities: First, attract and retain the best associates; **second, earn resident and family trust by delivering high-quality care and service** to create Brookdale advocates and generate future referrals; and third, drive attractive long-term returns for our shareholders.

– 66 –

Let me state with our associates' priority. **The top 3 leaders in each community set the standard for the rest of their teams to provide the best service to residents** and win locally. Therefore, it is critical that we have the field teams supporting and coaching the top leaders in our communities. At the beginning of the second quarter, we reduced the number of regions and improved the span of control. By the beginning of June, we had also completed the vertical realignment of our sales organization so community-level sales associates now report to sales leadership. In June, our contact center implemented extended hours and now operate 7 days a week.

219. On September 17, 2018, Brookdale filed a presentation with the SEC titled "Investor Update September 2018" ("September 2018 Presentation"). The September 2018 Presentation similarly claimed that Brookdale's "Mission" was purportedly "*[e]nriching the lives of those we serve with compassion, respect, excellence and integrity*." The presentation stated the Company's "Strategy" was "*[w]in [l]ocally by providing choices for high quality care & personalized service by caring associates while leveraging industry leading scale and experience*." The "Plan" included "*[e]arn resident and family trust and endorsements by providing valued high quality care and personalized service.*"

220. On November 6, 2018, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2018 on Form 10-Q (the "3Q18 10-Q").

221. The 3Q18 10-Q was signed by Swain and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

222. For the quarter, Brookdale reported net loss of $37.12 million attributable to Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion, compared to a net loss of approximately $413.89 million attributable to Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion for the same quarter in the prior year.

– 67 –

223. Regarding "Resident Fees" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $82.7 million, or 9.0%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 104 communities, since the beginning of the prior year period, which generated $15.0 million of revenue during the current year period compared to $106.9 million of revenue in the prior year period. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. Weighted average occupancy decreased 90 basis points at the 714 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. RevPAR and RevPOR at the 714 communities we owned or leased during both full periods increased by 0.2% and 1.3%, respectively. Total RevPAR for the consolidated portfolio also increased by 4.0% compared to the prior year period primarily due to fewer weighted average units.

224. With respect to "Facility Operating Expense" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $43.6 million, or 6.7%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 104 communities since the beginning of the prior year period, which incurred $11.2 million of facility operating expense during the current year period compared to $75.6 million of facility operating expense in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. We expect that our labor investments will continue into 2019. Facility operating expense included costs related to our responses to hurricanes of $1.5 million in the current year period and $5.4 million in the prior year period.

225. With respect to "General and Administrative Expense" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

> General and administrative expense decreased $6.5 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year. During the current year period, general and administrative expense included retention costs of $1.6 million.

226. Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

– 68 –

Costs incurred on behalf of managed communities increased $24.4 million, or 10.3%, primarily due to our entry into interim management agreements with HCP and Welltower for communities for which our leases were terminated subsequent to the prior year period. Additionally, costs incurred on behalf of managed communities increased due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.2 million for the three months ended September 30, 2018.

227. The 3Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of September 30, 2018, the Company had "the ability to serve approximately 93,000 residents."

228. Further, the 3Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]"

229. Moreover, the 3Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

230. The "Risk Factors" section of the 3Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

231. The 3Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and

– 69 –

procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of September 30, 2018, our disclosure controls and procedures were effective.

232. The 3Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

233. Brookdale also held an investor conference call on November 6, 2018 to discuss the Company's third quarter 2018 financial results (the "3Q18 Call"). Defendants Baier and Swain participated on the call. During the 3Q18 Call, Defendant Baier similarly focused on the purported high-quality service delivered:

Brookdale's top priority is the turnaround strategy to drive operational improvement. I will now share the progress were making to turn around our business by winning locally. Let me remind you of our 3 strategic priorities: to write attractive long-term returns to our shareholders; **by attracting and retaining the best associates; and earning resident and family trust by delivering high-quality care and services**, which creates Brookdale advocates and generates future resident referrals.

\*      \*      \*

**We are a company providing health care and services, so that our country's seniors, possibly your mom or dad, can live the best life that is possible for them.** We are a company that believes in the balance of mission and margin, and I imagine, if you are an investor, that you also believe in both.

234. On February 14, 2019, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2018 on a Form 10-K (the "2018 10-K").

235.     The 2018 10-K was signed by Baier, Swain, Bromley, Bumstead, Clegg, Johnson-Mills, Seward, Warren, and Wielansky, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

236.     For the 2017 fiscal year, the Company reported a net loss of $528.3 million attributable to Company stockholders, or $2.82 per diluted share, on total revenue of $4.53 billion, compared to a net loss of $571.4 million attributable to Company stockholders, or $3.07 per diluted share, on total revenue of $4.75 billion for the prior year.

237.     Regarding "Resident Fees" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $330.9 million, or 8.8%, compared to the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year[.]
>
> *     *     *
>
> The decrease was partially offset by $32.3 million of revenue for four communities acquired during 2018.  The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period.  RevPOR at the 664 communities we owned or leased during both full years increased by 1.2%.  Weighted average occupancy decreased 90 basis points at the 664 communities we owned or leased during both full years, which reflects the impact of new competition in our markets. RevPOR increased at communities that we owned or leased during both full years primarily as a result of in-place rent increases and lower discounting.

238.     With respect to "Facility Operating Expense" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

> Facility operating expense decreased $148.8 million, or 5.7%, over the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year, which incurred $207.8 million of facility operating expense during 2018 compared to $453.4 million of facility operating expense in the prior year.  The decrease was partially offset by an increase

– 71 –

in labor expense at the communities we operated during both full years and by $17.9 million of facility operating expense for four communities acquired during 2018.

*       *       *

Facility operating expense at the 664 communities we operated during both full years increased 4.6%, over the prior year, reflecting the impact of our investment in salaries and benefits and a tight labor market during 2018. We expect that our labor investments will continue into 2019. Additionally, costs for information technology systems and insurance expenses increased at the communities we operated during both full years.

239. With regard to the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

General and administrative expense decreased $5.0 million, or 1.9%, over the prior year primarily due to a decrease in salaries and wages expense as a result of a reduction in our corporate associate headcount pursuant to the initiative to scale our general and administrative costs in connection with our portfolio optimization strategy. General and administrative expense included severance costs and retention costs of $12.3 million and $6.5 million, respectively, in 2018.

240. Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $119.1 million, or 13.4%, primarily due to our entry into management agreements with the Blackstone Venture and the transition of communities previously leased from HCP and Welltower into the management services segment on an interim basis. Additionally, costs incurred on behalf of managed communities increased as a result of increases in salaries and wages and other facility operating expense at the communities managed in both full years and due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to each of revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $46.1 million for 2018.

241. Like the Company's previous quarterly and annual reports referenced above, the 2018 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, " [t]he Company is committed to providing senior living solutions primarily

– 72 –

within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of December 31, 2018, the Company had "the ability to serve approximately 84,000 residents."

242. Further, the 2018 10-K stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living ("ADL") such as eating, bathing, dressing, toileting and transferring/walking[.]"

243. Moreover, the 2018 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

244. With respect to the Company's "Operations," the 2018 10-K stated:

> **We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service.** Further, we believe our centralized support infrastructure allows our community-based leaders and personnel **to focus on resident care and family connections**.
>
> We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement. **We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations**; billing and collections; accounts payable; finance and accounting; risk management; **development of employee training materials and programs**; marketing activities; **the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]**

245. Regarding "Community Staffing and Training" the 2018 10-K stated, in relevant part, the following:

– 73 –

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

*    *    *

Depending upon the size of the community, each Executive Director is supported by key leaders, a [h]ealth and [w]ellness [d]irector (or nursing director) and/or a [s]ales [d]irector. The [h]ealth and [w]ellness [d]irector or nursing director is directly responsible for day-to-day care of residents. The [s]ales [d]irector oversees the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

246.    With respect to "Quality Assurance" the 2018 10-K stated, in relevant part, the following:

> ***We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.*** These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; ***quality of resident care*** (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.***

247.    In the "Risk Factors," section the 2018 10-K contained generic, hypothetical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, and wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2018 10-

– 74 –

K were generic catch-all clauses that were not crafted to divulge the Company's known risks related to the misconduct.

248.    Specifically, the 2018 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists or other personnel, low levels of unemployment, or general inflationary pressures may have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the proposed increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its]

staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

249. The 2018 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of December 31, 2018, our disclosure controls and procedures were effective.

250. The 2018 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our [CEO] and [CFO], we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
> *        *        *
>
> Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2018. Management reviewed the results of their assessment with our Audit Committee.
>
> *        *        *
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

251. The 2018 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2018 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

– 76 –

Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

252.    On March 13, 2019 Defendant Swain presented at the Barclays Global Healthcare Conference ("2019 Barclays Presentation").  Defendant Swain repeated, "*[e]arn the family and the residence trust* and win locally and effectively use our scale."

253.    On May 7, 2019, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2019 on Form 10-Q (the "1Q19 10-Q").

254.    The 1Q19 10-Q was signed by Swain and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

255.    For the quarter, Brookdale reported net loss of $42.60 million attributable to Company stockholders, or $0.23 per diluted share, on total revenue of approximately $1.04 billion, compared to a net loss of approximately $457.19 million attributable to Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion for the same quarter in the prior year.

256.    Regarding "Resident Fees" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 118 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which had $119.9 million less in resident fees during the three months ended March 31, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.6% increase in same community RevPAR at the 658 communities we owned or leased during both full periods, comprised of a 3.1% increase in same community RevPOR and a 120 basis point decrease in same community weighted average occupancy.  Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $48.4 million primarily due

– 77 –

to terminations of management agreements subsequent to the beginning of the prior year period.

257. With respect to "Facility Operating Expense" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which had $80.7 million less in facility operating expense during the three months ended March 31, 2019 compared to the prior year period. The decrease was partially offset by a 4.4% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from wage rate increases.

258. Regarding "General and Administrative Expense" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a decrease in organizational restructuring costs and salaries and wages expense as a result of a reduction in our corporate associate headcount since the beginning of the prior year period as we scaled our general and administrative costs in connection with community dispositions. Transaction and organizational restructuring costs decreased $16.7 million compared to the prior period, to $0.5 million for the three months ended March 31, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs.

259. With regard to "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that "[t]he decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period."

260. The 1Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for

– 78 –

residents" and that as of March 31, 2019, the Company had "the ability to serve approximately 80,000 residents."

261.    Further, the 1Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]"

262.    Moreover, the 1Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

263.    The "Risk Factors" section of the 1Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

264.    The 1Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report.  Based on such evaluation, our [CEO] and [CFO] each concluded that, as of March 31, 2019, our disclosure controls and procedures were effective.

265.    The 1Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> During the quarter ended March 31, 2019, the Company adopted the new lease standard (ASC 842).  The Company updated its lease policies and implemented new processes, which changed the Company's internal controls over financial reporting for leases and related disclosures for our current period reporting.  There were no other changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

– 79 –

266.     On August 5, 2019, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2019 on Form 10-Q (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Swain and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

267.     For the quarter, Brookdale reported net loss of $55.47 million attributable to Company stockholders, or $0.30 per diluted share, on total revenue of approximately $1.02 billion, compared to a net loss of approximately $165.49 million attributable to Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion for the same quarter in the prior year.

268.     Regarding "Resident Fees" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 124 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $117.4 million less in resident fees during the three months ended June 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.9% increase in same community RevPAR at the 650 communities we owned or leased during both full periods, comprised of a 3.3% increase in same community RevPOR and a 110 basis points decrease in same community weighted average occupancy.  Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $41.6 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

269.     With respect to "Facility Operating Expense" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

> The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which resulted in $80.2 million less in facility operating expense during the three months ended June 30, 2019 compared to the prior year period.  The decrease was partially offset by a 5.5% increase in same community facility operating expense, which was

primarily due to an increase in labor expense attributable to wage rate increases and increased use of overtime.

270.     With respect to "General and Administrative Expense" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

> The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs. Transaction and organizational restructuring costs decreased $4.4 million compared to the prior period, to $0.6 million for the three months ended June 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the remainder of 2019 we expect to incur additional transaction costs related to stockholder relations advisory matters.

271.     Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that "[t]he decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period."

272.     The 2Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of June 30, 2019, the Company had "the ability to serve approximately 77,000 residents."

273.     Further, the 2Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]"

– 81 –

274.     Moreover, the 2Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

275.     The "Risk Factors" section of the 2Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

276.     The 2Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report.  Based on such evaluation, our [CEO] and [CFO] each concluded that, as of June 30, 2019, our disclosure controls and procedures were effective.

277.     The 2Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

278.     Brookdale also held an investor conference call on August 6, 2019 to discuss the Company's second quarter 2019 financial results (the "2Q19 Call").  Defendants Baier and Swain participated on the call.

279.     During the 2Q19 Call, Defendant Baier once again emphasized Brookdale's purported "high-quality care," adding that such care was performed by "a talented team" that Brookdale "focus[ed] on retaining":

> At Brookdale, there is simply no substitute for great people who genuinely care, do the right thing and **serve our residents and patients with high-quality care**.  Our associates do extraordinary things every single day.  That is why the foundation of our strategy is to win locally, which relies on having a talented team of associates **dedicated to providing high-quality care and services to our residents and**

– 82 –

**patients**.  We're pleased that we continue to see positive associate metrics showing our strategy is working as **we focus first on retaining our high-quality group of associates.**

280.    On November 5, 2019, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2019 on Form 10-Q (the "3Q19 10-Q").

281.    The 3Q19 10-Q was signed by Swain and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

282.    For the quarter, Brookdale reported net loss of $78.46 million attributable to Company stockholders, or $0.42 per diluted share, on total revenue of approximately $1.01 billion, compared to a net loss of approximately $37.12 million attributable to Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion for the same quarter in the prior year.

283.    Regarding "Resident Fees" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 77 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $63.9 million less in resident fees during the three months ended September 30, 2019 compared to the prior year period.  The decrease in resident fees was partially offset by a 1.8% increase in same community RevPAR, comprised of a 2.8% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy.  Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $72.2 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

284.    With respect to "Facility Operating Expense" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

– 83 –

The increase in facility operating expense was primarily attributable to a 7.0% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases, an increase in employee benefit expense, and an increase in advertising, property remediation, and insurance costs during the period. The increase was partially offset by the disposition of communities since the beginning of the prior year period, which resulted in $47.5 million less in facility operating expense during the three months ended September 30, 2019 compared to the prior year period.

285.    Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a reduction in our corporate headcount, as we scaled our general and administrative costs in connection with community dispositions. The decrease was partially offset by a $0.7 million increase in transactional and organizational restructuring costs compared to the prior period, to $3.9 million for the three months ended September 30, 2019. The increase was due to $3.4 of transaction costs related to stockholder relations advisory matters incurred during the three months ended September 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the full year 2019, we expect transaction costs related to stockholder relations advisory matters to be approximately $5.5 million, of which $3.4 million was incurred for the three months ended September 30, 2019.

286.    With regard to "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that "[t]he decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period."

287.    The 3Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for

– 84 –

residents" and that as of September 30, 2019, the Company had "the ability to serve approximately 75,000 residents."

288.    Further, the 3Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]"

289.    Moreover, the 3Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

290.    The "Risk Factors" section of the 3Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

291.    The 3Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report.  Based on such evaluation, our [CEO] and [CFO] each concluded that, as of September 30, 2019, our disclosure controls and procedures were effective.

292.    The 3Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended September 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

293.    Brookdale's financial and operating results for the 3Q19 10-Q ended September 30, 2019.  Brookdale also held an investor conference call on November 5, 2019 to discuss the

– 85 –

Company's third quarter 2019 financial results (the "3Q19 Call"). Defendants Baier and Swain participated on the call. During the 3Q19 Call, in reply to a question from an analyst related to "wage pressures," Defendant Baier responded, in pertinent part:

> Now, turning to your first question, what are we doing to deal with the wage pressure, probably the first and most important thing is a true focus on controlling overtime and contract labor. Now, we have to get to the root cause of what drove this up in 2019 and in Q3 in particular. One of the things that we've seen is it's the tightest labor market in the last 50 years. And so, making sure that we've got appropriate staff in our communities is the most important thing that we can do.

294. On February 19, 2020, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2019 on a Form 10-K (the "2019 10-K").

295. The 2019 10-K was signed by Baier, Swain, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, Wielansky, and Freed, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

296. For the 2019 fiscal year, the Company reported a net loss of $268.5 million attributable to Company stockholders, or $1.44 per diluted share, on total revenue of $4.06 billion, compared to a net loss of $528.3 million attributable to Company stockholders, or $2.82 per diluted share, on total revenue of $4.53 billion for the prior year.

297. Regarding "resident fees" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 135 communities through sales of owned communities and lease terminations since the beginning of the prior year, which resulted in $336.5 million less in resident fees during the year ended December 31, 2019 compared to the prior year.

*       *       *

– 86 –

The decrease in total revenue was partially offset by a 1.9% increase in same community resident fee revenue and RevPAR, resulting from a 2.9% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy.

298.    Regarding "facility operating expense" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year, which resulted in $234.2 million less in facility operating expense during the year ended December 31, 2019. The decrease was partially offset by a 5.1% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from planned wage rate increases and an increase in employee benefit expense and increases in insurance and advertising costs compared to the prior year.

299.    Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs, a reduction in our corporate associate headcount since the beginning of the prior year as we scaled our general and administrative costs in connection with community dispositions, and lower professional fees.

300.    With respect to the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, that "[t]he decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period."

301.    Like the Company's previous quarterly and annual reports referenced above, the 2019 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of February 1, 2020, the Company had "the ability to serve approximately 65,000 residents."

– 87 –

302.     .” Further, the 2019 10-K stated that the Company offers its residents “access to a broad continuum of services across the most attractive sectors of the senior living industry” and “a supportive home-like setting, assistance with activities of daily living (“ADLs”) such as eating, bathing, dressing, toileting, transferring/walking[.]”

303.     Moreover, the 2019 10-K asserted that “[b]y providing residents with a range of service options as their needs change,” the Company “provide[s] greater continuity of care.”

304.     Regarding the Company’s “Operations,” the 2019 10-K stated:

> ***We have implemented intensive standards, policies and procedures, and systems, including detailed staff resources and training materials, which we believe have contributed to high levels of customer service***.  Further, we believe our centralized support infrastructure allows our community-based leaders and personnel ***to focus on resident care and family connections***.
>
> *    *    *
>
> We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities.  The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology, and marketing.  We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services.  In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining, clinical services, sales, customer engagement, marketing, and procurement.  ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and accounting; risk management; ***development of associate training materials and programs; advertising and marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements***[.]

305.     With respect to “Community Staffing and Training” the 2019 10-K stated, in relevant part, the following:

> Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services, and financial performance.

– 88 –

*   *   *

Depending upon the size and type of the community, each Executive Director is supported by key leaders, a [h]ealth and [w]ellness [d]irector (or nursing director), and/or a [s]ales [d]irector.  The [h]ealth and [w]ellness [d]irector or nursing director is directly responsible for day-to-day care of residents.  The [s]ales [d]irector oversees the community's sales, marketing, and community outreach programs.

Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

306.    Regarding "Quality Assurance" the 2019 10-K stated, in relevant part, the following:

> ***We maintain quality assurance programs at each of our communities through our corporate and regional staff.  Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction through the care and services that we provide.  Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.***  These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; ***quality of resident care*** (including assisted living services, nursing care, therapy, and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations.   Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services we provide to residents***.

307.    In the "Risk Factors" section, the 2019 10-K contained general, theoretical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow."  The risk warnings contained in the 2019 10-K were generic catch-all provisions that were not fashioned to make public Brookdale's known risks regarding the misconduct.

– 89 –

308.    Specifically, the 2019 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists, or other personnel, low levels of unemployment, or general inflationary pressures have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase in the minimum salary threshold for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists, or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs, and/or reduce [its] flexibility with respect to certain workplace rules"; and "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

309. The 2019 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our [CEO] and [CFO], has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our [CEO] and [CFO] each concluded that, as of December 31, 2019, our disclosure controls and procedures were effective.

310. The 2019 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our [CEO] and [CFO], we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
>    *  *  *
>
> Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2019. Management reviewed the results of their assessment with our Audit Committee.
>
>    *  *  *
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

311. The 2019 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2019 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

– 91 –

312. The above statements, which Individual Defendants willfully or recklessly made and/or caused the Company to make, were materially false and misleading because they failed to disclose, *inter alia*: (1) the Company intentionally underestimated data inputs that were entered into the SAS Software in a concerted effort to meet certain financial targets; (2) as a result, the Company systematically and purposefully set daily staffing numbers and hours at Brookdale facilities significantly below the necessary staffing levels to meet resident needs and the demand for care in accordance with the Company's PSAs; (3) the Company failed to permit the facility-level employees or local facilities to adjust data inputs to the SAS Software or facility staffing levels based on known facility staffing needs; (4) as a result, the Company failed to provide prompt and effective care and services to its residents that had been paid for; (5) as a result, the Company was in violation of its form Residency Agreements and various state adult care home rules and regulations; (6) the Company's commercial success was maintained by, among other things, this misconduct; (7) this misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the reveal of this misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (8) consequently, Brookdale's financial performance was untenable; and (9) Brookdale failed to maintain adequate internal controls to prevent this misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## H. Individual Defendants Further Breached Its Fiduciary Duties by Causing the Company to Repurchase Its Own Stock at Artificially Inflated Prices

313. Individual Defendants further breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

314. Specifically, nearly 10.1 million shares of the Company's common stock were repurchased between September 2016 and March 2020 for nearly ***$72.5 million***. As the Company stock was actually only worth $3.12 per share, the low price it reached during trading on May 1, 2020, the Company overpaid nearly ***$41.1 million*** in total.

| | **2016** | **2017** | **2018** | **2019** | **2020** | **Total** |
|---|---|---|---|---|---|---|
| Shares Repurchased | 776,329 | 414,583 | 1,723,302 | 3,481,499 | 3,063,000 | 10,069,027 |
| Average Price per Share | $13.87 | $12.67 | $7.43 | $6.56 | $6.83 | $9.29 |
| Total Aggregate Cost to Company | 9,996,878.45 | $5,888,971.63 | $11,557,930.42 | $19,712,800.00 | $23,021,463.21 | $72,497,497.52 |

## V.     THE TRUTH BEGINS TO EMERGE

### A.     The Consumer Class Action

315. On May 3, 2019, the first of several lawsuits was filed against Brookdale captioned *Bright v. Brookdale Senior Living, Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn.) (the "*Bright* Action"), seeking damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently serve the needs of its resident populations.

316. On April 24, 2020, a separate action seeking substantially similar relief as the *Bright* Action and demanding Brookdale "stop the unlawful and fraudulent practices" was filed under the caption *Gunza v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn.) (the "*Gunza* Action").

317.     The *Bright* Action and *Gunza* Action were consolidated by court order on June 23, 2020 (collectively, the "Consumer Class Action").

318.     Contrary to the representations that Brookdale made publicly, the Consumer Class Action Complaint alleges that:

> [E]very day that the hours of time required to provide all basic care and daily life services to residents in a BROOKDALE facility exceeded the amount of actual staff time available to provide these services, residents could not have received the promised levels of care and daily living services.

319.     The Consumer Class Action Complaint also alleges that plaintiffs encountered willful understaffing to boost profitability, including:

> [A] system of chronically understaffed assisted living facilities that routinely and as a matter of practice fail to provide sufficient staffing that correlates to the service needs of its resident populations in order to provide the most basic level of promised care and daily living services.
>
> *          *          *
>
> Instead, BROOKDALE has systemically and willfully understaffed its facilities to boost its profitability.

320.     The Consumer Class Action Complaint alleges that rather than use the PSA system to determine staff and labor hours to meet resident needs, Brookdale used the SAS to dilute and underestimate staffing requirements.

> At the very heart of this scheme was BROOKDALE's method of determining and limiting staffing levels at its facilities.  Rather than providing the amount of staff and labor hours required to meet resident service needs as determined by its PSA system, BROOKDALE used a staffing algorithm known as its [SAS] [s]oftware to dilute and underestimate the staffing time actually needed.
>
> *          *          *
>
> In other words, BROOKDALE's [SAS] [s]oftware systematically underestimates the staffing needs at each facility by, inter alia, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations.

– 94 –

321.    According to the Consumer Class Action Complaint, SAS was used to "justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and financial performance thresholders."

322.    The Consumer Class Action Complaint also alleges that Brookdale's corporate headquarters exercised absolute control over these actions:

> **From its corporate headquarters in Brentwood Tennessee, Brookdale exercises absolute and exclusive control over staffing determinations at its facilities**, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budget on a frequent or daily basis. Moreover, **BROOKDALE prohibits its facilities from making staffing decisions at the local level or modifying BROOKDALE's corporate determined staffing levels without corporate approval.** BROOKDALE did not disclose and has affirmatively concealed these crucial and material facts from residents, including [p]laintiffs, the proposed [c]lass [m]embers, their family members, and the members of the consuming public who may consider admission to a Brookdale facility.

323.    On April 30, 2020, *Nashville Business Journal* reported on the filing of the Consumer Class Action, which accuses the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016. According to the Consumer Class Action, Brookdale misled residents and their families when it promised to provide basic care and daily living services. The lawsuit also claims that the proposed class of plaintiffs "have not received the care and services they paid for." Finally, the article revealed that the Company had established lucrative incentive programs that were connected to satisfying or surpassing the Company's financial performance targets to induce employees to keep staffing expenses within budget, regardless of need.

324.    On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020.

325.    On March 12, 2021, Judge William L. Campbell, Jr. denied the defendants' motion to dismiss.

– 95 –

**B. The Securities Class Action**

326. In addition, on June 25, 2020, the Company, along with the Company's CEO, its former CEO, and its CFO, was also named as a defendant in the Securities Class Action currently pending in the United States District Court for the Middle District of Tennessee.

327. The Securities Class Action alleges Brookdale and Defendants Baier, Swain, and Smith violated Sections 10(b) and 20(a) of the Exchange Act as well as Rule 10b-5 promulgated thereunder by their misstatements and misrepresentations about Brookdale's staffing, quality of care, SAS, local leadership, and failure to comply with local and state regulations.

## VI. INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES OWED TO THE COMPANY

328. In Delaware, it is well-established that directors owe fiduciary duties of care and loyalty to the Company. In addition, directors owe a fiduciary duty of disclosure, which is derived from the foregoing duties.

329. Brookdale's Code of Business Conduct and Ethics (the "Code") states:

> To reach our goal of being the most trusted and effective senior living provider and employer, we must strongly uphold the highest standards of business and personal ethical conduct. We must hold each other accountable and always act with the best interests of our residents, fellow associates and shareholders in mind.
>
> \*   \*   \*
>
> The Code applies to everyone at Brookdale, including our [Board]. We are all responsible for knowing and following our Code and living up to its principles every day. That includes full-time and part-time associates, exempt and non-exempt. The concepts described in the Code also apply to those who do business with us, including vendors, third-party contractors and affiliated healthcare providers. Brookdale suppliers are additionally subject to a separate supplier code of conduct.
>
> \*   \*   \*
>
> Brookdale is committed to complying with all health, reimbursement, safety, environmental and employment laws, and our Brookdale policies and procedures are written in accordance with these laws. We count on our Brookdale associates to assist in spotting potential issues and helping avoid inadvertent violations.

– 96 –

*     *     *

Each associate should do his or her part to ensure that Brookdale's books of accounts and financial records meet applicable standards of accuracy and completeness. If an associate has reason to believe that any of Brookdale's books and records are not being maintained in an accurate or complete manner, the associate is expected to report this immediately to the head of Brookdale's Legal Department. Similarly, Brookdale relies on associates to speak up if they ever feel that they are being pressured to prepare or destroy documents in violation of Brookdale policy or applicable law, or if they become aware that any misleading, incomplete or false statement was made to an accountant, auditor, attorney or government official in connection with any audit, examination or filing with a government agency, such as the [SEC]. Associates should ensure that all transactions are reported accurately, completely and in reasonable detail. Transactions must be recorded appropriately to ensure full accountability for all assets and activities of Brookdale and to supply data needed in connection with the preparation of financial statements.

Each associate involved in the preparation of Brookdale's financial statements should prepare them according to generally accepted accounting principles and other applicable standards and rules, so the statements reflect fairly Brookdale's operations and financial condition.

**Complaints and Concerns Regarding Accounting Matters**

Brookdale is committed to compliance with applicable securities and other laws, rules and regulations, accounting standards and internal accounting controls. It is the responsibility of every Brookdale associate to promptly report complaints or concerns regarding accounting, internal accounting controls and auditing matters. Associates may report suspected misconduct, including such concerns or complaints, on a confidential basis by the calling the Brookdale [i]ntegrity [l]ine.

**Code of Ethics for Chief Executive and Senior Financial Officers**

In compliance with the [SOX] and related [SEC] regulations, the Company has established a written Code of Ethics for [c]hief [e]xecutive and [s]enior [f]inancial [o]fficers (the "Code of Ethics"). Amendments to, or implicit or explicit waivers of the Code of Ethics, will be disclosed as required by SEC rules. The Code of Ethics has been designed to deter wrongdoing and to promote honest and ethical conduct, including the ethical handling of any actual or apparent conflicts of interest; full, fair, accurate, timely and understandable disclosure in Brookdale's SEC filings and submissions, as well as other public communications by the Company; compliance with applicable laws, rules and regulations; and prompt reporting of any violations or suspected violations of the Code of Ethics or applicable law. To the extent of any inconsistency between the terms of this Code and the Code of Ethics, the requirements of the [SOX] shall control.

330.    Brookdale's Audit Committee Charter states:

– 97 –

The purpose of the Audit Committee (the "Committee") of the [Board] of [Brookdale] (the "Corporation") shall be to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Corporation and its subsidiaries, including, without limitation, (a) assisting the Board's oversight of (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors, the Corporation's internal audit function, the Corporation's compliance function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the [SEC] for inclusion in the Corporation's annual proxy statement.

\*       \*       \*

Each member of the Committee must be financially literate, as such qualification is interpreted by the Board in its business judgment, or must become financially literate within a reasonable period of time after his or her appointment to the Committee. In addition, at least one member of the Committee must be designated by the Board to be the "audit committee financial expert," as defined by the SEC pursuant to [SOX].

\*       \*       \*

The Committee shall have the following duties and responsibilities with respect to the oversight of the Corporation's financial reporting process and internal controls:

(a)    To review:

(i)    the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Corporation's internal audit function through inquiry and discussions with the Corporation's independent auditors, management and director or other supervisor of the Corporation's internal audit function;

(ii)    the yearly report prepared by management assessing the effectiveness of the Corporation's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Corporation's Annual Report on Form 10-K; and

(iii)    the Committee's level of involvement and interaction with the Corporation's internal audit function, including the

– 98 –

Committee's line of authority and role in appointing and compensating employees in the internal audit function;

(b)　To review with the [CEO], [CFO] and independent auditors, periodically, the following:

      (i)　all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize and report financial information; and

      (ii)　any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting;

(c)　To discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the compliance department and internal audit function, assess and manage the Corporation's exposure to risk, as well as the Corporation's major financial and compliance risk exposures and the steps management has taken to monitor and control such exposures;

\*　　　\*　　　\*

(j)　To review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance);

\*　　　\*　　　\*

(b)　To meet periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Corporation and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Corporation or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Corporation;

(c)　To prepare the report required by the rules of the SEC to be included in the Corporation's annual proxy statement;

(d)     To review the Corporation's policies relating to the ethical handling of conflicts of interest and review past or proposed transactions between the Corporation and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets.   The Committee shall consider the results of any review of these policies and procedures by the Corporation's independent auditors;

(e) To establish procedures for (i) the receipt, retention and treatment of complaints received by the Corporation regarding compliance, accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters;

*     *     *

(i)     To report regularly to the Board on its activities, as appropriate.   In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Corporation's financial statements, the Corporation's compliance with legal or regulatory requirements, the performance and independence of the Corporation's independent auditors, or the performance of the internal audit function;

*     *     *

The Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities, and may retain, at the Corporation's expense, such independent counsel or other consultants or advisers as it deems necessary.

331.     As described herein, Individual Defendants breached their fiduciary duties of care and loyalty (as well as their related duty of disclosure) to the Company by purposefully understaffing the Company's facilities in violation of its form Residency Agreements in order to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed herein.

## VII.   DAMAGES TO BROOKDALE

332.     As a result of the misconduct described herein, the Company has suffered, and will continue to suffer, immense economic and reputational harm, including, but not limited to, a significant loss in market capitalization, compromised financial integrity, and irreparable damage to its credibility in the business community and financial marketplace.   As with any public entity,

– 100 –

the Company will pursue future debt and equity offerings to finance its operations, and because of the misconduct, if left unpunished, the Company will suffer from the liars' discount and will be forced to conduct offerings on less favorable terms for the Company, which will only hinder the Company's future financing efforts.

333.    To date, as a result of Individual Defendants' misconduct, Brookdale has been and will continue to be forced to expend millions of dollars.  Such losses include, but are not limited to:

a)  Costs incurred in connection with being named a defendant in the federal Consumer Class Action, including the defense and settlement of or judgement in the litigation;

b)  Costs incurred in connection with being named a defendant in the Securities Class Action, including the defense and settlement of or judgement in the litigation, as well as any other related litigation based on the same facts;

c)  Expenditures stemming from the need to undertake internal investigations into the misconduct detailed herein;

d)  Costs associated with the Company's overpayment by nearly $41.1 million for its own stock while the Company's stock price was artificially inflated due to the false and misleading statements discussed herein;

e)  Costs incurred from the loss of the Company's customers' confidence in Brookdale and its products and services; and

f)  Costs incurred in connection with the lavish and unjustified compensation and benefits paid to Individual Defendants while they were actively breaching their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

334.     Moreover, these actions have irreparably damaged Brookdale's corporate image and goodwill.  For at least the foreseeable future, Brookdale will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Brookdale's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered over $2.95 billion in market capitalization loss as a direct result of the Individual Defendants' wrongdoing alleged herein.

335.     Thus, in accordance with its fiduciary duties, the Board is obligated to bring an action against Individual Defendants and vindicate the Company's rights and redress the harm done.

## VIII.   DERIVATIVE AND FUNCTIONAL REFUSAL ALLEGATIONS

336.     Plaintiff brings this action derivatively in the right and for the benefit of Brookdale to redress injuries suffered, and to be suffered, by Brookdale as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Brookdale is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

337.     Plaintiff will adequately and fairly represent the interests of Brookdale in enforcing and prosecuting its rights.

338.     Plaintiff was a stockholder of Brookdale at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Brookdale stockholder.

339.     Plaintiff made her formal Demand for litigation on December 16, 2020, where she demanded that the Board (i) undertake (or cause to be undertaken) an independent internal

investigation into Individual Defendants' violations of Delaware and/or federal law; and (ii) commence a civil action against Individual Defendant (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Management) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein, as well as take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future. **Exhibit A**.

340. On December 17, 2020, Mr. Timothy J. Cesar, Vice President of Legal at Brookdale, wrote to Plaintiff's counsel requesting documentation of Plaintiff's stock ownership, confirming receipt of the Demand, and advising that the Demand had been provided to the Board for its consideration. **Exhibit B**.

341. On December 30, 2020, Plaintiff's counsel responded to Mr. Cesar, providing documentation of Plaintiff's current and continuous stock ownership and inquiring into the Board's anticipated timeframe for responding to the Demand, among other things. **Exhibit C.**

342. In response, in a letter dated March 11, 2021, the Board informed Plaintiff that it "determined that it is in the Company's interest to defer consideration of the [Demand]" indefinitely while the Securities Class Action is pending, rather than conduct an internal investigation (the "Refusal"). In support of its decision to defer consideration of the Demand, "[t]he Board noted that pursuit by the Company of the claims alleged in the [Demand], while the [Securities Class Action] is pending, could prejudice the Company's defense of the [Securities Class Action.]" The Board's unwillingness to form an investigative committee or take any positive steps towards investigating the alleged misconduct functions as a refusal. **Exhibit D**.

343.     Under Delaware law, a board may not abdicate its responsibilities to investigate a litigation demand, but instead must substantively respond to the demand within a reasonable amount of time. *See Ingrao v. Stoppelman, et al.*, No. 20-cv-02753-EMC, 2020 WL 7025083, at *6 (N. D. Cal. Nov. 30, 2020) (finding the board of a Delaware corporation's deferral of investigation or consideration of the demand amounted to a rejection of the demand and the board's decision was not entitled to the presumption of the "business judgment rule because it was not done in an informed manner and with due care").

344.     A stockholder "satisfies Rule 23.1 and may proceed derivatively if he demonstrates that the failure to act is wrongful" and in "bad faith," "such as 'where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 976–77 (Del. Ch. 2013) (quoting *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006)). "Similarly, the business judgment rule does not apply if directors fail to inform themselves of all material information reasonably available to them and fail to act with requisite care." *Id.* at 977.

345.     Here, the Board has determined, without any investigation, to defer consideration of the Demand indefinitely—throughout the pendency of the Securities Class Action, which could span months and even years into the future, particularly in the event that the Securities Class Action proceeds to summary judgment briefing and/or trial, and any appeal(s). *See* **Exhibit D**. An indefinite deferral of this nature will irreparably prejudice the Company and its claims; and a board cannot simply point to a pending, parallel lawsuit in order to justify its inaction in a derivative suit.

– 104 –

346. Specifically, the harms complained of in the Demand are actively ongoing and remain unremedied by the Board, causing further damage to the Company with each passing day. In addition, while the Board is refusing to consider the allegations in the Demand, it is also actively forcing the Company to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the Company in the Securities Class Action, thereby further damaging the Company. Moreover, depending on the length of the deferral, the Board's deferral might subject the Company's claims to the applicable statute of limitations period. These actions by the Board cannot be reasonably interpreted to be in the best interests of the Company or in good faith.

347. Thus, the Board's failure to respond within a reasonable time to the Demand, and the Board's unwarranted and egregious deferral of its consideration of the Demand will unduly prejudice Plaintiff and the Company, and is therefore a violation of Delaware law. The Board's actions thus constitute a wrongful refusal of the Demand. Accordingly, Plaintiff has satisfied Delaware's demand requirement and may pursue this action on behalf of the Company.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

348. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

349. As alleged in detail herein, each of the Defendants had a duty to ensure that Brookdale disseminated accurate, truthful and complete information to its shareholders. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Brookdale shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein, as well as in approving the repurchase of the Company's shares at artificially inflated prices

– 105 –

as a result of the foregoing misstatements. These actions could not have been a good faith exercise of prudent business judgment.

350.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

351.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

352.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

353.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the relevant period. It resulted in continuous, connected, and on-going harm to the Company.

354.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions; and (iii) the Company's overpayment by nearly $41.1 million for its own stock while the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

– 106 –

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

355.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

356.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Brookdale by virtue of the excessive and unwarranted compensation paid to them while in breach of their fiduciary duties.

357.    Plaintiff, as a shareholder and representative of Brookdale, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

### For Contribution for Violations of § 10(b) and § 21D of the Exchange Act
### (Against the Defendants Baier, Smith, and Swain)

358.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

359.    Defendants Baier, Smith, and Swain are named defendants in the Securities Class Action.

360.    Brookdale is also named as a defendant in the Securities Class Actions, which assert claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of Baier, Smith, or Swain, as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

– 107 –

361. Defendants Baier, Smith, and Swain, as directors and/or officers of the Company and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's affairs, including the content of public statements about Brookdale, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5. Further, Defendants Baier, Smith, and Swain are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

362. As a result, Defendants Baier, Smith, and Swain damaged Brookdale and are liable to the Company for contribution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Brookdale, demands judgment as follows:

A. Finding that this action is a proper derivative action maintainable under the law and that the shareholder demand on Brookdale's Board was a *de facto* wrongful refusal;

B. Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and the Company has a right of contribution;

C. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

D. Directing Brookdale to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Brookdale and its stockholders from a repeat of the damaging events

– 108 –

described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. The Board should require Individual Defendants to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action or any related or similar litigation;

2. The Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

3. The Board should require Individual Defendants to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

4. The Board should require Individual Defendants to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct; and

5. The Board should adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future;

6. The Board should split the CEO and Chair of the Board position;

7. The Board should strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding any unlawful activities, public disclosures, and internal controls.

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' ill-gotten gains or their other assets so as to assure that Plaintiff on behalf of Brookdale has an effective remedy;

F. Awarding to Brookdale restitution from the Individual Defendants, and each of them and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G. Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Brookdale's directors, officers, and employees do not engage in wrongful or illegal practices;

H. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED: May 10, 2021

/s/ Wade B. Cowan
Wade B. Cowan
P.O. Box 50617
Nashville, TN 37205
Telephone: (615) 352-2331
Email: wcowan@dhhrplc.com

JOHNSON FISTEL, LLP
Michael I. Fistel, Jr.
michaelf@johnsonfistel.com
Mary Ellen Conner
maryellenc@johnsonfistel.com
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com
maryellenc@johnsonfistel.com

***Attorneys for Plaintiff***

## <u>VERIFICATION</u>

I, Stefanie Anders, am the plaintiff in the within action.  I have reviewed the allegations made in this verified stockholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1      of May, 2021.

DocuSigned by:

*Stefanie Anders*

E55DAFEE90D7480...

Stefanie Anders