# EXHIBIT A

Murray House
40 Powder Springs Street
Marietta, Georgia 30064
Tel: 770.200.3104
Fax: 770.200.3101

Michael I. Fistel, Jr.
Direct Dial: 470.632.6000
MichaelF@johnsonfistel.com

December 16, 2020

**VIA FEDEX**
Board of Directors of Brookdale Senior Living
Inc. c/o Guy P. Sansone
Chairman of the Board
Brookdale Senior Living Inc.
111 Westwood Place, Suite 400
Brentwood, TN 37027

Re:     **Stockholder Demand Pursuant to Del. Ct. Ch. R. 23.1**

Dear Mr. Sansone and members of the Board of Directors:

The below firms represent Stefanie Anders (the "Stockholder"), a current stockholder of Brookdale Senior Living Inc. ("Brookdale" or the "Company"). Pursuant to Del. Ct. Ch. R. 23.1, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including but not limited to the following executive officers and/or directors of the Company, who are referred to herein as "Management."

- **Lucinda M. Baier ("Baier")** has served as Brookdale's President and CEO and as a Company director since February 2018. Previously, Baier served as Brookdale's CFO from December 2015 until February 2018. According to the Company's Schedule 14A filed with the SEC on May 18, 2020 (the "2020 Proxy Statement"), on May 11, 2020, Baier beneficially owned 252,154 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Baier owned over $743,854 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Baier received $6,350,901 in compensation from the

Company. This included $910,000 in salary, $4,773,420 in stock awards, $657,295 in non-equity incentive plan compensation, and $10,186 in all other compensation. For the fiscal year ended December 31, 2018, Baier received $4,674,255 in compensation from the Company. This included $782,248 in salary, $50,000 in bonus, $3,551,872 in stock awards, $281,023 in non-equity incentive plan compensation, and $9,112 in all other compensation. For the fiscal year ended December 31, 2017, Baier received $2,407,188 in compensation from the Company. This included $550,000 in salary, $1,500,013 in stock awards, $196,150 in non-equity incentive plan compensation, and $161,025 in all other compensation. For the fiscal year ended December 31, 2016, Baier received $2,492,367 in compensation from the Company. This included $552,115 in salary, $1,500,005 in stock awards, $222,750 in non-equity incentive plan compensation, and $217,497 in all other compensation.

- **T. Andrew Smith ("Smith")** served as the Company's CEO from February 2013, as President from March 2016, and as a Company director from June 2014 until he resigned from all of his positions with the Company on February 28, 2018. Previously, he had served as Executive Vice President, General Counsel, and Secretary from October 2006 until February 2013. For the fiscal year ended December 31, 2018, Smith received $2,709,314 in compensation from the Company. This included $157,115 in salary and $2,552,199 in all other compensation. For the fiscal year ended December 31, 2017, Smith received $1,315,829 in compensation from the Company. This included $950,000 in salary, $356,709 in non-equity incentive plan compensation, and $9,120 in all other compensation. For the fiscal year ended December 31, 2016, Smith received $6,608,594 in compensation from the Company. This included $953,654 in salary, $5,225,007 in stock awards, $418,594 in non-equity incentive plan compensation, and $11,339 in all other compensation.

- **Steven E. Swain ("Swain")** has served as the Company's CFO since September 2018. According to the 2020 Proxy Statement, on May 11, 2020, Swain beneficially owned 22,659 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Swain owned over $66,844 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Swain received $2,117,449 in compensation from the Company. This included $515,000 in salary, $1,306,414 in stock awards, $275,545 in non-equity incentive plan compensation, and $20,490 in all other compensation. For the fiscal year ended December 31, 2018, Swain received $1,272,135 in compensation from the Company. This included $161,538 in salary, $100,000 in bonus, $802,324 in stock awards, $46,038 in non-equity incentive plan compensation, and $162,235 in all other compensation.

- **Marcus E. Bromley ("Bromley")** has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. According to the 2020 Proxy Statement, on May 11,

2020, Bromley beneficially owned 75,171 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Bromley owned over $221,754 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Bromley received $256,995 in compensation from the Company. This included $157,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Bromley received $230,831 in compensation from the Company. This included $187,000 in fees earned and cash paid and $43,831 in stock awards. For the fiscal year ended December 31, 2017, Bromley received $203,472 in compensation from the Company. This included $103,478 in fees earned and cash paid and $99,993 in stock awards.

- **Frank M. Bumstead ("Bumstead")** has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, on May 11, 2020, Bumstead beneficially owned 300,224 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Bumstead owned over $885,660 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Bumstead received $289,995 in compensation from the Company. This included $190,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Bumstead received $315,994 in compensation from the Company. This included $216,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Bumstead received $379,992 in compensation from the Company. This included $280,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Bumstead received $320,995 in compensation from the Company. This included $221,000 in fees earned and cash paid and $99,995 in stock awards.

- **Jackie M. Clegg ("Clegg")** served as a Company director from November 2005 until October 29, 2019. She also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and as a member of the Audit Committee. For the fiscal year ended December 31, 2019, Clegg received $349,047 in compensation from the Company. This included $249,052 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Clegg received $322,994 in compensation from the Company. This included $223,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Clegg received $390,992 in compensation from the Company. This included $291,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Clegg received $339,995 in compensation from the

3

Company.  This included $240,000 in fees earned and cash paid and $99,995 in stock awards.

- **Daniel A. Decker ("Decker")** served as Executive Chairman of the Board from November 1, 2016 until he resigned effective March 1, 2018.  Previously, he served as Non-Executive Chairman of the Board from October 2015 until October 31, 2016.  He also served as a member of the Investment Committee.  For the fiscal year ended December 31, 2018, Decker received $221,656 in compensation from the Company.  This included $138,077 in fees earned and cash paid, $80,047 in stock awards, and $3,532 in all other compensation.  For the fiscal year ended December 31, 2017, Decker received $705,966 in compensation from the Company.  This included $687,500 in fees earned and cash paid and $18,466 in all other compensation.  For the fiscal year ended December 31, 2016, Decker received $1,082,164 in compensation from the Company.  This included $479,167 in fees earned and cash paid, $591,313 in stock awards, and $11,685 in all other compensation.

- **Rita Johnson-Mills ("Johnson-Mills")** has served as a Company director since August 2018.  She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee.  According to the 2020 Proxy Statement, on May 11, 2020, Johnson-Mills beneficially owned 41,907 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date.  Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Johnson-Mills owned over $123,625 worth of Brookdale stock as of that date.  For the fiscal year ended December 31, 2019, Johnson-Mills received $211,976 in compensation from the Company.  This included $170,609 in fees earned and cash paid and $41,367 in stock awards.  For the fiscal year ended December 31, 2018, Johnson-Mills received $155,024 in compensation from the Company.  This included $55,033 in fees earned and cash paid and $99,991 in stock awards.

- **Jeffrey R. Leeds ("Leeds")** served as a Company director from November 2005 until his resignation effective October 4, 2018.  He also served as Non-Executive Chairman of the Board from June 2012 until September 2015.  Leeds also served as a member of the Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee.  For the fiscal year ended December 31, 2018, Leeds received $273,081 in compensation from the Company.  This included $173,087 in fees earned and cash paid and $99,994 in stock awards.  For the fiscal year ended December 31, 2017, Leeds received $373,992 in compensation from the Company.  This included $274,000 in fees earned and cash paid and $99,992 in stock awards.

- **Mark J. Parrell ("Parrell")** served as a Company director from April 2015 until his resignation effective July 24, 2017 at the Company's annual meeting.  He also served as a member of the Audit Committee and Investment Committee.  For the fiscal year ended December 31, 2017, Parrell received $213,514 in compensation

4

from the Company. This included $113,522 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Parrell received $259,306 in compensation from the Company. This included $190,000 in fees earned and cash paid and $69,306 in stock awards.

- **William G. Petty, Jr. ("Petty")** served as a Company director from December 2014 until his resignation effective February 21, 2018. He also served as the Chair of the Investment Committee and as a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2018, Petty received $115,883 in compensation from the Company. This included $15,889 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Petty received $214,992 in compensation from the Company. This included $115,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Petty received $308,995 in compensation from the Company. This included $209,000 in fees earned and cash paid and $99,995 in stock awards.

- **Guy P. Sansone ("Sansone")** has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. According to the 2020 Proxy Statement, on May 11, 2020, Sansone beneficially owned 2,491 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Sansone owned over $7,348 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Sansone received $120,387 in compensation from the Company. This included $20,391 in fees earned and cash paid and $99,996 in stock awards.

- **James R. Seward ("Seward")** served as a Company director from November 2008 until his resignation effective October 29, 2019. He also served as a member of the Audit Committee as the Chair of the Investment Committee. For the fiscal year ended December 31, 2019, Seward received $327,403 in compensation from the Company. This included $227,408 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Seward received $326,161 in compensation from the Company. This included $226,167 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Seward received $367,159 in compensation from the Company. This included $267,167 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Seward received $309,995 in compensation from the Company. This included $210,000 in fees earned and cash paid and $99,995 in stock awards.

- **Denise W. Warren ("Warren")** has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, on May 11, 2020, Warren beneficially owned 48,606 shares of the Company's common stock which represented less than 1% of the Company's outstanding

shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Warren owned over $143,387 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Warren received $196,882 in compensation from the Company. This included $172,500 in fees earned and cash paid and $24,382 in stock awards. For the fiscal year ended December 31, 2018, Warren received $132,181 in compensation from the Company. This included $32,185 in fees earned and cash paid and $99,996 in stock awards.

- **Lee S. Wielansky ("Wielansky")** has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. According to the 2020 Proxy Statement, on May 11, 2020, Wielansky beneficially owned 101,338 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Wielansky owned over $298,947 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Wielansky received $506,604 in compensation from the Company. This included $406,609 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Wielansky received $553,577 in compensation from the Company. This included $453,583 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Wielansky received $361,992 in compensation from the Company. This included $262,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Wielansky received $274,306 in compensation from the Company. This included $205,000 in fees earned and cash paid and $69,306 in stock awards.

- **Victoria L. Freed ("Freed")** has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, on May 11, 2020, Freed beneficially owned 2,491 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Freed owned over $7,348 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2019, Freed received $124,387 in compensation from the Company. This included $24,391 in fees earned and cash paid and $99,996 in stock awards.

As you are aware, by reason of their positions as officers and/or directors of Brookdale and because of their ability to control the business and corporate affairs of Brookdale, members of Management owed and owe Brookdale and its stockholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use its utmost ability to control and manage Brookdale in a fair, just, and honest manner in compliance with all applicable federal,

6

state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that Management has violated these core fiduciary duty principles causing Brookdale to suffer damages. More specifically, the Stockholder believes that Management purposefully understaffed its senior living communities in order to bolster the Company's financial metrics and enrich members of Management, which subjected the Company to an increased risk of litigation and was foreseeably likely to have a material, negative impact on the Company's financial results and reputation.

## I.    FACTUAL BACKGROUND[1]

### A.    Company Background

Brookdale is headquartered in Brentwood, Tennessee. According to its public filings, Brookdale is the nation's largest senior-living community operator, with $4 billion in reported revenue in 2019 alone. As of February 1, 2020, Brookdale owned 356 communities, leased 307 communities, managed 77 communities on behalf of third parties, and three communities for which it has an equity interest. The Company operates independent living, assisted living, dementia-care communities, and continuing care retirement centers ("CCRCs"). Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living and hospice services.

Brookdale's ascension to its position as the largest senior-living community operator in the United States was solidified by: (1) its acquisition of Horizon Bay, the then-ninth largest operator of senior living communities in the United States, on September 1, 2011, and (2) its acquisition by merger of Emeritus Corporation, the then-second largest operator of senior living communities in the United States, for $2.8 billion on July 31, 2014.

According to representations made by Brookdale in annual filings with the United States Security and Exchange Commission ("SEC") between 2014 and 2018, Brookdale's aggressive growth and purchase strategy required massive financing and infusions of cash. As a result, Brookdale shackled itself with enormous loan obligations, debt, and lease obligations to financing institutions and real estate investment companies.

To secure such significant loans, financing agreements, and lease contracts, Brookdale agreed to designate profit and financial performance thresholds for its assisted living facilities both on an individual basis and on a consolidated, portfolio-wide and multi-community basis, as stated in Brookdale 10-K filings with the SEC between 2014 and 2018:

> Our outstanding indebtedness and leases contain restrictions and covenants and require us to maintain or satisfy specified financial ratios and coverage tests, including maintaining prescribed net worth levels, leverage ratios and debt service

---

[1] All emphasis is added unless otherwise noted.

and lease coverage ratios on a consolidated basis, and on a community or communities basis based on the debt or lease securing the communities. In addition, certain of our leases require us to maintain lease coverage ratios on a lease portfolio basis (each as defined in the leases) and maintain stockholders' equity or tangible net worth amounts.

*     *     *

Certain of our debt and lease documents contain restrictions and financial covenants, such as those requiring us to maintain prescribed minimum net worth and stockholders' equity levels and debt service and lease coverage ratios, and requiring us not to exceed prescribed leverage ratios, in each case on a consolidated, portfolio-wide, multi-community, single-community and/or entity basis.

*     *     *

We operate certain of our communities pursuant to management agreements. In some cases, subject to our rights, if any, to cure deficiencies, community owners may terminate us as manager if . . . we do not satisfy certain designated performance thresholds.

In addition, Brookdale guaranteed and pledged the individual and aggregate assets and revenues of its assisted living facilities as collateral for such loan and lease agreements. Therefore, in order to meet its enormous debt obligations, financial covenants, and financial performance thresholds and to minimize the risk of defaulting on widespread portions of its portfolio of assisted living facilities and other communities, Brookdale closely monitored and tightly controlled every aspect of the operations and management of its assisted living facilities, including the largest line-item expense—day-to-day staffing.

### B.    Management Regulated Brookdale's Staffing Needs from Company Headquarters, Prohibiting Local Facility-Level Staffing Decision-Making

Brookdale's method of determining and limiting staffing levels at its facilities is done via a staffing algorithm known as its Service Alignment Software. As described by Brookdale, its Service Alignment Software consists of two main categories of data. First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies Brookdale itself conducted; and the aggregate assess care needs of all residents. Second, the Service Alignment Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to set the number of staffing hours on a daily basis. In other words, the Service Alignment Software determines the number of staffing hours in each of its facilities by multiplying (1) the aggregate assessed care needs to be delivered by staff to residents by (2) the associated task times Brookdale claims are required for each assessed care need.

Brookdale's design, methodology, and use of its Service Alignment Software are faulty and flawed. Specifically, because Brookdale's insufficient staffing is the product of the two critical variables described in the paragraph above, namely (1) the number and types of services to be provided to each of its collective resident populations and (2) the time required to deliver

each type of service, Brookdale reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit benchmarks. In other words, Brookdale's Service Alignment Software systematically underestimates the staffing needs at each facility by, *inter alia*, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations. Moreover, to accurately and reliably determine the number of staff and labor time required to deliver services in industries like Brookdale's, industrial engineers recognize that certain engineering principles and critical variables must be taken into account and applied. Plaintiff believes that the Service Alignment Software is also flawed and faulty because it fails to take into account these engineering principles and critical variables, thereby resulting in chronically insufficient staffing.

Indeed, Brookdale's use of its Service Alignment Software results in willfully and chronically understaffed facilities. Brookdale purposefully uses its Service Alignment Software to justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, Brookdale deliberately fails to properly, accurately, and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of the improper conduct.

Of course, Management maintained the confidentiality of its staffing methods, even from its own facility-level employees. Indeed, at all relevant times, Brookdale's staffing decisions were not made at the facility level, but at the corporate level. From its corporate headquarters in Brentwood, Tennessee, Brookdale exercised absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budget on a frequent or daily basis. Moreover, Brookdale prohibited its facilities from making staffing decisions at the local level or modifying Brookdale's corporate predetermined staffing levels without corporate approval. That is, executive directors and facility level staff could not modify the corporate-predetermined staffing levels without express permission from several layers of Brookdale corporate management. Any such request for permission to modify or customize must be documented.

Moreover, a majority of Brookdale's executive and administrative functions are located in Tennessee, the CEO and Chief Operating Officer, the Company's Secretary maintain their principal offices in Tennessee, all of Brookdale's Executive Vice Presidents are also located in Tennessee, final decisions regarding the company-wide issues relating to the operations of Brookdale facilities throughout the nation were made by corporate executives at the Company's headquarters in Tennessee.

The Company's centralized operation as a single enterprise is further evidenced by Brookdale's annual and quarterly reports that Management caused the Company to file with the SEC, as referenced in detail below. For example, the Company's annual report for the periods ended December 31, 2014, December 31, 2015, December 31, 2016, December 31, 2017, and December 31, 2018 state that "we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing."

### C. Management Strictly Enforced Its Pre-Determined Staffing Levels

At all relevant times, Management oversaw, managed, and ultimately dictated the Company's operating budgets at each one of Brookdale's facilities around the country, including expense limits dedicated to staffing. Indeed, according to the Company's annual report filed with the SEC on February 22, 2018 for the quarter and year ended December 31, 2017 on a Form 10-K "[w]e have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections. Our operating procedures include . . . implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures." The Company's annual reports filed with the SEC for the quarter and year ended December 31, 2014, December 31, 2015, and December 31, 2016 contained substantively the same statements.

Brookdale begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal server with near final amounts. Once preloading is complete, each assisted living facility has one week to review the budget and respond to the Brookdale Regional Vice President, Regional Director of Operations, and corporate FP&A with comments and any requests for change. The employees working at each assisted living facility only have read-only access to the budgets, meaning they cannot change any of the preloaded amounts. All changes and final approval of the budgets are made by Brookdale.

At all relevant times, once the budgets have been approved by Brookdale, they are locked in for the entire year. In addition, the employees working at each assisted living facility are not able to make changes to the budget.

Brookdale has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings. As alleged in the Consumer Class Action (defined herein) filed against the Company, the executive directors at each of Brookdale's assisted living facilities have been routinely admonished by corporate officers in emails demanding that: a) they strictly comply with the staffing budget; b) they make reductions in staffing needed to eliminate budget variances; c) they comply with each facility's staffing expense savings commitment; d) they "do a better job managing our labor, as this is by far our largest expense"; e) they make the necessary adjustments to get staffing within budget or be forced to make reductions; f) everyone will be held accountable for labor control; g) Brookdale does not tolerate an assisted living facility running over its approved staffing budget; h) Brookdale management strenuously emphasizes the importance of managing labor and eliminating overtime, and i) Brookdale does not tolerate an assisted living facility "dropping the ball" on labor controls.

To entice its employees to stay at or below Brookdale's limits for staffing and expenses, Brookdale also created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale's financial performance targets. These programs provided facility department heads and Brookdale's senior management significant bonuses for staying at or below Brookdale's budgeted expense limits—the largest of which was staffing.

### D. Brookdale's Form Residency Agreements Misrepresented and Misled Potential Residents Regarding Brookdale's Inhumane Understaffing

The Company's standard form Residency Agreements advertise Brookdale's commitment to personalized care. Specifically, Brookdale mandates that each of its facilities conduct what Brookdale refers to as a Personal Service Assessment ("PSA") upon each resident, which assesses a resident's care needs. Afterwards, according to the level of care required, residents are assigned to one of two "Care Groups": (1) Choice Personal Services—care includes services related to, among other things, medication, nutrition, dressing and grooming, showering or bathing, bathroom assistance, escort, and mobility and service coordination; or (2) Comprehensive Care Options— care includes services related to, among other things, chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand upright, bathroom assistance needs for residents who are catheterized, incontinent, or cannot stand upright, two person or mechanical lifts, cognitive and psychological needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance, and pet care. In its form contract, Brookdale also pledges to regularly reassess residents' the level of care needed to meet their needs.

Each service need is broken down by particular and granular needs and ascribed a cost. The Company charges its residents a monthly "Personal Service Rate" in exchange for meeting the evaluated level of care and specific needs documented in the "Personal Service Plan," which includes the "Basic Service Rate" and together with the lesser of: (1) the total cost for meeting each assessed need with each category; or (2) a "Predictable Maximum Total" the Company assigns to each Care Group. Personal Service Rates are amended from time to time depending on re-evaluations of residents' needs and updates to their Personal Service Plans. According to the standardized letters the Company sends to Brookdale residents who are subject to rate increases, the Company attributes the increased rate, in large part, to the increased staffing costs to "take care of your senior living needs."

Further anchoring consumers' reasonable belief that Brookdale would have staff sufficient to provide these contracted services was the claim set forth in Brookdale's uniform Residency Agreement that "associates are available 24 hours a day, 7 days a week."

### E. Brookdale's Marketing Materials Further Misled Potential Residents Regarding the Truth Behind Brookdale's Abhorrent Care and Services Resulting from Its Purposeful Understaffing

It was not just Brookdale's form Residency Agreements that misrepresented staffing and services provided to Brookdale's residents; the same or similar misrepresentations were contained in the Company's marketing materials as well, including the Company's website, brochures, and presentations, which induced residents to enter into the Company's form Residency Agreements.

For instance, in certain Company presentations available on Brookdale's social media platforms, such as a video presentation uploaded to YouTube on December 1, 2017, Brookdale marketed its senior living facilities to individuals and their families on a promise of tailored services that meet the individualized and personal needs of residents, and by touting an army of "***passionate associates ready to work for you***."

Deliberately woven through the Company's sales and marketing materials on its website is language assuring elderly and dependent individuals and their families that caring for and meeting the needs of residents was of paramount importance to Brookdale. Specifically, the Company's website promotes such care:

- "At Brookdale, we believe in delivering senior care that's ***tailored to you and your loved one based on those unique needs*** and desires. That's why we provide a variety of options. This ***personalized approach*** ensures that you and your family get exactly what you need without paying for what you don't."

- "[W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, offering individually tailored personal care options to perfectly suit their needs."

- "***Your health is our top priority***, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A ***personalized service assessment and plan*** where we evaluate ***your individual needs*** and then create a ***custom care plan tailored to you***."

- "Brookdale will ***assess your needs*** and help you chose the ***services you need***."

- "***Our trained caregivers provide attention and assistance*** with medication support, bathing, dressing, cooking and other tasks throughout the day. Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. So your loved one gets the care they need while enjoying the quality of life they've earned."

- "***Trained caregivers provide assisted living care*** by providing assistance with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers."

- "At an assisted living community, ***caring staff members*** are available to help them accomplish these tasks, making life a lot easier than if they were living alone. This service provides peace of mind for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day***."

- "The Brookdale approach provides ***services that are tailored to each individual's unique needs***, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, by ***offering the desired service and care as their needs and preferences dictate***. By ***customizing personal care offerings for the individual***, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go."

- "At Brookdale, we are *committed to listening to your needs*, understanding the life you want for yourself or your loved one, and then partnering with you to *customize a solution* for all the places you still want your life to go."

- "The first step towards determining the right senior living option is to *understand you and your family's needs*."

- "[We] cannot provide exceptional care and service until we find out exactly what it is that your loved one needs."

- "We start with a detailed assessment, listing the specifics of your loved one's level of care."

Brookdale's website also advertised that the Company would "[r]ecognize and [i]ntegrate" the results of each resident's Personal Service Assessment by ensuring that Brookdale's "professional staff is trained to recognize the specific needs . . . of each individual" and that a "continuous assessment process" "ensures" the Company would be able to satisfy its residents' care needs.

Moreover, certain of the Company's marketing materials advertised that at Brookdale facilities:

> *Carefully selected and trained associates do more than assist with activities of daily living* such as dressing, bathing and dispensing of medications; *they implement custom care plans designed to meet the individual needs of each resident* … It all begins with a Personal Service Assessment. We take the time to listen to our residents so that *we understand how to establish clinical, dining and program support that works for them in a meaningful way*. We recognize their individual needs and preferences and respond to them accordingly.

Additionally, the Company proclaimed that it:

> *[p]rovide[s] customized care solutions to meet residents' unique needs* and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, *we strive to offer personalized care and exceptional service* at competitive and affordable rates. *Fees for care and services are based on each resident's needs and preferences*, as determined by the Living Accommodation selected and their Personal Service Plan.

### F.      Management Intentionally Understaffed Its Facilities, Sacrificing Care for Profit, and Actively Concealed this Misconduct

At all relevant times, Management caused the Company to fail to provide adequate staffing at its facilities, and as such, despite its representations of "tailored" and "customized" "exceptional care and service," Management caused the Company to routinely fail to satisfy residents' needs as determined by the PSA, and thus violate the terms of the Company's form Residency Agreements, as well as various other state laws and regulations.

13

Specifically, to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed herein, Management caused the Company to set staffing figures, including the amount of time estimated to fulfill certain tasks and levels of care, greatly beneath the actual required duration. As a result, the collective amount of labor time required to deliver the daily services for Brookdale's resident population exceeded the daily amount of staff time the Company allotted to its facilities. Moreover, to ensure staffing costs would not rise, Management caused the Company to assert tight control over the facility staffing and adopt a policy that precluded local facility-level employees from adjusting staffing, or critical factors and data that was entered into the Company's Service Alignment Software (such as, task counts, task times, logic algorithms, and source code), based upon known staffing demands to meet the daily care needs of Brookdale's residents. Furthermore, the Company itself failed to appropriately adjust staffing despite the fact that Management knew Brookdale's staffing figures were inadequate to meet residents' assessed care needs, Brookdale's contractual obligations, and to comply with adult care home laws, rules, and regulations.

This misconduct resulted in extreme wait times for service care needs that were already paid for and worse still, subjected dependent, disabled, and/or vulnerable residents to the risk of actual service deprivations. As a result, Management's misconduct violated state laws and regulations and exposed the Company to a substantially increased risk of litigation.

Despite receiving a wave of complaints arising out of the Company's purposeful understaffing of its facilities from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, Management intentionally and knowingly refused to address the well-founded complaints, continued to engage in or permit the understaffing to continue to occur, failed to disclose it, and actively concealed it, so that the Company would not default on its massive debt and lease obligations. Moreover, numerous reports generated by the Company's own facilities, corporate audits of each facilities' performance, and internal emails and communications demonstrate that Management engaged in or permitted this misconduct.

### G. Management Issued Numerous Materially False and Misleading Statements

On August 9, 2016, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2016 on Form 10-Q (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Baier, and contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. For the quarter, Brookdale reported net loss of $35.45 million attributable to Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion, compared to a net loss of approximately $84.8 million attributable to Company stockholders, or $0.46 per diluted share, on total revenue of approximately $1.24 billion for the same quarter in the prior year. Regarding "Resident Fees" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Resident fee revenue increased $10.6 million, or 1.0%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 1.6% at the 933 communities we owned or leased during both full periods with a 3.0%

increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue).

Regarding "Facility Operating Expense" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

Facility operating expense decreased over the prior year period primarily due to the impact of disposition and lease termination activity since the beginning of the prior year period and a $13.7 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The decrease was partially offset by increases in salaries and wages due to wage rate increases.

Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

General and administrative expense increased $1.2 million, or 1.3%, over the prior year period primarily as a result of an increase in salaries and wages due to wage rate and bonus accrual increases and an increase in non-cash stock-based compensation expense. The increase was partially offset by a decrease in integration, transaction, transaction-related and strategic project costs.

Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $6.7 million, or 3.7%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

The 2Q16 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2016, the Company had "the ability to serve approximately 107,000 residents." Further, the 2Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 2Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The 2Q16 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-

15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2016, our disclosure controls and procedures were effective.

The 2Q16 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On November 3, 2016, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2016 on Form 10-Q (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Baier, and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. For the quarter, Brookdale reported net loss of $51.69 million attributable to Company stockholders, or $0.28 per diluted share, on total revenue of approximately $1.25 billion, compared to a net loss of approximately $68.22 million attributable to Company stockholders, or $0.37 per diluted share, on total revenue of approximately $1.24 billion for the same quarter in the prior year. Regarding "Resident Fees" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

Resident fee revenue increased $2.7 million, or 0.3%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 2.0% at the 896 communities we owned or leased during both full periods with a 3.2% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue). The increase was partially offset by the impact of disposition activity since the beginning of the prior year period and a 110 basis point decrease in weighted average occupancy in the 896 communities we owned or leased during both full periods. The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, generated $15.1 million of revenue during the current year period compared to $31.5 million of revenue in the prior year period.

Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q16 10- Q also reported, in relevant part, that:

Facility operating expense increased $4.5 million, or 0.6%, over the prior year period primarily due to the impact of increases in salaries and wages due to wage rate increases. This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year period and a $13.9 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience.

The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, incurred $13.0 million of facility operating expenses during the current year period compared to $26.8 million of facility operating expenses in the prior year period.

Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

General and administrative expense decreased $36.1 million, or 36.3%, over the prior year period primarily due to a $29.4 million decrease in integration, transaction, transaction-related and strategic project costs, a decrease in bonus expense and a decrease in stock-based compensation expense.

Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $3.7 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

The 3Q16 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 105,000 residents." Further, the 3Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 3Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The 3Q16 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2016, our disclosure controls and procedures were effective.

The 3Q16 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On February 15, 2017, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2016 on a Form 10-K (the "2016 10-K"). The 2016 10-K was signed by Baier, Smith, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities and Exchange Act of 1934 ("Exchange Act") and SOX signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the 2016 fiscal year, the Company reported a net loss of $404.4 million attributable to Company stockholders, or $2.18 per diluted share, on total revenue of $4.98 billion, compared to a net loss of $457.5 million attributable to Company stockholders, or $2.48 per diluted share, on total revenue of $4.96 billion for the prior year.

Regarding "Resident Fees" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

Resident fee revenue decreased $8.5 million, or (0.2)%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year and a 130 basis point decrease in occupancy at the 876 communities we owned or leased during both full periods. The decrease in resident fees was partially offset by a 3.1% increase in RevPOR at these communities compared to the prior year. Total RevPAR for the consolidated portfolio also increased by 3.0% compared to the prior year. The 81 communities disposed of subsequent to the beginning of the prior year generated $126.2 million of revenue during 2016 compared to $202.0 million of revenue in the prior year.

Regarding "Facility Operating Expense" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

Facility operating expense increased $10.5 million, or 0.4%, over the prior year primarily due to a $46.5 million increase in salaries and wages due to wage rate increases at the 876 communities we owned or leased during both full periods and $18.4 million of expense increases for our ancillary services in connection with higher home health and hospice average daily census. This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year and a $35.4 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The 81 communities disposed of subsequent to the beginning of the prior year, either through sales or lease terminations, incurred

$99.6 million of facility operating expenses during 2016 compared to $164.5 million of facility operating expenses in the prior year.

Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

General and administrative expense decreased $57.2 million, or 15.4%, over the prior year primarily due to a $61.5 million decrease in integration, transaction-related and strategic project costs.

\*       \*       \*

This decrease was partially offset by an increase in salaries and wages due to wage rate increases.

Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $14.3 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full years.

Like the 2Q16 10-Q, the 2016 10-K also flaunted the Company's purportedly first-rate services and facilities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of December 31, 2016, the Company had "the ability to serve approximately 103,000 residents." Further, the 2Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 2Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

Regarding the Company's "Operations," the 2016 10-K stated:

***We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. We have centralized accounting, finance and other operating functions in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations.*** Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, energy and insurance, ***implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and

accounting; *risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]*

Regarding "Community Staffing and Training" the 2016 10-K stated, in relevant part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

And further:

Depending upon the size of the community, each Executive Director is supported by a community staff member who is directly responsible for day-to-day care of the residents and either community staff or regional support to oversee the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, therapy services, activities, housekeeping, and engineering.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

Regarding "Quality Assurance" the 2016 10-K stated, in relevant part, the following:

*We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.* These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.*

In the "Risk Factors," section the 2016 10-K contained nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, [which] would have an adverse effect on [the Company's] business, results of operations and cash flow." The risk warnings contained in the 2016 10-K were broad catch-all clauses that were not designed to disclose the Company's known risks regarding the Misconduct. Specifically, the 2016 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day

operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

The 2016 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2016, our disclosure controls and procedures were effective.

The 2016 10-K, stated in relevant part, about the Company's internal control over financial reporting:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\*     \*     \*

Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016. Management reviewed the results of their assessment with our Audit Committee.

\*     \*     \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On May 10, 2017, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Baier, and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. For the quarter, Brookdale reported net loss of $126.3 million attributable to Company stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion, compared to a net loss of approximately $48.78 million attributable to Company stockholders, or $0.26 per diluted share, on total revenue of approximately $1.26 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the third fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

Resident fee revenue decreased $44.2 million, or 4.2%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 816 communities we owned or leased during both full periods. Additionally, Brookdale Ancillary Services segment revenue decreased $10.2 million, or 8.4%, primarily due to a decrease in outpatient therapy service volume. The 59 communities disposed of subsequent to the beginning of the prior year period (excluding the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $0.7 million of revenue during the current year period compared to $43.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 2.0% increase in RevPOR at the 816 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period. Resident fee revenue for the three months ended March 31, 2017 includes $64.0 million of revenue for the 62 communities acquired by the Blackstone Venture.

Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

Facility operating expense decreased $41.4 million, or 5.8%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 59 communities since the beginning of the prior year period, which incurred $1.3 million of facility operating expenses during the three months ended March 31, 2017 compared to $33.8 million of facility operating expenses in the three months ended March 31, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $11.3 million, or 10.5%, primarily due to a decrease in outpatient therapy services volume.

Regarding "General and Administrative Expense" for the first fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

General and administrative expense decreased $27.1 million, or 29.2%, over the prior year period primarily due to a $19.0 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.2 million during the current period compared to $19.1 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended March 31, 2017.

Regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities decreased $1.3 million, or 0.7%, primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

The 1Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 103,000 residents." Further, the 1Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior

23

living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 1Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 1Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

The 1Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2017, our disclosure controls and procedures were effective.

The 1Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On August 8, 2017, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2017 on Form 10-Q (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Baier, and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the quarter, Brookdale reported net loss of $46.29 million attributable to Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion, compared to a net loss of approximately $35.45 million attributable to Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion for the same quarter in the prior year.

With respect to "Resident Fees" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $120.5 million, or 11.4%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 150 basis points at the 818 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased

$13.1 million, or 10.7%, primarily due to decreases in volume for outpatient therapy services and home health services. The 130 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $6.3 million of revenue during the current year period compared to $116.2 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.8% increase in RevPOR at the 818 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period.

With respect to "Facility Operating Expense" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

Facility operating expense decreased $50.7 million, or 7.3%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 130 communities since the beginning of the prior year period, which incurred $7.5 million of facility operating expenses during the three months ended June 30, 2017 compared to $88.5 million of facility operating expenses in the three months ended June 30, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $7.2 million, or 6.9%, primarily due to decreases in volume for outpatient therapy services and home health services. These decreases were partially offset by an $11.3 million increase in insurance expense related to positive changes in the three months ended June 30, 2016 to estimates in general liability and professional liability and workers compensation expenses and an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods.

Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

General and administrative expense decreased $23.6 million, or 26.0%, over the prior year period primarily due to a $16.1 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.6 million during the current period compared to $16.7 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic

project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended June 30, 2017.

With respect to "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $43.9 million, or 23.6%, primarily due to our entry into management agreements with the Blackstone Venture.

The 2Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2017, the Company had "the ability to serve approximately 102,000 residents." Further, the 2Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 2Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 2Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

The 2Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2017, our disclosure controls and procedures were effective.

The 2Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On November 7, 2017, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2017 on Form 10-Q (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Baier, and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the quarter, Brookdale reported net loss of $413.89 million attributable to Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion, compared to a net loss of approximately $51.69 million attributable to Company stockholders, or $0.28 per diluted share, on total revenue of approximately $1.25 billion for the same quarter in the prior year.

With respect to "Resident Fees" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

Resident fee revenue decreased $119.9 million, or 11.5%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 160 basis points at the 809 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $6.7 million, or 5.7%, primarily due to a decrease in volume for outpatient therapy services and a decrease in reimbursement rates for home health services. The 136 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $4.0 million of revenue during the current year period compared to $115.1 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.4% increase in RevPOR at the 809 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 1.1% compared to the prior year period.

Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

Facility operating expense decreased $53.6 million, or 7.6%, over the prior year period. For the three months ended September 30, 2017, facility operating expense includes $5.3 million of costs related to our response to Hurricanes Harvey and Irma. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 136 communities since the beginning of the prior year period, which incurred $3.3 million of facility operating expenses during the current year period compared to $87.4 million of facility operating expenses in the prior year period. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $1.9 million, or 1.8%, primarily due to a decrease in volume for outpatient therapy services. These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods and an

$8.1 million increase in insurance expense related to positive changes in the three months ended September 30, 2016 to estimates in general liability and professional liability and workers compensation expenses.

With respect to "General and Administrative Expense" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

General and administrative expense increased $0.4 million, or 0.6%, over the prior year period primarily due to increased legal fees. This increase was partially offset by a $5.6 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.8 million during the current period compared to $6.4 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale.

With respect to "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $49.2 million, or 26.2%, primarily due to our entry into management agreements with the Blackstone Venture.

The 3Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2017, the Company had "the ability to serve approximately 101,000 residents." Further, the 3Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 3Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 3Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

The 3Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2017, our disclosure controls and procedures were effective.

The 3Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On February 22, 2018, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2017 on a Form 10-K (the "2017 10-K"). The 2017 10-K was signed by Baier, Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Seward, and Wielansky, and contained SOX certifications signed by Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. For the 2017 fiscal year, the Company reported a net loss of $571.4 million attributable to Company stockholders, or $3.07 per diluted share, on total revenue of $4.75 billion, compared to a net loss of $404.4 million attributable to Company stockholders, or $2.18 per diluted share, on total revenue of $4.98 billion for the prior year.

With regard to "Resident Fees" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $388.5 million, or 9.3%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year. Weighted average occupancy decreased 130 basis points at the 766 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets.

*       *       *

The 165 communities disposed of subsequent to the beginning of the prior year (including the 62 communities for which the financial results were deconsolidated

29

from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $172.6 million of revenue during the current year period compared to $543.3 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 2.5% increase in RevPOR. Total RevPAR for the consolidated portfolio also increased by 1.6% compared to the prior year.

With respect to "Facility Operating Expense" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

Facility operating expense decreased $197.2 million, or 7.0%, over the prior year.

\*       \*       \*

The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 165 communities since the beginning of the prior year period, which incurred $135.0 million of facility operating expenses during the current year compared to $413.1 million of facility operating expenses in the prior year.

\*       \*       \*

These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full years and a $23.3 million increase in insurance expense related to positive changes in the prior year to estimates in general liability and professional liability and workers compensation expenses.

Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

General and administrative expense decreased $58.0 million, or 18.5%, over the prior year primarily due to a $47.4 million decrease in integration, transaction-related and strategic project costs.

\*       \*       \*

Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out projects) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expenses in the current year.

With regard to the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $153.5 million, or 20.8%, primarily due to our entry into management agreements with the Blackstone Venture.

Like the 2Q16 10-Q and the 2016 10-K, the 2017 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of December 31, 2017, the Company had "the ability to serve approximately 101,000 residents." Further, the 2Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 2Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

Regarding the Company's "Operations," the 2017 10-K stated:

> *We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service*. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections*. Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, supplies and insurance, *implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations*; billing and collections; accounts payable; finance and accounting; *risk management; development of employee training materials and programs*; marketing activities; *the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]*

Regarding "Community Staffing and Training" the 2017 10-K stated, in relevant part, the following:

> Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

> \*     \*     \*

> Depending upon the size of the community, each Executive Director is supported by a community staff member (health and wellness director or nursing director) who is directly responsible for day-to-day care of residents and community marketing and sales staff with regional support to oversee the community's sales,

marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

Regarding "Quality Assurance" the 2017 10-K stated, in relevant part, the following:

> *We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.* These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.*

In the "Risk Factors," section the 2017 10-K contained nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, could have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2017 10-K were generic catch-all clauses that were not tailored to reveal the known risks related to the misconduct detailed herein. Specifically, the 2017 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs

and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

The 2017 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2017, our disclosure controls and procedures were effective.

The 2017 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
> *       *       *
>
> Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2017. Management reviewed the results of their assessment with our Audit Committee.
>
> *       *       *
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On May 8, 2018, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2018 on Form 10-Q (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Baier, and contained SOX certifications signed by Baier and Interim CFO, Teresa F. Sparks ("Sparks") attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. For the quarter, Brookdale reported net loss of $457.19 million

attributable to Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion, compared to a net loss of approximately $126.30 million attributable to Company stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $110.7 million, or 10.9%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 130 basis points at the 769 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $1.5 million, or 1.3%, primarily due to a decline in volume for home health visits. The 111 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $2.2 million of revenue during the current year period compared to $107.6 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.0% increase in RevPOR at the 769 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.8% compared to the prior year period.

Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $42.2 million, or 6.3%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 111 communities since the beginning of the prior year period, which incurred $2.1 million of facility operating expenses during the current year period compared to $81.0 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in employee compensation costs at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. Additionally, insurance expense increased related to positive changes in the prior year period to estimates in general liability and professional liability and workers compensation expenses. Additionally, Brookdale Ancillary Services segment facility operating expenses increased $5.9 million, or 6.1%, primarily due to an increase in salaries and wages for the expansion of our hospice services.

With respect to "General and Administrative Expense" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

General and administrative expense increased $11.2 million, or 17.0%, over the prior year period primarily due to increased costs associated with organizational restructuring, including severance and retention costs related to our efforts to reduce general and administrative expense and senior leadership changes. During the current year period, general and administrative expense included severance costs and retention costs of $10.7 million and $1.7 million, respectively.

Regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $78.3 million, or 42.6%, primarily due to our entry into management agreements with the Blackstone Venture.

The 1Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of March 31, 2018, the Company had "the ability to serve approximately 99,000 residents." Further, the 1Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 1Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 1Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

The 1Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2018, our disclosure controls and procedures were effective.

The 1Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On August 7, 2018, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2018 on Form 10-Q (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Baier, and contained SOX certifications signed by Baier and Sparks attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. For the quarter, Brookdale reported net loss of $165.49 million attributable to Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion, compared to a net loss of approximately $46.29 million attributable to Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

Resident fee revenue decreased $38.1 million, or 4.1%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 94 communities, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 758 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. The communities disposed of subsequent to the beginning of the prior year period generated $50.0 million of revenue during the current year period compared to $94.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 0.9% increase in RevPOR at the 758 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.5% compared to the prior year period.

With respect to "Facility Operating Expense" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

Facility operating expense decreased $15.3 million, or 2.4%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 94 communities since the beginning of the prior year period, which incurred $31.8 million of facility operating expenses during the current year period compared to $68.7 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period.

Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

General and administrative expense decreased $6.8 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year.

With regard to "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $12.2 million, or 5.3%, primarily due primarily due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.3 million for the three months ended June 30, 2018, respectively.

The 2Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of June 30, 2018, the Company had "the ability to serve approximately 95,000 residents." Further, the 2Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 2Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 2Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

The 2Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2018, our disclosure controls and procedures were effective.

The 2Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On August 21, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and

Wielansky solicited the 2018 Proxy Statement which contained material misstatements and omissions.

Specifically, with respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, including our principal." The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements discussed herein and Management's failures to report violations of the Code of Conduct.

The 2018 Proxy Statement also called for stockholder approval of, among other things: (1) the election of three directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to declassify the Board (the "First 2018 Proposal"); and (3) the approval of an amendment to the Company's Certificate of Incorporation to eliminate a supermajority voting for director removal (the "Second 2018 Proposal" and, together with the First 2018 Proposal, the "2018 Proposals").

The 2018 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading, because it improperly failed to disclose, *inter alia*, that: (1) the Company's purposeful understaffing of its facilities as detailed herein; (2) the Company's commercial success was maintained by, among other things, this misconduct; (3) the Company's purposeful understaffing of its facilities exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of this misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was unsustainable; and (5) Brookdale failed to maintain adequate internal controls to prevent the occurrence of this misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

The misrepresentations and omissions set forth herein were material to stockholders in voting on the 2018 Proposals who would not have approved the 2018 Proposals had they been informed about the Misconduct.

On November 6, 2018, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2018 on Form 10-Q (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Swain, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the quarter, Brookdale reported net loss of $37.12 million attributable to Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion, compared to a net loss of approximately $413.89 million attributable to Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

Resident fee revenue decreased $82.7 million, or 9.0%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 104 communities, since the beginning of the prior year period, which generated $15.0 million of revenue during the current year period compared to $106.9 million of revenue in the prior year period. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. Weighted average occupancy decreased 90 basis points at the 714 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. RevPAR and RevPOR at the 714 communities we owned or leased during both full periods increased by 0.2% and 1.3%, respectively. Total RevPAR for the consolidated portfolio also increased by 4.0% compared to the prior year period primarily due to fewer weighted average units.

With respect to "Facility Operating Expense" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

Facility operating expense decreased $43.6 million, or 6.7%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 104 communities since the beginning of the prior year period, which incurred $11.2 million of facility operating expense during the current year period compared to $75.6 million of facility operating expense in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. We expect that our labor investments will continue into 2019. Facility operating expense included costs related to our responses to hurricanes of $1.5 million in the current year period and $5.4 million in the prior year period.

With respect to "General and Administrative Expense" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

General and administrative expense decreased $6.5 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year. During the current year period, general and administrative expense included retention costs of $1.6 million.

Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $24.4 million, or 10.3%, primarily due to our entry into interim management agreements with HCP and Welltower for communities for which our leases were terminated subsequent to the prior year period. Additionally, costs incurred on behalf of managed communities increased due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified

retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.2 million for the three months ended September 30, 2018.

The 3Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of September 30, 2018, the Company had "the ability to serve approximately 93,000 residents." Further, the 3Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 3Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 3Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

The 3Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2018, our disclosure controls and procedures were effective.

The 3Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On February 14, 2019, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2018 on a Form 10-K (the "2018 10-K"). The 2018 10-K was signed by Baier, Swain, Bromley, Bumstead, Clegg, Johnson-Mills, Seward, Warren, and Wielansky, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the 2017 fiscal year, the Company reported a net loss of $528.3 million attributable to Company stockholders, or $2.82 per diluted share, on total revenue of $4.53 billion, compared to a net loss of $571.4 million attributable to Company stockholders, or $3.07 per diluted share, on total revenue of $4.75 billion for the prior year.

Regarding "Resident Fees" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

Resident fee revenue decreased $330.9 million, or 8.8%, compared to the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year[.]

*       *       *

The decrease was partially offset by $32.3 million of revenue for four communities acquired during 2018. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. RevPOR at the 664 communities we owned or leased during both full years increased by 1.2%. Weighted average occupancy decreased 90 basis points at the 664 communities we owned or leased during both full years, which reflects the impact of new competition in our markets. RevPOR increased at communities that we owned or leased during both full years primarily as a result of in-place rent increases and lower discounting.

With respect to "Facility Operating Expense" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

Facility operating expense decreased $148.8 million, or 5.7%, over the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year, which incurred $207.8 million of facility operating expense during 2018 compared to $453.4 million of facility operating expense in the prior year. The decrease was partially offset by an increase in labor expense at the communities we operated during both full years and by $17.9 million of facility operating expense for four communities acquired during 2018.

*       *       *

Facility operating expense at the 664 communities we operated during both full years increased 4.6%, over the prior year, reflecting the impact of our investment in salaries and benefits and a tight labor market during 2018. We expect that our labor investments will continue into 2019. Additionally, costs for information technology systems and insurance expenses increased at the communities we operated during both full years.

With regard to the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

General and administrative expense decreased $5.0 million, or 1.9%, over the prior year primarily due to a decrease in salaries and wages expense as a result of a reduction in our corporate associate headcount pursuant to the initiative to scale our general and administrative costs in connection with our portfolio optimization strategy. General and administrative expense included severance costs and retention costs of $12.3 million and $6.5 million, respectively, in 2018.

Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $119.1 million, or 13.4%, primarily due to our entry into management agreements with the Blackstone Venture and the transition of communities previously leased from HCP and Welltower into the management services segment on an interim basis. Additionally, costs incurred on behalf of managed communities increased as a result of increases in salaries and wages and other facility operating expense at the communities managed in both full years and due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to each of revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $46.1 million for 2018.

Like the Company's previous quarterly and annual reports referenced above, the 2018 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of December 31, 2018, the Company had "the ability to serve approximately 84,000 residents." Further, the 2017 10-K stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living ("ADL") such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 2018 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

With respect to the Company's "Operations," the 2018 10-K stated:

*We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service*. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections*.

We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement. *We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations*; billing and collections; accounts payable; finance and accounting; risk management; *development of employee training materials and programs*; marketing activities; *the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]*

Regarding "Community Staffing and Training" the 2018 10-K stated, in relevant part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

*               *               *

Depending upon the size of the community, each Executive Director is supported by key leaders, a Health and Wellness Director (or nursing director) and/or a Sales Director. The Health and Wellness Director or nursing director is directly responsible for day-to-day care of residents. The Sales Director oversees the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

With respect to "Quality Assurance" the 2018 10-K stated, in relevant part, the following:

*We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.* These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy and home

health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.***

In the "Risk Factors," section the 2018 10-K contained generic, hypothetical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, and wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2018 10-K were generic catch-all clauses that were not crafted to divulge the Company's known risks related to the Misconduct. Specifically, the 2018 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists or other personnel, low levels of unemployment, or general inflationary pressures may have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the proposed increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

The 2018 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2018, our disclosure controls and procedures were effective.

The 2018 10-K, stated in relevant part, about the Company's internal control over financial reporting:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\*     \*     \*

Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2018. Management reviewed the results of their assessment with our Audit Committee.

\*     \*     \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

The 2018 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2018 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

On May 7, 2019, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2019 on Form 10-Q (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Swain, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the quarter, Brookdale reported net loss of $42.60 million attributable to Company stockholders, or $0.23 per diluted share, on total revenue of approximately $1.04 billion, compared to a net loss of approximately $457.19 million attributable to Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

The decrease in total revenue was primarily attributable to the disposition of 118 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which had $119.9 million less in resident fees

during the three months ended March 31, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.6% increase in same community RevPAR at the 658 communities we owned or leased during both full periods, comprised of a 3.1% increase in same community RevPOR and a 120 basis point decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $48.4 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

With respect to "Facility Operating Expense" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which had $80.7 million less in facility operating expense during the three months ended March 31, 2019 compared to the prior year period. The decrease was partially offset by a 4.4% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from wage rate increases.

Regarding "General and Administrative Expense" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a decrease in organizational restructuring costs and salaries and wages expense as a result of a reduction in our corporate associate headcount since the beginning of the prior year period as we scaled our general and administrative costs in connection with community dispositions. Transaction and organizational restructuring costs decreased $16.7 million compared to the prior period, to $0.5 million for the three months ended March 31, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs.

With regard to "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

The 1Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed,

purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of March 31, 2019, the Company had "the ability to serve approximately 80,000 residents." Further, the 1Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]" Moreover, the 1Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 1Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

The 1Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2019, our disclosure controls and procedures were effective.

The 1Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> During the quarter ended March 31, 2019, the Company adopted the new lease standard (ASC 842). The Company updated its lease policies and implemented new processes, which changed the Company's internal controls over financial reporting for leases and related disclosures for our current period reporting. There were no other changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On August 6, 2019, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2019 on Form 10-Q (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Swain, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the quarter, Brookdale reported net loss of $55.47 million attributable to Company stockholders, or $0.30 per diluted share, on total revenue of approximately $1.02 billion, compared to a net loss of approximately $165.49 million attributable to Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in total revenue was primarily attributable to the disposition of 124 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $117.4 million less in resident fees during the three months ended June 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.9% increase in same community RevPAR at the 650 communities we owned or leased during both full periods, comprised of a 3.3% increase in same community RevPOR and a 110 basis points decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $41.6 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

With respect to "Facility Operating Expense" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which resulted in $80.2 million less in facility operating expense during the three months ended June 30, 2019 compared to the prior year period. The decrease was partially offset by a 5.5% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases and increased use of overtime.

With respect to "General and Administrative Expense" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs. Transaction and organizational restructuring costs decreased $4.4 million compared to the prior period, to $0.6 million for the three months ended June 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the remainder of 2019 we expect to incur additional transaction costs related to stockholder relations advisory matters.

Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

The 2Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of June 30, 2019, the Company had "the ability to serve approximately 77,000 residents." Further, the 2Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]" Moreover, the 2Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 2Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

The 2Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2019, our disclosure controls and procedures were effective.

The 2Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

On September 18, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky solicited the 2019 Proxy Statement which contained material misstatements and omissions.

With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he Board also has adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, as well as a Code of Ethics for Chief Executive and Senior Financial

Officers, which applies to our President and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Treasurer and Controller."

The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein and Management's failures to report violations of the Code of Conduct or Code of Ethics.

The 2019 Proxy Statement also called for stockholder approval of, among other things: (1) the election of two directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to facilitate implementation of a majority voting standard for uncontested elections of directors (the "2019 First Amendment Proposal"); and (3) the approval of the Amended and Restated 2014 Omnibus Inventive Plan (the "Plan") which, among other things, would: (i) replenish the number of shares of common stock available to be granted under the plan by 5,400,000, or 2.9% of the Company's outstanding shares of Brookdale common stock as of September 9, 2019; (ii) amend the term of the existing plan from June 5, 2024 to the tenth anniversary of the Annual Meeting; (iii) increase the share limitation on awards granted during any fiscal year from 700,000 to 800,000 for restricted shares, restricted stock units, unrestricted shares, performance awards or other stock-based awards; (iv) subject dividends or dividend equivalents credited with respect to any award granted under the Plan to the same restrictions, conditions and risks of forfeiture as the underlying awards; and (v) subject all equity-based awards granted under the Plan, other than shares representing a maximum of 5% of the shares reserved for issuance under the plan, to a minimum vesting period of at least 12 months following the grant date (the "Incentive Proposal" and, together with the 2019 First Amendment Proposal, the "2019 Proposals" and, together with the 2018 Proposals, the "Proposals").

The 2019 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Management improperly failed to disclose, *inter alia*, that: (1) the Company's purposeful understaffing of its facilities as detailed herein; (2) the Company's commercial success was maintained by, among other things, this misconduct; (3) the Company's purposeful understaffing of its facilities exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of this misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was unsustainable; and (5) Brookdale failed to maintain adequate internal controls to prevent the occurrence of this misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

The misrepresentations and omissions set forth herein were material to stockholders in voting on the 2019 Proposals who would not have approved the 2019 Proposals had they been informed about the misconduct.

On November 5, 2019, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2019 on Form 10-Q (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Swain, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the quarter, Brookdale reported net loss of $78.46 million attributable to Company stockholders, or $0.42 per diluted share, on total revenue of approximately $1.01 billion, compared to a net loss of approximately $37.12 million attributable to Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion for the same quarter in the prior year.

Regarding "Resident Fees" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

The decrease in total revenue was primarily attributable to the disposition of 77 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $63.9 million less in resident fees during the three months ended September 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.8% increase in same community RevPAR, comprised of a 2.8% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $72.2 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

With respect to "Facility Operating Expense" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

The increase in facility operating expense was primarily attributable to a 7.0% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases, an increase in employee benefit expense, and an increase in advertising, property remediation, and insurance costs during the period. The increase was partially offset by the disposition of communities since the beginning of the prior year period, which resulted in $47.5 million less in facility operating expense during the three months ended September 30, 2019 compared to the prior year period.

Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a reduction in our corporate headcount, as we scaled our general and administrative costs in connection with community dispositions. The decrease was partially offset by a $0.7 million increase in transactional and organizational restructuring costs compared to the prior period, to $3.9 million for the three months ended September 30, 2019. The increase was due to $3.4 of transaction costs related to stockholder relations advisory matters incurred during the three months ended September 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts

to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the full year 2019, we expect transaction costs related to stockholder relations advisory matters to be approximately $5.5 million, of which $3.4 million was incurred for the three months ended September 30, 2019.

With regard to "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

The 3Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of September 30, 2019, the Company had "the ability to serve approximately 75,000 residents." Further, the 3Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]" Moreover, the 3Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

The "Risk Factors" section of the 3Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

The 3Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2019, our disclosure controls and procedures were effective.

The 3Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended September 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Also on November 5, 2019, the Company held an earnings call in connection to Brookdale's financial and operating results for the fiscal quarter ended September 30, 2019. During the call, in reply to a question from an analyst related to "wage pressures," Defendant Baier responded, in pertinent part:

Now, turning to your first question, what are we doing to deal with the wage pressure, probably the first and most important thing is a true focus on controlling overtime and contract labor. Now, we have to get to the root cause of what drove this up in 2019 and in Q3 in particular. One of the things that we've seen is it's the tightest labor market in the last 50 years. And so, making sure that we've got appropriate staff in our communities is the most important thing that we can do.

On February 19, 2020, the Company filed its annual report with the SEC announcing its financial and operating results for the year ended December 31, 2019 on a Form 10-K (the "2019 10-K"). The 2019 10-K was signed by Baier, Swain, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, Wielansky, and Freed, and contained SOX certifications signed by Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

For the 2019 fiscal year, the Company reported a net loss of $268.5 million attributable to Company stockholders, or $1.44 per diluted share, on total revenue of $4.06 billion, compared to a net loss of $528.3 million attributable to Company stockholders, or $2.82 per diluted share, on total revenue of $4.53 billion for the prior year.

Regarding "resident fees" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

The decrease in total revenue was primarily attributable to the disposition of 135 communities through sales of owned communities and lease terminations since the beginning of the prior year, which resulted in $336.5 million less in resident fees during the year ended December 31, 2019 compared to the prior year.

\*      \*      \*

The decrease in total revenue was partially offset by a 1.9% increase in same community resident fee revenue and RevPAR, resulting from a 2.9% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy.

Regarding "facility operating expense" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year, which resulted in $234.2 million less in facility operating expense during the year ended December 31, 2019. The decrease was partially offset by a 5.1% increase in same community facility operating expense, which was primarily due to an increase in labor expense

arising from planned wage rate increases and an increase in employee benefit expense and increases in insurance and advertising costs compared to the prior year.

Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

> The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs, a reduction in our corporate associate headcount since the beginning of the prior year as we scaled our general and administrative costs in connection with community dispositions, and lower professional fees.

With respect to the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, that:

> The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

Like the Company's previous quarterly and annual reports referenced above, the 2019 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of February 1, 2020, the Company had "the ability to serve approximately 65,000 residents." Further, the 2019 10-K stated that the Company offers its residents "access to a broad continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living ("ADLs") such as eating, bathing, dressing, toileting, transferring/walking[.]" Moreover, the 2019 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

Regarding the Company's "Operations," the 2019 10-K stated:

> **We have implemented intensive standards, policies and procedures, and systems, including detailed staff resources and training materials, which we believe have contributed to high levels of customer service**. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel **to focus on resident care and family connections**.

>     *   *   *

> We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology, and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we

have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining, clinical services, sales, customer engagement, marketing, and procurement. ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and accounting; risk management; ***development of associate training materials and programs; advertising and marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements***[.]

With respect to "Community Staffing and Training" the 2019 10-K stated, in relevant part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services, and financial performance.

*       *       *

Depending upon the size and type of the community, each Executive Director is supported by key leaders, a Health and Wellness Director (or nursing director), and/or a Sales Director. The Health and Wellness Director or nursing director is directly responsible for day-to-day care of residents. The Sales Director oversees the community's sales, marketing, and community outreach programs.

Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

Regarding "Quality Assurance" the 2019 10-K stated, in relevant part, the following:

***We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction through the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.*** These inspections cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; ***quality of resident care*** (including assisted living services, nursing care, therapy, and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services we provide to residents***.

In the "Risk Factors," section the 2019 10-K contained general, theoretical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow."  The risk warnings contained in the 2019 10-K were generic catch-all provisions that were not fashioned to make public Brookdale's known risks regarding the Misconduct.  Specifically, the 2019 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists, or other personnel, low levels of unemployment, or general inflationary pressures have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase in the minimum salary threshold for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists, or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs, and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

The 2019 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2019, our disclosure controls and procedures were effective.

The 2019 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief

Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\*        \*        \*

Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2019. Management reviewed the results of their assessment with our Audit Committee.

\*        \*        \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

The 2019 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2019 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

The above statements, which Management willfully or recklessly made and/or caused the Company to make, were materially false and misleading because they failed to disclose, *inter alia*: (1) the Company intentionally underestimated data inputs that were entered into the Service Alignment Software in a concerted effort to meet certain financial targets; (2) as a result, the Company systematically and purposefully set daily staffing numbers and hours at Brookdale facilities significantly below the necessary staffing levels to meet resident needs and the demand for care in accordance with the Company's PSAs; (3) the Company failed to permit the facility-level employees or local facilities to adjust data inputs to the Service Alignment Software or facility staffing levels based on known facility staffing needs; (4) as a result, the Company failed to provide prompt and effective care and services to its residents that had been paid for; (5) as a result, the Company was in violation of its form Residency Agreements and various state adult care home rules and regulations; (6) the Company's commercial success was maintained by, among other things, this misconduct; (7) this misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the reveal of this misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (8) consequently, Brookdale's financial performance was untenable; and (9) Brookdale failed to maintain adequate internal controls to prevent this misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**Management Further Breached Its Fiduciary Duties by Causing the Company to Repurchase Its Own Stock at Artificially Inflated Prices**

Management further breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Specifically, nearly 10.1 million shares of the Company's common stock were repurchased between September 2016 and March 2020 for nearly *$72.5 million*. As the Company stock was actually only worth $3.12 per share, the low price it reached during trading on May 1, 2020, the Company overpaid nearly *$41.1 million* in total.

## II. THE TRUTH EMERGES

On May 3, 2019, the first of several lawsuits was filed against Brookdale captioned *Bright v. Brookdale Senior Living, Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn. 2019) (the "*Bright* Action"), seeking damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently serve the needs of its resident populations. On April 24, 2020, a separate action seeking substantially similar relief as the *Bright* Action and demanding Brookdale "stop the unlawful and fraudulent practices" was filed under the caption *Gunza v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn. 2020) (the "*Gunza* Action"). The *Bright* Action and *Gunza* Action were consolidated by court order on June 23, 2020 (collectively, the "Consumer Class Action").

On April 30, 2020, *Nashville Business Journal* reported on the filing of the Consumer Class Action, which accuses the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016. According to the Consumer Class Action, Brookdale misled residents and their families when it promised to provide basic care and daily living services. The lawsuit also claims that the proposed class of plaintiffs "have not received the care and services they paid for." Finally, the article revealed that the Company had established lucrative incentive programs that were connected to satisfying or surpassing the Company's financial performance targets to induce employees to keep staffing expenses within budget, regardless of need.

On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020.

In addition, on June 25, 2020, the Company, along with the Company's Chief Executive Officer ("CEO"), its former CEO, and its Chief Financial Officer ("CFO"), was also named as a defendant in a federal securities fraud class action lawsuit currently pending in the United States District Court for the Middle District of Tennessee captioned *Posey v. Brookdale Senior Living Inc. et al.*, No. 3:20-cv-00543 (the "Securities Class Action").

## III. MANAGEMENT'S FIDUCIARY DUTIES OWED TO THE COMPANY

In Delaware, it is well-established that directors "owe fiduciary duties of care and loyalty" to the Company. *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009). In addition, directors owe a fiduciary duty of disclosure, which is derived from the foregoing duties. *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("[c]orporate fiduciaries can breach their duty of disclosure" by

affirmatively making a "false statement, by omitting a material fact, or by making a [misleading] partial disclosure").

The Delaware Supreme Court has made clear that corporate officers and directors must take their duties seriously or face the consequences for not doing so:

> Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor. It is against these standards, and in this spirit, that the alleged actions of [improper conduct] . . . should be judged.

*In re Tyson Foods, Inc.*, No. CIV.A. 1106-CC, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007).

As described herein, Management breached their fiduciary duties of care and loyalty (as well as their related duty of disclosure) to the Company by purposefully understaffing the Company's facilities in violation of its form Residency Agreements in order to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed herein.

## IV.    DAMAGE TO BROOKDALE

As a result of the misconduct described herein, the Company has, and will continue to, suffer immense economic and reputational harm, including, but not limited to, a significant loss in market capitalization, compromised financial integrity, and irreparable damage to its credibility in the business community and financial marketplace.  As with any public entity, the Company will pursue future debt and equity offerings to finance its operations, and because of the misconduct, if left unpunished, the Company will suffer from the liars' discount and will be forced to conduct offerings on less favorable terms for the Company, which will only hinder the Company's future financing efforts.

To date, as a result of Management's misconduct, Brookdale has been and will continue to be forced to expend millions of dollars.  Such losses include, but are not limited to:

1.    Costs incurred in connection with being named a defendant in the federal Consumer Class Action, including the defense and settlement of or judgement in the litigation;

2.    Costs incurred in connection with being named a defendant in the Securities Class Action, including the defense and settlement of or judgement in the litigation, as well as any other related litigation based on the same facts;

3.    Expenditures stemming from the need to undertake internal investigations into the misconduct detailed herein;

4.    Costs associated with the Company's overpayment by nearly $41.1 million for its own stock while the Company's stock price was artificially inflated due to the false and misleading statements discussed herein; and

5.  Costs incurred in connection with the lavish and unjustified compensation and benefits paid to Management while they were actively breaching their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

Thus, in accordance with its fiduciary duties, the Board is obligated to bring an action against Management and vindicate the Company's rights and redress the harm done.

## V.     STOCKHOLDER'S DEMAND PURSUANT TO DEL. CT. CH. R. 23.1

Based on these events, the Stockholder contends that Management breached its fiduciary duties of loyalty and good faith and violated other applicable laws by compromising patient care through the intentional understaffing of Brookdale's facilities, causing damage to Brookdale. Specifically, as a result of the misconduct described herein, Management appears to have violated federal securities laws and SEC rules and regulations. As a result of their misconduct, the Company now possesses valuable claims against these individuals for breaching their fiduciary duties, aiding and abetting breaches of fiduciary duties, indemnification and contribution for any monies paid, or to be paid, by the Company as a result of this misconduct, including any settlement or judgment in the Securities Class Action.

The foregoing is not intended to be an exhaustive list of every law, rule, regulation, or policy implicated by Management's misconduct; rather, it appears likely that, by their conduct, some or all of Management, and potentially others, may have violated additional laws, rules, and regulations.

The Company should not have to bear the enormous financial burden caused by the misdeeds of Management who have breached their fiduciary duties and violated state and federal laws. Accordingly, pursuant to Delaware law, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law;[2] and (ii) commence a civil action against each member of Management (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Management) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Furthermore, the Stockholder demands that the Company's Board take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future. Such measures include, but are not limited to, the following:

- the Board should require Management to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and

---

[2] Any complete and thorough investigation must include a full investigation of the facts alleged in any related litigation including, without limitation, the allegations detailed in the complaints filed in the Securities Class Action. If an additional pleading is filed in the Securities Class Action, or any related or similar litigation, any additional allegations must also be thoroughly investigated.

misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action or any related or similar litigation;

- the Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

- the Board should require Management to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

- the Board should require Management to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct; and

- the Board should adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future.

We trust the Board, consistent with its fiduciary duties of care and loyalty, will undertake the actions demanded above promptly.

Please confirm, as soon as possible, but no later than 30 days from the date of this letter, that a copy of this letter was provided to each member of the Board. As part of your response, please disclose whether the Company has commenced an independent investigation into the serious misconduct set forth herein. Please also state who has been appointed to conduct any such investigation, whether they have retained outside counsel (and if so, who), and the scope of their authority.

Pursuant to Delaware law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a stockholder's derivative action on behalf of the Company seeking appropriate relief.

Sincerely,

Michael I. Fistel, Jr.

JOHNSON FISTEL, LLP