## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| STEFANIE ANDERS, and PATRICIA TEMPLIN, Derivatively on behalf of Brookdale Senior Living, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, LEE S. WIELANSKY, VICTORIA L. FREED, and JORDAN R. ASHER,<br><br>Defendants,<br><br>BROOKDALE SENIOR LIVING, INC., a Delaware corporation,<br><br>Nominal Defendant. | Civil Action No.: 3:21-cv-00373<br><br>Judge Aleta A. Trauger<br>Magistrate Judge Jeffery S. Frensley<br><br><br>JURY TRIAL DEMANDED |

## VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Stefanie Anders ("Anders") and Plaintiff Patricia Templin ("Templin" and together with Anders, "Plaintiffs"), by their attorneys, submit this Verified Consolidated Amended Stockholder Derivative Complaint for breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiffs' counsel, which included, among other things, a review of (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) a review of news reports, press releases, and other publicly available sources; (iii) news articles, shareholder communications, and postings on Brookdale Senior Living, Inc.'s ("Brookdale" or the "Company") website; (iv) pleadings, papers, and other documents filed with, and publicly available from, litigation surrounding Brookdale; and (v) other publicly available information concerning Brookdale and the Individual Defendants (defined herein).

## I. NATURE AND SUMMARY OF THE ACTION[1]

1. This is a stockholder derivative action brought by Plaintiffs on behalf of nominal defendant Brookdale against certain former and current officers and directors for breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, which arises from Brookdale's board of directors' ("Board") failure to vindicate Brookdale's rights by wrongfully refusing both Plaintiff Anders' shareholder litigation demand dated December 16, 2020 and Plaintiff Templin's shareholder litigation demand dated November 11, 2020 (individually, "Demand," and collectively, the "Demands") that demanded the Board investigate the wrongdoing detailed herein and bring an action against certain current

---

[1] All emphasis herein is added unless otherwise noted.

and former directors and officers of the Company for their misconduct. These wrongs have resulted in billions of dollars in damages to Brookdale's reputation, goodwill, and standing in the business community, as well as in exposing the Company to potential liability for violations of federal law.

2.    Brookdale owns and operates over 700 senior living communities and retirement communities in the United States. The Company was established in 1978 and is based in Brentwood, Tennessee. As of 2018, Brookdale was the largest operator of senior housing in the United States.

3.    Throughout the relevant period, Brookdale painted a vivid picture of its communities as offering only the highest quality of resident care, which focused on a "personalized approach" and provided "24-hour assistance with activities of mid-acuity frail and elderly residents." Brookdale emphasized that its number one priority was "protecting" its senior residents, stating that the senior community "that we serve is our most important priority" and "as you would expect, you can enjoy peace of mind knowing we have staff onsite 24 hours a day, seven days a week, just in case you need us." Thus, "[w]hen you move into a Brookdale assisted living community, you can enjoy a life rich in quality care, genuine friendships and fun activities."

4.    In reality, Brookdale has regularly and intentionally understaffed its facilities for years using proprietary software called the Service Alignment System ("SAS") that intended to calculate the total number of labor hours required for each community. Even though Brookdale claimed "[w]e will make decisions closer to our customer by empowering our executive directors with more local decision rights," the communities were completely at the mercy of the calculated number, regardless of any other factor, and despite the fact that the program nearly always undercalculated the needed hours to provide adequate resident care. In fact, community staffing

decisions required corporate-level approval from local executive directors, which meant that requests for additional staffing were repeatedly denied, regardless of need.

5. The reason for intentional understaffing was simple—Brookdale was focused solely on its bottom line and nothing else. The inevitable result of focusing on control instead of providing care was that Brookdale's facilities were chronically understaffed, evidenced by issuance of citations from state and local authorities, incredibly high turnover, and worst of all, resident injury and death.

6. Brookdale's chronic understaffing has been alleged for years, and finally came to a head on April 30, 2020, when multiple local and national news sources published stories detailing a consumer class action complaint filed in the U.S. District Court for the Middle District of Tennessee, which was brought on behalf of a resident with firsthand knowledge of Brookdale's internal operations and insufficient staffing practices.

7. On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020, eventually bottoming out at $2.92 on May 5, 2020.

8. In accordance with Delaware law, on November 11, 2020 and December 16, 2020, Plaintiff Templin and Plaintiff Anders, respectively, served the Board with their pre-suit litigation Demands, requesting the Board investigate and take all necessary legal action against those responsible for the damage caused to, and suffered by, the Company. *See* **Exhibits A and B**.

9. The Board, however, unreasonably refused Plaintiffs' Demands by refusing to investigate or even consider the Demands within a reasonable amount of time. In informing Plaintiffs that the Board would not timely investigate the allegations in the Demands, Plaintiffs were initially informed that the Board would not investigate while the securities fraud class action

– 3 –

lawsuit, captioned *Posey v. Brookdale Senior Living, Inc., et al.*, No. 3:20-cv-00543 (M.D. Tenn.) ("Securities Class Action"), was pending. ***See* Exhibits C and D**. Worse still, following resolution of the Securities Class Action, the Board informed Plaintiffs that it was continuing to refuse to investigate Plaintiffs' Demands pending resolution of the issue of demand futility in the related demand futility actions, captioned *Davis v. Baier, et al.*, No. 3:20-cv-00929 (M.D. Tenn.), and *Bickett v. Baier et al.*, No. 1:21-cv-00872-MN (D. Del.) (collectively, the "Demand Futility Actions"). ***See* Exhibit E**.

10.     In light of the Board's initial response refusing to investigate Plaintiffs' claims, which was on its face improper under Delaware law, Plaintiffs Anders and Templin filed the instant derivative action through the filing of separate pleadings on May 10, 2021 and May 21, 2021, respectively. Nevertheless, as detailed herein, when the Securities Class Action was dismissed by this Court for failure to plead factors unique to the Private Securities Litigation Reform Act ("PSLRA")—and inapplicable in the instant action—the Board ***still*** refused to commence an investigation into the properly served Demands, and is continuing to refuse to investigate Plaintiffs' claims pending resolution of a distinct procedural issue of demand futility—equally inapplicable to the instant action—in the separately pending Demand Futility Actions. ***See* Exhibit E**.

11.     The Board's continued refusal to investigate Plaintiffs' Demands—for more than a ***year***—makes clear that the Board has no intention of fulfilling its responsibilities to represent the interests of Brookdale and perform an independent and good faith investigation into the allegations detailed in the Demands. Thus, Plaintiffs rightfully bring this action to vindicate Brookdale's rights against its wayward fiduciaries and to hold those fiduciaries accountable for

– 4 –

the damage they have caused the Company, and this derivative action should be permitted to proceed.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Brookdale maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Brookdale, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III. THE PARTIES

### A. Plaintiffs

15. Plaintiffs were stockholders of Brookdale at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Brookdale stockholders.

### B. Nominal Defendant

16. Nominal defendant Brookdale is a Delaware corporation with principal executive offices located at 111 Westwood Place, Suite 400, Brentwood, Tennessee 37027. Brookdale is the nation's largest senior-living community operator, owning 350 communities, leasing 301 communities, managing 75 communities on behalf of third parties, and holding an equity interest in three. The Company operates independent living, assisted living, dementia-care communities, and continuing care retirement centers. Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living, and hospice services.

### C. Defendants

17. Defendant Lucinda M. Baier ("Baier") has served as Brookdale's President and Chief Executive Officer ("CEO") and as a Company director since February 2018. Previously, Baier served as Brookdale's Chief Financial Officer ("CFO") from December 2015 until February 2018. According to the Company's Schedule 14A filed with the SEC on April 29, 2021 (the "2021 Proxy Statement"), on April 23, 2021, Baier beneficially owned 444,597 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Baier owned over $2.8 million worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Baier received $7,087,470 in compensation from the Company. This included $938,000 in salary, $1,044,698 in bonus, $4,939,153 in stock awards, $158,288 in non-equity incentive plan compensation, and

$7,331 in all other compensation. For the fiscal year ended December 31, 2019, Baier received $6,350,901 in compensation from the Company. This included $910,000 in salary, $4,773,420 in stock awards, $657,295 in non-equity incentive plan compensation, and $10,186 in all other compensation. For the fiscal year ended December 31, 2018, Baier received $4,674,255 in compensation from the Company. This included $782,248 in salary, $50,000 in bonus, $3,551,872 in stock awards, $281,023 in non-equity incentive plan compensation, and $9,112 in all other compensation. For the fiscal year ended December 31, 2017, Baier received $2,407,188 in compensation from the Company. This included $550,000 in salary, $1,500,013 in stock awards, $196,150 in non-equity incentive plan compensation, and $161,025 in all other compensation. For the fiscal year ended December 31, 2016, Baier received $2,492,367 in compensation from the Company. This included $552,115 in salary, $1,500,005 in stock awards, $222,750 in non-equity incentive plan compensation, and $217,497 in all other compensation.

18. Defendant T. Andrew Smith ("Smith") served as the Company's CEO from February 2013, as President from March 2016, and as a Company director from June 2014 until he resigned from all of his positions with the Company on February 28, 2018. Previously, he had served as Executive Vice President, General Counsel, and Secretary from October 2006 until February 2013. For the fiscal year ended December 31, 2018, Smith received $2,709,314 in compensation from the Company. This included $157,115 in salary and $2,552,199 in all other compensation. For the fiscal year ended December 31, 2017, Smith received $1,315,829 in compensation from the Company. This included $950,000 in salary, $356,709 in non-equity incentive plan compensation, and $9,120 in all other compensation. For the fiscal year ended December 31, 2016, Smith received $6,608,594 in compensation from the Company. This

– 7 –

included $953,654 in salary, $5,225,007 in stock awards, $418,594 in non-equity incentive plan compensation, and $11,339 in all other compensation.

19.     Defendant Steven E. Swain ("Swain") has served as the Company's CFO since September 2018.  According to the 2021 Proxy Statement, on April 23, 2021, Swain beneficially owned 67,207 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date.  Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Swain owned over $435,501 worth of Brookdale stock as of that date.   For the fiscal year ended December 31, 2020, Swain received $2,841,756 in compensation from the Company.   This included $575,00 in salary, $474,375 in bonus, $1,713,588 in stock awards, $71,875 in non-equity incentive plan compensation, and $6,918 in all other compensation.  For the fiscal year ended December 31, 2019, Swain received $2,117,449 in compensation from the Company.   This included $515,000 in salary, $1,306,414 in stock awards, $275,545 in non-equity incentive plan compensation, and $20,490 in all other compensation.   For the fiscal year ended December 31, 2018, Swain received $1,272,135 in compensation from the Company.   This included $161,538 in salary, $100,000 in bonus, $802,324 in stock awards, $46,038 in non-equity incentive plan compensation, and $162,235 in all other compensation.

20.     Defendant Marcus E. Bromley ("Bromley") has served as a Company director since July 2017.   He also serves as a member of the Audit Committee and as a member of the Investment Committee.  According to the 2021 Proxy Statement, on April 23, 2021, Bromley beneficially owned 101,693 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date.  Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48,

– 8 –

Bromley owned over $658,970 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Bromley received $211,033 in compensation from the Company. This included $111,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Bromley received $256,995 in compensation from the Company. This included $157,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Bromley received $230,831 in compensation from the Company. This included $187,000 in fees earned and cash paid and $43,831 in stock awards. For the fiscal year ended December 31, 2017, Bromley received $203,472 in compensation from the Company. This included $103,478 in fees earned and cash paid and $99,993 in stock awards.

21.     Defendant Frank M. Bumstead ("Bumstead") has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, on April 23, 2021, Bumstead beneficially owned 326,746 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Bumstead owned over $2.1 million worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Bumstead received $228,003 in compensation from the Company. This included $128,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Bumstead received $289,995 in compensation from the Company. This included $190,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Bumstead received $315,994 in compensation from the Company. This included $216,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017,

Bumstead received $379,992 in compensation from the Company. This included $280,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Bumstead received $320,995 in compensation from the Company. This included $221,000 in fees earned and cash paid and $99,995 in stock awards.

22.     Defendant Jackie M. Clegg ("Clegg") served as a Company director from November 2005 until October 29, 2019. She also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and as a member of the Audit Committee. For the fiscal year ended December 31, 2019, Clegg received $349,047 in compensation from the Company. This included $249,052 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Clegg received $322,994 in compensation from the Company. This included $223,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Clegg received $390,992 in compensation from the Company. This included $291,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Clegg received $339,995 in compensation from the Company. This included $240,000 in fees earned and cash paid and $99,995 in stock awards.

23.     Defendant Daniel A. Decker ("Decker") served as Executive Chairman of the Board from November 1, 2016 until he resigned effective March 1, 2018. Previously, he served as Non-Executive Chairman of the Board from October 2015 until October 31, 2016. He also served as a member of the Investment Committee. For the fiscal year ended December 31, 2018, Decker received $221,656 in compensation from the Company. This included $138,077 in fees earned and cash paid, $80,047 in stock awards, and $3,532 in all other compensation. For the fiscal year ended December 31, 2017, Decker received $705,966 in compensation from the

– 10 –

Company. This included $687,500 in fees earned and cash paid and $18,466 in all other compensation. For the fiscal year ended December 31, 2016, Decker received $1,082,164 in compensation from the Company. This included $479,167 in fees earned and cash paid, $591,313 in stock awards, and $11,685 in all other compensation.

24.    Defendant Rita Johnson-Mills ("Johnson-Mills") has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee. According to the 2021 Proxy Statement, on April 23, 2021, Johnson-Mills beneficially owned 74,591 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Johnson-Mills owned over $483,349 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Johnson-Mills received $228,003 in compensation from the Company. This included $128,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Johnson-Mills received $211,976 in compensation from the Company. This included $170,609 in fees earned and cash paid and $41,367 in stock awards. For the fiscal year ended December 31, 2018, Johnson-Mills received $155,024 in compensation from the Company. This included $55,033 in fees earned and cash paid and $99,991 in stock awards.

25.    Defendant Jeffrey R. Leeds ("Leeds") served as a Company director from November 2005 until his resignation effective October 4, 2018. He also served as Non-Executive Chairman of the Board from June 2012 until September 2015. Leeds also served as a member of the Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31,

2018, Leeds received $273,081 in compensation from the Company. This included $173,087 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Leeds received $373,992 in compensation from the Company. This included $274,000 in fees earned and cash paid and $99,992 in stock awards.

26. Defendant Mark J. Parrell ("Parrell") served as a Company director from April 2015 until his resignation effective July 24, 2017 at the Company's annual meeting. He also served as a member of the Audit Committee and Investment Committee. For the fiscal year ended December 31, 2017, Parrell received $213,514 in compensation from the Company. This included $113,522 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Parrell received $259,306 in compensation from the Company. This included $190,000 in fees earned and cash paid and $69,306 in stock awards.

27. Defendant William G. Petty, Jr. ("Petty") served as a Company director from December 2014 until his resignation effective February 21, 2018. He also served as the Chair of the Investment Committee and as a member of the Nominating and Corporate Governance Committee. For the fiscal year ended December 31, 2018, Petty received $115,883 in compensation from the Company. This included $15,889 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Petty received $214,992 in compensation from the Company. This included $115,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Petty received $308,995 in compensation from the Company. This included $209,000 in fees earned and cash paid and $99,995 in stock awards.

28. Defendant Guy P. Sansone ("Sansone") has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. According to

the 2021 Proxy Statement, on April 23, 2021, Sansone beneficially owned 43,740 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Sansone owned over $283,435 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Sansone received $226,537 in compensation from the Company. This included $209,000 in fees earned and cash paid and $17,537 in stock awards. For the fiscal year ended December 31, 2019, Sansone received $120,387 in compensation from the Company. This included $20,391 in fees earned and cash paid and $99,996 in stock awards.

29.     Defendant James R. Seward ("Seward") served as a Company director from November 2008 until his resignation effective October 29, 2019. He also served as a member of the Audit Committee as the Chair of the Investment Committee. For the fiscal year ended December 31, 2019, Seward received $327,403 in compensation from the Company. This included $227,408 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Seward received $326,161 in compensation from the Company. This included $226,167 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Seward received $367,159 in compensation from the Company. This included $267,167 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Seward received $309,995 in compensation from the Company. This included $210,000 in fees earned and cash paid and $99,995 in stock awards.

30.     Defendant Denise W. Warren ("Warren") has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, on April 23, 2021, Warren

– 13 –

beneficially owned 75,128 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Warren owned over $486,829 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Warren received $231,033 in compensation from the Company. This included $131,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Warren received $196,882 in compensation from the Company. This included $172,500 in fees earned and cash paid and $24,382 in stock awards. For the fiscal year ended December 31, 2018, Warren received $132,181 in compensation from the Company. This included $32,185 in fees earned and cash paid and $99,996 in stock awards.

31.     Defendant Lee S. Wielansky ("Wielansky") has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. According to the 2021 Proxy Statement, on April 23, 2021, Wielansky beneficially owned 127,860 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Wielansky owned over $828,532 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Wielansky received $226,003 in compensation from the Company. This included $126,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Wielansky received $506,604 in compensation from the Company. This included $406,609 in fees earned and cash paid and $99,995 in stock awards. For the fiscal

– 14 –

year ended December 31, 2018, Wielansky received $553,577 in compensation from the Company. This included $453,583 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Wielansky received $361,992 in compensation from the Company. This included $262,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Wielansky received $274,306 in compensation from the Company. This included $205,000 in fees earned and cash paid and $69,306 in stock awards.

32. Defendant Victoria L. Freed ("Freed") has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, on April 23, 2021, Freed beneficially owned 43,740 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Freed owned over $238,435 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Freed received $130,537 in compensation from the Company. This included $113,000 in fees earned and cash paid and $17,537 in stock awards. For the fiscal year ended December 31, 2019, Freed received $124,387 in compensation from the Company. This included $24,391 in fees earned and cash paid and $99,996 in stock awards.

33. Defendant Jordan R. Asher ("Asher") has served as a Company director since February 2020. Asher also currently serves on the Audit Committee and Investment Committee. According to the 2021 Proxy Statement, on April 23, 2021, Asher beneficially owned 49,857 shares of the Company's common stock, which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the

– 15 –

Company's common stock at the close of trading on April 23, 2021 was $6.48, Asher owned over $323,073 worth of Brookdale stock as of that date. For the fiscal year ended December 31, 2020, Asher received $191,165 in compensation from the Company. This included $91,165 in fees earned and cash paid and $100,000 in stock awards.

34.     The defendants identified in paragraphs 17–33 above are referred to herein as the "Individual Defendants."

35.     The "Audit Committee Defendants" refers to the defendants identified in paragraphs 20, 22, 25, 26, 29–31, and 33.

## IV.     FACTUAL BACKGROUND

### A.     Company Background

36.     Brookdale is headquartered in Brentwood, Tennessee. According to its public filings, Brookdale is the nation's largest senior-living community operator, with $4 billion in reported revenue in 2019 alone. As of April 30, 2021, Brookdale owned 350 communities, leased 301 communities, managed 75 communities on behalf of third parties, and had an equity interest in three communities. The Company operates independent living, assisted living, dementia-care communities, and continuing care retirement centers. Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living, and hospice services.

37.     Brookdale's ascension to its position as the largest senior-living community operator in the United States was solidified by: (1) its acquisition of Horizon Bay, the then-ninth largest operator of senior living communities in the United States, on September 1, 2011, and (2) its acquisition by merger of Emeritus Corporation, the then-second largest operator of senior living communities in the United States, for $2.8 billion on July 31, 2014.

– 16 –

38.     According to representations made by Brookdale in annual filings with the SEC between 2014 and 2018, Brookdale's aggressive growth and purchase strategy required massive financing and infusions of cash.  As a result, Brookdale shackled itself with enormous loan obligations, debt, and lease obligations to financing institutions and real estate investment companies.

39.     To secure such significant loans, financing agreements, and lease contracts, Brookdale agreed to designate profit and financial performance thresholds for its assisted living facilities both on an individual basis and on a consolidated, portfolio-wide, and multi-community basis, as stated in Brookdale 10-K filings filed with the SEC between 2014 and 2018:

> Our outstanding indebtedness and leases contain restrictions and covenants and require us to maintain or satisfy specified financial ratios and coverage tests, including maintaining prescribed net worth levels, leverage ratios and debt service and lease coverage ratios on a consolidated basis, and on a community or communities basis based on the debt or lease securing the communities. In addition, certain of our leases require us to maintain lease coverage ratios on a lease portfolio basis (each as defined in the leases) and maintain stockholders' equity or tangible net worth amounts.
>
> *     *     *
>
> Certain of our debt and lease documents contain restrictions and financial covenants, such as those requiring us to maintain prescribed minimum net worth and stockholders' equity levels and debt service and lease coverage ratios, and requiring us not to exceed prescribed leverage ratios, in each case on a consolidated, portfolio-wide, multi-community, single-community and/or entity basis.
>
> *     *     *
>
> We operate certain of our communities pursuant to management agreements. . . . In addition, in some cases, subject to our rights, if any, to cure deficiencies, community owners may terminate us as manager if . . . we do not satisfy certain designated performance thresholds[.]

40.     In addition, Brookdale guaranteed and pledged the individual and aggregate assets and revenues of its assisted living facilities as collateral for such loan and lease agreements. Therefore, to meet its enormous debt obligations, financial covenants, and financial performance

– 17 –

thresholds and to minimize the risk of defaulting on widespread portions of its portfolio of assisted living facilities and other communities, Brookdale closely monitored and tightly controlled every aspect of the operations and management of its assisted living facilities, including the largest line-item expense—day-to-day staffing.

### B. Brookdale Regulated Staffing Needs from Company Headquarters, Prohibiting Local Facility-Level Staffing Decision-Making

41.     Brookdale represented in various court filings that a majority of its executive and administrative functions are located at its Tennessee headquarters and all final decisions regarding the Company's operations of its communities are made from Brookdale's corporate headquarters: "Brookdale's corporate officers, based out of Brentwood, TN, direct, control, and coordinate Brookdale's services and overall business operations for its locations throughout the United States."[2]

42.     For instance, the Company makes all decisions regarding staffing, budgets, and marketing materials at the corporate level. The Company's 2020 Definitive Proxy Statement confirmed that the "Board and management" were in charge of the "budgeting process."

43.     Brookdale's method of determining and limiting staffing levels at its facilities is done via a staffing algorithm known as its SAS. As described by Brookdale, its SAS Software consists of two main categories of data. First, assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies the Company conducted; and the aggregate assess care needs of all residents. Second, the SAS Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents, and other parameters and factors" to set the number of staffing hours on a

---

[2] *See Edwards v. Emeritus Corporation et al.*, No. 2:16-cv-08191-BRO-JPR (C.D. Cal.), Dkt No. 1, Defendants' Notice of Removal of Action to Federal Court, ¶11.

– 18 –

daily basis. In other words, the SAS Software determines the number of staffing hours in each of its facilities by multiplying (1) the aggregate assessed care needs to be delivered by staff to residents by and (2) the associated task times Brookdale claims are required for each assessed care need.

44. Brookdale's design, methodology, and use of its SAS Software are defective and exceedingly flawed. Specifically, because Brookdale's insufficient staffing is the product of two critical variables, namely (1) the number and types of services to be provided to each of its collective resident populations and (2) the time required to deliver each type of service, Brookdale reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit benchmarks. Brookdale's SAS Software systematically underestimates the staffing needs at each facility by, *inter alia*, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and services provided to its collective resident populations.

45. Moreover, to accurately and reliably determine the number of staff and labor time required to deliver services in industries like Brookdale's, industrial engineers recognize that certain engineering principles and critical variables must be taken into account and applied. The SAS Software is also flawed and faulty because it fails to include these engineering principles and critical variables, thereby resulting in chronically insufficient staffing.

46. Brookdale's use of its SAS Software results in willfully and chronically understaffed facilities. Brookdale intentionally uses its SAS Software to justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, Brookdale deliberately fails to properly,

accurately, and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of the improper conduct.

47.     Of course, Brookdale maintained the confidentiality of its staffing methods, even from its own facility-level employees.   Indeed, at all relevant times, Brookdale's staffing decisions were not made at the facility level, but at the corporate level.   From its corporate headquarters in Brentwood, Tennessee, Brookdale exercised absolute and exclusive control over staffing determinations at its facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budget on a frequent or daily basis.

48.     Moreover, Brookdale prohibited its facilities from making staffing decisions at the local level or modifying Brookdale's corporate predetermined staffing levels without corporate approval.   That is, executive directors and facility level staff could not modify the corporate-predetermined staffing levels without express permission from several layers of Brookdale corporate management—a process designed to limit such requests.   Moreover, any such request for permission to modify or customize must be documented.

49.     The Company's centralized operation as a single enterprise is further evidenced by Brookdale's annual and quarterly reports that Individual Defendants caused the Company to file with the SEC, as referenced in detail below.   For example, the Company's annual report for the periods ended December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017 state that "we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing."

### C. Brookdale Strictly Enforced Its Pre-Determined Staffing Levels

50. At all relevant times, Brookdale oversaw, managed, and ultimately dictated the Company's operating budgets at each one of Brookdale's facilities around the country, including expense limits dedicated to staffing.

51. Indeed, according to the Company's annual report filed with the SEC on February 22, 2018 for the quarter and year ended December 31, 2017 on a Form 10-K "[w]e have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections. Our operating procedures include . . . implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures."

52. The Company's annual reports filed with the SEC for the quarter and year ended December 31, 2014, December 31, 2015, and December 31, 2016 contained substantively the same statements.

53. Brookdale begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal server with near final amounts. Once preloading is complete, each assisted living facility has one week to review the budget and respond to the Brookdale Regional Vice President, Regional Director of Operations, and corporate FP&A with comments and any requests for change.

54. The employees working at each assisted living facility have only read-only access to the budgets, meaning they cannot change any of the preloaded amounts. All changes and final approval of the budgets are made by Brookdale.

– 21 –

55. At all relevant times, once the budgets have been approved by Brookdale, they are locked in for the entire year. In addition, the employees working at each assisted living facility are not able to make changes to the budget.

56. Brookdale has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings. As alleged in the Consumer Class Action (defined herein) filed against the Company, the executive directors at each of Brookdale's assisted living facilities have been routinely admonished by corporate officers in emails demanding that: a) they strictly comply with the staffing budget; b) they make reductions in staffing needed to eliminate budget variances; c) they comply with each facility's staffing expense savings commitment; d) they "do a better job managing our labor, as this is by far our largest expense"; e) they make the necessary adjustments to get staffing within budget or be forced to make reductions; f) everyone will be held accountable for labor control; g) Brookdale does not tolerate an assisted living facility running over its approved staffing budget; h) Brookdale management strenuously emphasizes the importance of managing labor and eliminating overtime; and i) Brookdale does not tolerate an assisted living facility "dropping the ball" on labor controls.

57. To entice its employees to stay at or below Brookdale's limits for staffing and expenses, Brookdale also created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale's financial performance targets. These programs provided facility department heads and Brookdale's senior management significant bonuses for staying at or below Brookdale's budgeted expense limits—the largest of which was staffing.

**D. Brookdale's Form Residency Agreements Misrepresented and Mislead Potential Residents Regarding Brookdale's Inhumane Understaffing**

58. The Company's standard form Residency Agreements advertise Brookdale's commitment to personalized care. Specifically, Brookdale mandates that each of its facilities

– 22 –

conduct what Brookdale refers to as a Personal Service Assessment ("PSA") of each resident, which assesses a resident's care needs.

59.     Afterwards, according to the level of care required, residents are assigned to one of two "Care Groups": (1) Choice Personal Services—care includes services related to, among other things, medication, nutrition, dressing and grooming, showering or bathing, bathroom assistance, escort, and mobility and service coordination; or (2) Comprehensive Care Options—care includes services related to, among other things, chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand upright, bathroom assistance needs for residents who are catheterized, incontinent, or cannot stand upright, two person or mechanical lifts, cognitive and psychological needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance, and pet care.

60.     In its form contract, Brookdale also pledges to regularly reassess the level of care needed to meet residents' needs.

61.     Each service need is broken down by particular and granular needs and ascribed a cost. The Company charges its residents a monthly "Personal Service Rate" in exchange for meeting the evaluated level of care and specific needs documented in the "Personal Service Plan," which includes the "Basic Service Rate" and together with the lesser of: (1) the total cost for meeting each assessed need with each category; or (2) a "Predictable Maximum Total" the Company assigns to each Care Group.

62.     Personal Service Rates are amended from time to time depending on re-evaluations of residents' needs and updates to their Personal Service Plans.

63.     According to the standardized letters the Company sends to Brookdale residents who are subject to rate increases, the Company attributes the increased rate, in large part, to the increased staffing costs to "take care of your senior living needs."

64.     Further anchoring consumers' reasonable belief that Brookdale would have staff sufficient to provide these contracted services was the claim set forth in Brookdale's uniform Residency Agreement that "associates are available 24 hours a day, 7 days a week."

**E.      Brookdale's Marketing Materials Further Misled Potential Residents Regarding the Truth Behind Brookdale's Abhorrent Care and Services Resulting from Its Purposeful Understaffing**

65.     It was not just Brookdale's form Residency Agreements that misrepresented staffing and services provided to Brookdale's residents; the same or similar misrepresentations were contained in the Company's marketing materials as well, including the Company's website, brochures, and presentations, which induced residents to enter into the Company's form Residency Agreements.

66.     In certain Company presentations available on Brookdale's social media platforms, such as a video presentation uploaded to YouTube on December 1, 2017, Brookdale marketed its senior living facilities to individuals and their families on a promise of tailored services that meet the individualized and personal needs of residents, and by touting an army of "***passionate associates ready to work for you***."

67.     Deliberately woven through the Company's sales and marketing materials on its website was/is language assuring elderly and dependent individuals and their families that caring for and meeting the needs of residents was of paramount importance to Brookdale.  Specifically, the Company's website promoted and/or promotes such care:

- "At Brookdale, we believe in delivering senior care that's ***tailored to you and your loved one based on those unique needs*** and desires.  That's why we provide a

– 24 –

variety of options. This ***personalized approach*** ensures that you and your family get exactly what you need without paying for what you don't."

- "[W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, offering individually tailored personal care options to perfectly suit their needs."

- "***Your health is our top priority***, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A ***personalized service assessment and plan*** where we evaluate ***your individual needs*** and then create a ***custom care plan tailored to you***."

- "Brookdale will ***assess your needs*** and help you chose the ***services you need***."

- "***Our trained caregivers provide attention and assistance*** with medication support, bathing, dressing, cooking and other tasks throughout the day. Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. So your loved one gets the care they need while enjoying the quality of life they've earned."

- "***Trained caregivers provide assisted living care*** by providing assistance with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers."

- "At an assisted living community, ***caring staff members*** are available to help them accomplish these tasks, making life a lot easier than if they were living alone. This service provides peace of mind for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day***."

- "The Brookdale approach provides ***services that are tailored to each individual's unique needs***, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, by ***offering the desired service and care as their needs and preferences dictate***. By ***customizing personal care offerings for the individual***, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go."

- "At Brookdale, we are ***committed to listening to your needs***, understanding the life you want for yourself or your loved one, and then partnering with you to ***customize a solution*** for all the places you still want your life to go."

- "The first step towards determining the right senior living option is to ***understand you and your family's needs***."

– 25 –

- "[We] cannot provide exceptional care and service until we find out exactly what it is that your loved one needs."

- "We start with a detailed assessment, listing the specifics of your loved one's level of care."

68. Brookdale's website also advertised that the Company would "[r]ecognize and [i]ntegrate" the results of each resident's PSA by ensuring that Brookdale's "professional staff is trained to recognize the specific needs . . . of each individual" and that a "continuous assessment process" "ensures" the Company would be able to satisfy its residents' care needs.

69. Moreover, certain of the Company's marketing materials advertised that at Brookdale facilities:

> ***Carefully selected and trained associates do more than assist with activities of daily living*** such as dressing, bathing and dispensing of medications; ***they implement custom care plans designed to meet the individual needs of each resident*** … It all begins with a Personal Service Assessment. We take the time to listen to our residents so that ***we understand how to establish clinical, dining and program support that works for them in a meaningful way***. We recognize their individual needs and preferences and respond to them accordingly.

70. Additionally, the Company proclaimed that it:

> ***[p]rovide[s] customized care solutions to meet residents' unique needs*** and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, ***we strive to offer personalized care and exceptional service*** at competitive and affordable rates. ***Fees for care and services are based on each resident's needs and preferences***, as determined by the Living Accommodation selected and their Personal Service Plan.

### F. Brookdale Intentionally Understaffed Its Facilities, Sacrificing Care for Profit, and Actively Concealed Its Misconduct

71. At all relevant times, Individual Defendants caused the Company to fail to provide adequate staffing at its facilities, and as such, despite its representations of "tailored" and "customized" "exceptional care and service," the Individual Defendants caused the Company to

– 26 –

routinely fail to satisfy residents' needs as determined by the PSA, and thus violate the terms of the Company's form Residency Agreements, as well as various other state laws and regulations.

72.     Specifically, to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed herein, the Individual Defendants caused the Company to set staffing figures, including the amount of time estimated to fulfill certain tasks and levels of care, greatly beneath the actual required duration.

73.     As a result, the collective amount of labor time required to deliver the daily services for Brookdale's resident population exceeded the daily amount of staff time the Company allotted to its facilities.

74.     Moreover, to ensure staffing costs would not rise, the Individual Defendants caused the Company to assert tight control over the facility staffing and adopt a policy that precluded local facility-level employees from adjusting staffing, or critical factors and data that was entered into the Company's SAS Software (such as task counts, task times, logic algorithms, and source code), based upon known staffing demands to meet the daily care needs of Brookdale's residents.

75.     Furthermore, the Company itself failed to appropriately adjust staffing despite the fact that the Individual Defendants knew Brookdale's staffing figures were inadequate to meet residents' assessed care needs, Brookdale's contractual obligations, and to comply with adult care home laws, rules, and regulations.

76.     This misconduct resulted in extreme wait times for service care needs that were already paid for, and worse still, subjected dependent, disabled, and/or vulnerable residents to the risk of actual service deprivations.  As a result, the Individual Defendants' misconduct violated state laws and regulations and exposed the Company to a substantially increased risk of litigation.

77. Despite receiving a wave of complaints arising out of the Company's purposeful understaffing of its facilities from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, Brookdale intentionally and knowingly refused to address well-founded complaints, continued to engage in or permit the understaffing to continue to occur, failed to disclose it, and actively concealed it, so that the Company would not default on its massive debt and lease obligations.

78. Moreover, numerous reports generated by the Company's own facilities, corporate audits of each facilities' performance, and internal emails and communications demonstrate that Brookdale engaged in or permitted this misconduct.

### G. The Individual Defendants Downplay Accusations of Understaffing, Even When Confronted with Multiple Lawsuits.

79. On March 24, 2017, a former employee filed a lawsuit against Brookdale, titled *Rejuso v. Brookdale Senior Living Communities, Inc.*, Case No. BC655101, Dkt. No. 1 (Cal. Super. Ct. 2017). The lawsuit alleged that the plaintiff was assigned to provide one-on-one care for residents who were paying for that extra care option. The plaintiff alleged that one such resident required one-on-one attention in excess of six hours. When Brookdale began scheduling the plaintiff's care with that of multiple residents, the plaintiff complained to her supervisor. The supervisor stated she had no choice but to help multiple patients at the same time because the facility was understaffed. This allegedly resulted in a reduction of the plaintiff's hours to only one hour per week.

80. On April 4, 2017, a class action lawsuit was filed against Brookdale, titled *Runton v. Brookdale Senior Living, Inc.*, No. 17-CV-60664 (S.D. Fla. 2017) ("*Runton*"), alleging violations of the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, *et seq.*, breaches of contract, and other violations of Florida state law. The violations primarily concerned

understaffing in Florida senior living facilities that were operated by Brookdale, including that there were staffing shortages despite having contracted for more personalized care according to each resident's PSA. The plaintiff in *Runton* alleged that Brookdale misrepresented the level of care that a resident would receive by not having the level of staffing that the residents required. Gloria Runton, the named plaintiff, alleged that she was charged extra fees for personal care, with the amount increasing drastically for increased personalized care throughout her residency at a Brookdale facility. Ms. Runton alleged that she did not receive increased care despite being charged more by Brookdale and that Brookdale ignored or refused her repeated requests to provide her personal documentation to her. Among other things, Runton alleged that Brookdale controlled the staffing levels from their corporate headquarters in Brentwood, Tennessee, implementing a uniform corporate policy of controlling staffing levels based solely on corporate profits as opposed to the individualized staffing needs at each facility. The action settled before trial.

81.     The Individual Defendants attempted to combat these allegations in public statements made to the investing public. On May 8, 2017, Brookdale held an investor conference call on May 9, 2017 to discuss the Company's first quarter 2017 financial results (the "1Q17 Call"). Defendants Baier and Smith participated on the call. During the 1Q17 Call, Defendant Smith similarly highlighted Brookdale's purported "high quality" care:

> Right. Thank you, Dan. As Dan mentioned, our management and [B]oard are focused on maximizing shareholder value. While we are exploring the options and alternatives available to us, we are also fully committed to driving the operational improvements in our business that will increase shareholder value, ***while also providing high-quality care to our residents*** and strong opportunities for our associates.
>
> *             *             *
>
> And finally, we continue our portfolio-optimization work to dispose of communities that aren't consistent with our strategy or our return expectations. ***Our goal is to have a portfolio that will enrich the lives of our residents*** while providing strong long-term returns for our shareholders.

– 29 –

82. On May 10, 2017, the Individual Defendants caused Brookdale to file its quarterly report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "1Q17 10-Q"). The 1Q17 10-Q advertised the Company's supposedly excellent senior living communities and the services they could provide to residents, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents."

83. Further, the 1Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" The Individual Defendants caused the Company to make nearly identical statements each quarter of 2017.

84. On July 13, 2017, a class action complaint was filed in the Northern District of California alleging violations of consumer protection laws, among other violations, against Brookdale, titled *Stiner v. Brookdale Senior Living, et al.*, No. 4:17-cv-03962. The action was brought on behalf of nine named plaintiffs, each of whom were residents at a Brookdale facility and received inadequate care due to a lack of staffing. The complaint alleged that "corporate policy and procedure of providing pre-determined staffing at its facilities precludes BROOKDALE from providing the care and services residents have been promised and places all residents at substantial risk that they will not receive the care and services that they have paid for on any given day."

85. In an attempt to further distance the Company from allegations that staffing was controlled at Company headquarters rather than at the local level, Brookdale held an investor conference call on February 22, 2018 to discuss the Company's fourth quarter and full year 2018 financial results (the "4Q17 Call"). Defendant Baier participated on the call as CFO and falsely

– 30 –

reiterated Brookdale's purported focus on high quality care and investment in retaining associates, adding that Brookdale was focusing on its residents by giving local executive directors more control over decisions when, in fact, executive directors had no control over the most important decisions such as the budget and staffing:

> Let me turn to the operations next. Our operating focus will be based on 3 tenets: first, attract, engage, develop and retain the best associates. Second, *our resident and family trust and endorsement by providing valued, high quality care and personalized service*, which in turn leaves us to our third tenet, which is to drive attractive long-term returns for our shareholders. We plan to return to our strong foundation, while we will differentiate ourselves based on caring associates who create passionate advocates and generate referrals. It's about winning locally while leveraging our industry-leading scale and experience.

> *On the surface, you may not see this as a big change from what we said in the past, but the reality is, our focus is very different. We will make decisions closer to our customers by empowering our executive directors with more local decision rights.* We are also changing how we allocate our resources. This is about improving our ability to operate by narrowing our focus. You can't be the best of anything when you're trying to do everything. But we will stop trying to do so much and we will eliminate anything that distracts us from our mission. *We will make sure that our associates are able to focus only on what matters most, our residents.*

> \*      \*      \*

> *Second, our strategy improved our focus on our residents and patients. Our unwavering commitment is to our customers. We will continue our work on enhancing our customer value proposition, differentiating based on quality, choice, personalized services and associates who care.* We will raise Brookdale's profile on a local level with potential customers and their adult children. We will concentrate on customer satisfaction because we know through improving [n]et [p]romoter [s]core, work that delighted our residents, correlates with higher performance. We've identified the need to change our sales and marketing national versus local mix and intend to implement other changes we've identified to improve our performance. For example, we have initiatives to improve our lead management, pursuing the most productive channels, improving our initial response and follow up on those leads and marketing in a local targeted manner. At the same time, we are discontinuing well-meaning initiatives that distract from the things that matter most.

86. Also on February 22, 2018, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2017 on a Form 10-K (the "2017 10-K"). Regarding the Company's "Operations," the 2017 10-K stated:

> **We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service**. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel **to focus on resident care and family connections**. Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, supplies and insurance, **implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations**; billing and collections; accounts payable; finance and accounting; **risk management; development of employee training materials and programs**; marketing activities; **the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]**

87. Quarterly throughout 2018, the Individual Defendants would cause Brookdale to make similar claims as in 2017—that the Company was focused on proper staffing to meet resident needs.

88. Moreover, on May 8, 2018, Brookdale held an investor conference call to discuss the Company's first quarter 2018 financial results (the "1Q18 Call"). Defendant Baier participated on the call, as well as Teresa Sparks ("Sparks"), Brookdale' interim CFO. On the call, Defendant Baier again improperly insisted that executive directors were "empowered" with local decision making:

> I'll now turn to some drivers to reduce controllable move outs. Our goal is to make decisions as close to the customer as we can, while capturing the benefits of scale. **Our operations leadership team is empowering our [e]xecutive [d]irectors with more local decision [rights] so that they can take care of the community as if they owned it. For example, they're reallocating resources during low-contact time periods to look at ways to enhance our facility's focus. I'm committed to spending time in our communities every month to ensure that our communities have what they need to succeed. During my visits, I've seen evidence** that out culture of winning locally is starting to be revitalized with a focus on differentiating

– 32 –

Brookdale, ***based on caring, quality, personalized service to our residents***. The Brookdale team is actively pursuing all 3 of our strategic priorities. So let me provide the highlights for the third priority, our shareholders.

89.     On September 17, 2018, Brookdale filed a presentation with the SEC titled "Investor Update September 2018" ("September 2018 Presentation"). The September 2018 Presentation similarly claimed that Brookdale's "Mission" was purportedly "***[e]nriching the lives of those we serve with compassion, respect, excellence and integrity***." The presentation stated the Company's "Strategy" was "***[w]in [l]ocally by providing choices for high quality care & personalized service by caring associates while leveraging industry leading scale and experience***." The "Plan" included "***[e]arn resident and family trust and endorsements by providing valued high quality care and personalized service.***"

90.     In direct contravention of this message, on October 16, 2018, an individual plaintiff sued Brookdale and defendant Baier, later removing the action to federal court on February 21, 2019 in an action captioned *Johnson v. BLC Lexington SNF, LLC d/b/a Brookdale Richmond Place SNF*, 5:19-CV-00064 (E.D. Ky. 2019). The operative complaint brought claims of negligence, breach of contract, fraud, misrepresentations, and other related claims. As alleged in the third amended complaint filed on March 15, 2019, as a result of understaffing, the plaintiff suffered physical injuries such as poor hygiene, failure to have a surgical wound cleaned, contracting infections, including Methicillin-resistant Staphylococcus aureus, unnecessary pain and suffering, loss of dignity, emotional distress, and hospitalization. The plaintiff alleged that the defendants engaged in a fraudulent scheme in which they misrepresented the number of staff and the care a resident would receive.

91.     On May 3, 2019, another lawsuit was filed against Brookdale captioned *Bright v. Brookdale Senior Living, Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn.) (the "*Bright*

– 33 –

Action"), seeking damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently serve the needs of its resident populations.

92.     On April 24, 2020, a separate action seeking substantially similar relief as the *Bright* Action and demanding Brookdale "stop the unlawful and fraudulent practices" was filed under the caption *Gunza v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn.) (the "*Gunza* Action").

93.     The *Bright* Action and *Gunza* Action were consolidated by court order on June 23, 2020 (collectively, the "Consumer Class Action").

94.     Contrary to the representations that Brookdale made publicly, the Consumer Class Action Complaint alleges that:

> [E]very day that the hours of time required to provide all basic care and daily life services to residents in a BROOKDALE facility exceeded the amount of actual staff time available to provide these services, residents could not have received the promised levels of care and daily living services.

95.     The Consumer Class Action Complaint also alleges that plaintiffs encountered willful understaffing to boost profitability, including:

> [A] system of chronically understaffed assisted living facilities that routinely and as a matter of practice fail to provide sufficient staffing that correlates to the service needs of its resident populations in order to provide the most basic level of promised care and daily living services.

> *       *       *

> Instead, BROOKDALE has systemically and willfully understaffed its facilities to boost its profitability.

96.     The Consumer Class Action Complaint alleges that rather than use the PSA system to determine staff and labor hours to meet resident needs, Brookdale used the SAS to dilute and underestimate staffing requirements.

> At the very heart of this scheme was BROOKDALE's method of determining and limiting staffing levels at its facilities. Rather than providing the amount of staff

– 34 –

and labor hours required to meet resident service needs as determined by its PSA system, BROOKDALE used a staffing algorithm known as its [SAS] [s]oftware to dilute and underestimate the staffing time actually needed.

*     *     *

In other words, BROOKDALE's [SAS] [s]oftware systematically underestimates the staffing needs at each facility by, inter alia, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations.

97.     According to the Consumer Class Action Complaint, SAS was used to "justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and financial performance thresholders."

98.     The Consumer Class Action Complaint also alleges that Brookdale's corporate headquarters exercised absolute control over these actions:

> ***From its corporate headquarters in Brentwood Tennessee, Brookdale exercises absolute and exclusive control over staffing determinations at its facilities***, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budget on a frequent or daily basis. Moreover, ***BROOKDALE prohibits its facilities from making staffing decisions at the local level or modifying BROOKDALE's corporate determined staffing levels without corporate approval.*** BROOKDALE did not disclose and has affirmatively concealed these crucial and material facts from residents, including [p]laintiffs, the proposed [c]lass [m]embers, their family members, and the members of the consuming public who may consider admission to a Brookdale facility.

99.     On April 30, 2020, *Nashville Business Journal* reported on the filing of the Consumer Class Action, which accuses the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016. According to the Consumer Class Action, Brookdale misled residents and their families when it promised to provide basic care and daily living services. The lawsuit also claims that the proposed class of plaintiffs "have not received the care and services they paid for." Finally, the article revealed that the Company had established lucrative incentive programs that

– 35 –

were connected to satisfying or surpassing the Company's financial performance targets to induce employees to keep staffing expenses within budget, regardless of need.

100.    On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020.

101.    On March 12, 2021, Judge William L. Campbell, Jr. denied in part the defendants' motion to dismiss.

### H.    The Company Issues Materially False and Misleading Proxy Statements

### i.    2018 Proxy Statement

102.    On August 21, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky solicited the 2018 Proxy Statement, which contained material misstatements and omissions.[3]

103.    The 2018 Proxy Statement stated, "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, including our principal."

104.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Business Conduct and Ethics (defined below as the "Code") was not followed, as evidenced by the Individual Defendant's purposeful understaffing of its facilities and active concealment of that fact from the investing public and/or their failures to report these violations of the Code.

---

[3] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement and the 2019 Proxy Statement (defined below) are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

– 36 –

105.     The 2018 Proxy Statement also called for shareholder approval of, among other things: (1) the election of three directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to declassify the Board (the "First 2018 Proposal"); and (3) the approval of an amendment to the Company's Certificate of Incorporation to eliminate a supermajority voting for director removal (the "Second 2018 Proposal" and, together with the First 2018 Proposal, the "2018 Proposals").

106.     The 2018 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Individual Defendants purposefully understaffed Brookdale's facilities; (2) the Individual Defendants knowingly refused to address well-founded complaints of understaffing from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, and continued to engage in or permit the understaffing to continue to occur, failed to disclose it, and actively concealed it; (3) the Individual Defendants' misconduct exposed the Company to a greater chance of litigation and, in all likelihood, a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

107.     The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2018 Proposals who would not have approved the 2018 Proposals had they been informed about the misconduct.

– 37 –

ii.        **2019 Proxy Statement**

108.    On September 18, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky solicited the 2019 Proxy Statement, which contained material misstatements and omissions.

109.    The 2019 Proxy Statement stated, "[t]he Board also has adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, as well as a Code of Ethics for Chief Executive and Senior Financial Officers, which applies to our President and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Treasurer and Controller."

110.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code was not followed, as evidenced by the Individual Defendants' purposeful understaffing of its facilities and active concealment of that fact from the investing public and/or their failures to report these violations of the Code.

111.    The 2019 Proxy Statement also called for shareholder approval of, among other things: (1) the election of two directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to facilitate implementation of a majority voting standard for uncontested elections of directors (the "2019 First Amendment Proposal"); and (3) the approval of the Amended and Restated 2014 Omnibus Inventive Plan (the "Plan") which, among other things, would: (i) replenish the number of shares of common stock available to be granted under the plan by 5,400,000, or 2.9% of the Company's outstanding shares of Brookdale common stock as of September 9, 2019; (ii) amend the term of the existing plan from June 5, 2024 to the tenth anniversary of the Annual Meeting; (iii) increase the share limitation on awards granted during any fiscal year from 700,000 to 800,000 for restricted shares, restricted stock units, unrestricted shares, performance awards or other stock-based awards; (iv) subject dividends or dividend

– 38 –

equivalents credited with respect to any award granted under the Plan to the same restrictions, conditions and risks of forfeiture as the underlying awards; and (v) subject all equity-based awards granted under the Plan, other than awards representing a maximum of 5% of the shares reserved for issuance under the plan, to a minimum vesting period of at least 12 months following the grant date (the "Incentive Proposal" and, together with the 2019 First Amendment Proposal, the "2019 Proposals" and, together with the 2018 Proposals, the "Proposals").

112.    The 2019 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Individual Defendants purposefully understaffed Brookdale's facilities; (2) the Individual Defendants knowingly refused to address well-founded complaints of understaffing from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, and continued to engage in or permit the understaffing to continue to occur, failed to disclose it, and actively concealed it; (3) the Individual Defendants' misconduct exposed the Company to a greater chance of litigation and, in all likelihood, a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

113.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2019 Proposals who would not have approved the 2019 Proposals had they been informed about the misconduct.

# V. THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES OWED TO THE COMPANY

114. In Delaware, it is well-established that directors owe fiduciary duties of care and loyalty to the Company. In addition, directors owe a fiduciary duty of disclosure, which is derived from the foregoing duties.

115. Brookdale's Code of Business Conduct and Ethics (the "Code") states:

To reach our goal of being the most trusted and effective senior living provider and employer, we must strongly uphold the highest standards of business and personal ethical conduct. We must hold each other accountable and always act with the best interests of our residents, fellow associates and shareholders in mind.

\* \* \*

The Code applies to everyone at Brookdale, including our [Board]. We are all responsible for knowing and following our Code and living up to its principles every day. That includes full-time and part-time associates, exempt and non-exempt. The concepts described in the Code also apply to those who do business with us, including vendors, third-party contractors and affiliated healthcare providers. Brookdale suppliers are additionally subject to a separate supplier code of conduct.

\* \* \*

Brookdale is committed to complying with all health, reimbursement, safety, environmental and employment laws, and our Brookdale policies and procedures are written in accordance with these laws. We count on our Brookdale associates to assist in spotting potential issues and helping avoid inadvertent violations.

116. Brookdale's Audit Committee Charter states:

The purpose of the Audit Committee (the "Committee") of the [Board] of [Brookdale] (the "Corporation") shall be to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Corporation and its subsidiaries, including, without limitation, (a) assisting the Board's oversight of (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors, the Corporation's internal audit function, the Corporation's compliance function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the [SEC] for inclusion in the Corporation's annual proxy statement.

*        *        *

The Committee shall have the following duties and responsibilities with respect to the oversight of the Corporation's financial reporting process and internal controls:

(b)      To review with the [CEO], [CFO] and independent auditors, periodically, the following:

(i)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize and report financial information; and

(ii)      any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting;

(c)      To discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the compliance department and internal audit function, assess and manage the Corporation's exposure to risk, as well as the Corporation's major financial and compliance risk exposures and the steps management has taken to monitor and control such exposures;

*        *        *

(b)      To meet periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Corporation and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Corporation or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Corporation;

*        *        *

(e) To establish procedures for (i) the receipt, retention and treatment of complaints received by the Corporation regarding compliance, accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters;

*        *        *

(i)      To report regularly to the Board on its activities, as appropriate. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Corporation's financial statements, the Corporation's compliance with legal or regulatory requirements, the

– 41 –

performance and independence of the Corporation's independent auditors, or the performance of the internal audit function;

*      *      *

The Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities, and may retain, at the Corporation's expense, such independent counsel or other consultants or advisers as it deems necessary.

117.    As described herein, Individual Defendants breached their fiduciary duties of care and loyalty (as well as their related duty of disclosure) to the Company by purposefully understaffing the Company's facilities in violation of its form Residency Agreements in order to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed herein.

## VI.        DAMAGES TO BROOKDALE

118.    As a result of the misconduct described herein, the Company has suffered, and will continue to suffer, immense economic and reputational harm, including, but not limited to, a significant loss in market capitalization, compromised financial integrity, and irreparable damage to its credibility in the business community and financial marketplace.  As with any public entity, the Company will pursue future debt and equity offerings to finance its operations, and because of the misconduct, if left unpunished, the Company will suffer from the liars' discount and will be forced to conduct offerings on less favorable terms for the Company, which will only hinder the Company's future financing efforts.

119.    To date, as a result of Individual Defendants' misconduct, Brookdale has been and will continue to be forced to expend millions of dollars.  Such losses include, but are not limited to:

      a)   Costs incurred in connection with being named a defendant in the federal Consumer Class Action, including the defense and settlement of or judgment in the litigation;

– 42 –

b) Costs incurred from the loss of the Company's customers' confidence in Brookdale and its products and services; and

c) Costs incurred in connection with the lavish and unjustified compensation and benefits paid to Individual Defendants while they were actively breaching their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

120.    Moreover, these actions have irreparably damaged Brookdale's corporate image and goodwill.  For at least the foreseeable future, Brookdale will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Brookdale's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company has also suffered over $2.95 billion in market capitalization loss as a direct result of the Individual Defendants' wrongdoing alleged herein.

121.    Thus, in accordance with its fiduciary duties, the Board is obligated to bring an action against Individual Defendants and vindicate the Company's rights and redress the harm done.

## VII.    DERIVATIVE AND FUNCTIONAL REFUSAL ALLEGATIONS

122.    Plaintiffs bring this action derivatively in the right and for the benefit of Brookdale to redress injuries suffered, and to be suffered, by Brookdale as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Brookdale is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

– 43 –

123. Plaintiffs will adequately and fairly represent the interests of Brookdale in enforcing and prosecuting its rights.

124. Plaintiffs were stockholders of Brookdale at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Brookdale stockholders.

125. Plaintiffs Templin and Anders made their formal Demands for litigation on November 11, 2020 and December 16, 2020, respectively, where they demanded that the Board (i) undertake (or cause to be undertaken) an independent internal investigation into Individual Defendants' violations of Delaware and/or federal law; and (ii) commence a civil action against the Individual Defendants (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against management) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein, as well as take additional affirmative action to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future. **Exhibits A and B**.

126. On December 11, 2020, Mr. Timothy J. Cesar ("Cesar"), Vice President of Legal at Brookdale, wrote to Plaintiff Templin's counsel requesting documentation of Plaintiff Templin's stock ownership, confirming receipt of the Demand, and advising that the Demand had been provided to the Board for its consideration.

127. On December 17, 2020, Cesar wrote to Plaintiff Anders' counsel also requesting documentation of Plaintiff's stock ownership, confirming receipt of the Demand, and advising that the Demand had been provided to the Board for its consideration. **Exhibit F**.

128. On December 22, 2020 and December 30, 2020, Plaintiff Templin's and Plaintiff Anders' counsel, respectively, responded to Cesar, providing documentation of each

– 44 –

Plaintiff's current and continuous stock ownership and inquiring into the Board's anticipated timeframe for responding to the Demands, among other things.

129.     In response, in letters dated March 11, 2021, the Board informed Plaintiffs that it "determined that it is in the Company's interest to defer consideration of the [Demand]" indefinitely while the Securities Class Action is pending, rather than conduct an internal investigation.  In support of its decision to defer consideration of the Demand, "[t]he Board noted that pursuit by the Company of the claims alleged in the [Demand], while the [Securities Class Action] is pending, could prejudice the Company's defense of the [Securities Class Action.]"  The Board's unwillingness to form an investigative committee or take any positive steps towards investigating the alleged misconduct functions as a refusal.  **Exhibits C and D**.

130.     Nevertheless, when the Securities Class Action was dismissed by this Court for failure to plead factors unique to the Private Securities Litigation Reform Act ("PSLRA")—and inapplicable in the instant action—the Board has ***still*** refused to commence an investigation into the properly served Demands.

131.     Indeed, in a letter to Plaintiff Anders' counsel dated December 14, 2021, the Board further responded that after having reconsidered Plaintiff Anders' Demand following resolution of the Securities Class Action, the Board had "determined that it would not be a sensible expenditure of time and resources to conduct a full investigation into the allegations raised in [Plaintiff Anders' Demand]," and that "it is in the best interests of the Company to first litigate the issue of demand futility" in the Demand Futility Actions—a threshold procedural issue not at issue in this litigation.  ***See* Exhibit E**.

132.     As a result, more than ***a year*** has passed since Plaintiffs first served their respective Demands on Brookdale's Board without any investigation by the Board having been undertaken.

– 45 –

133.     As the Board continues to act in bad faith by refusing to perform its duties under Delaware law, the harms complained of in the Demands are actively ongoing and remain unremedied by the Board, causing further damage to the Company with each passing day. These actions by the Board cannot be reasonably interpreted to be in the best interests of the Company or in good faith.

134.     Thus, the Board's failure to respond within a reasonable time to the Demands, and the Board's unwarranted and egregious deferral of their consideration is therefore a violation of Delaware law. The Board's actions thus constitute a wrongful refusal of the Demands. Accordingly, Plaintiffs have satisfied Delaware's demand requirement and may pursue this action on behalf of the Company.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

135.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

136.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Brookdale disseminated accurate, truthful and complete information to its shareholders. The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Brookdale shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. The Individual Defendants further continued to intentionally understaff facilities, compromising resident care in the name of profit. These actions could not have been a good faith exercise of prudent business judgment.

137.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith, and, when put on notice of problems with the Company's

– 46 –

business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

138.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

139.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

140.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the relevant period.  It resulted in continuous, connected, and on-going harm to the Company.

141.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

142.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

143.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Brookdale by virtue of the excessive and unwarranted compensation paid to them while in breach of their fiduciary duties.

– 47 –

144.    Plaintiffs, as shareholders and representatives of Brookdale, seek restitution from these Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

**Against the Individual Defendants for**
**Violations of Section 14(a) of the Securities Exchange Act of 1934**

145.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

146.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

147.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

148.    Under the direction and watch of the Brookdale Board, the 2018 Proxy Statement and 2019 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Individual Defendants purposefully understaffed Brookdale's facilities; (2) the Individual

– 48 –

Defendants knowingly refused to address well-founded complaints of understaffing from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, and continued to engage in or permit the understaffing to continue to occur, failed to disclose it, and actively concealed it; (3) the Individual Defendants' misconduct exposed the Company to a greater chance of litigation and, in all likelihood, a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

149. The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation, in that they purported to employ performance-based compensation elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on the misconduct detailed herein, which caused the Company's share price and financial performance to be artificially inflated and allowed the Individual Defendants to wrongfully benefit from the fraud alleged herein.

150. Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code, due to the Individual Defendants' failures to abide by them and their engagement in or tolerance of the misconduct detailed herein.

151. The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the misconduct.

152.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval the Proposals.

153.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2019 Proposals who would not have approved, among other things, Defendants Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky's incentive award plan, had they been informed about the misconduct. As a result of shareholder approval of the Inventive Proposal, Defendants Baier and Swain undeservedly received performance-based stock awards during the fiscal year ended December 31, 2019; Defendants Bromley, Bumstead, Sansone, Wielansky, Clegg, Seward, and Freed undeservedly received approximately $99,995 each in stock awards during the fiscal year ended December 31, 2019; and Defendants Johnson-Mills and Warren undeservedly received approximately $41,367 and $24,382, respectively in stock awards during the fiscal year ended December 31, 2019.

154.    The false and misleading elements of the 2018 Proxy Statement led to, among other things, the approval of the 2018 Proposals and the election or re-election of Defendants Bromley, Johnson-Mills, and Warren, which allowed them to breach or continue breaching their fiduciary duties to Brookdale.

155.    The false and misleading elements of the 2019 Proxy Statement led to, among other things, the approval of the 2019 Proposals and the election of defendants Sansone and Freed, which allowed them to breach their fiduciary duties to Brookdale.

156.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

157.     Plaintiffs, on behalf of Brookdale, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Brookdale, demand judgment as follows:

A.     Finding that this action is a proper derivative action maintainable under the law and that the Plaintiffs' shareholder demands on Brookdale's Board were a *de facto* wrongful refusal;

B.     Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated Section 14(a) of the Exchange Act;

C.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act;

D.     Directing Brookdale to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Brookdale and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     The Board should require the Individual Defendants to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company

– 51 –

funds are used towards any settlement or resolution of any related or similar litigation;

2.　The Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

3.　The Board should require Individual Defendants to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

4.　The Board should require the Individual Defendants to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct;

5.　The Board should adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future; and

6.　The Board should strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding any unlawful activities, public disclosures, and internal controls.

E.　Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' ill-gotten gains or their other assets so as to assure that Plaintiffs on behalf of Brookdale have an effective remedy;

F.    Awarding to Brookdale restitution from the Individual Defendants, and each of them and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.    Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Brookdale's directors, officers, and employees do not engage in wrongful or illegal practices;

H.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED:  January 21, 2022

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

Michael I. Fistel, Jr. (admitted *pro hac vice*)
michaelf@johnsonfistel.com
Mary Ellen Conner (admitted *pro hac vice*)
maryellenc@johnsonfistel.com
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com
            maryellenc@johnsonfistel.com

– 53 –

**WADE B. COWAN, ATTORNEY AT LAW**
Wade B. Cowan
P.O. Box 50617
Nashville, TN 37205
Telephone: (615) 352-2331
Email: wcowan@dhhrplc.com

**THE WEISER LAW FIRM, P.C.**
James M. Ficaro
Four Tower Bridge
200 Barr Harbor Dr., Suite 400
West Conshohocken, PA 19428
Telephone: 610.225.0206
Facsimile: 610.408.8062
Email: jmf@weiserlawfirm.com

**RM LAW, P.C.**
Richard A. Maniskas, Esquire
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: 484.324.6800
Email: rmaniskas@rmclasslaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served upon the following

Filing Users through the Court's Electronic Filing System:

| | |
|---|---|
| Wade B. Cowan | James M. Ficaro |
| P.O. Box 50617 | THE WEISER LAW FIRM, P.C. |
| Nashville, TN 37205 | Four Tower Bridge |
| Telephone: (615) 352-2331 | 200 Barr Harbor Dr., Suite 400 |
| | West Conshohocken, PA 19428 |
| | |
| Geoffrey J. Ritts | Britt K. Latham |
| JONES DAY | BASS BERRY & SIMS, PLC |
| North Point | 150 Third Avenue South, Suite 2800 |
| 901 Lakeside Avenue | Nashville, TN 37201 |
| Cleveland, OH 44114-1190 | |

I certify under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct. Executed on January 21, 2022.

/s/ Michael I. Fistel, Jr.
MICHAEL I. FISTEL, JR

– 55 –

## <u>VERIFICATION</u>

I, Patricia Templin, verify that I have reviewed the foregoing Verified Consolidated Amended Stockholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: 1/21/22

*Patricia Templin*
Patricia Templin (Jan 21, 2022 09:31 EST)

Patricia Templin

1

# **VERIFICATION**

I, Stefanie Anders, verify that I have reviewed the foregoing Verified Consolidated Amended Stockholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: 1/17/2022 _____

_Stefanie Anders_
E55DAFEE90D7480...

_____

Stefanie Anders

1