# EXHIBIT A



# THE WEISER LAW FIRM

November 11, 2020

**VIA UPS**
Guy P. Sansone
Chairman of the Board
Brookdale Senior Living Inc.
111 Westwood Place, Suite 400
Brentwood, TN 37027

Re: **Shareholder Demand Pursuant to Del. Ct. Ch. R. 23.1**

Dear Mr. Sansone:

The below firms represent Patricia Templin (the "Stockholder"), a current stockholder of Brookdale Senior Living Inc. ("Brookdale" or the "Company"). Pursuant to Del. Ct. Ch. R. 23.1, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including yourself ("Sansone"), Lucinda M. Baier, Jordan R. Asher, Marcus E. Bromley, Frank M. Bumstead, Victoria L. Freed, Rita Johnson-Mills, Denise M. Warren, Lee S. Wielansky, Andrew Smith, and Steven E. Swain. Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

As you are aware, by reason of their positions as officers and/or directors of Brookdale and because of their ability to control the business and corporate affairs of Brookdale, members of Management owed and owe Brookdale and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use its utmost ability to control and manage Brookdale in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that Management has violated these core fiduciary duty principles causing Brookdale to suffer damages. More specifically, the Stockholder believes that Management purposefully understaffed Brookdale's senior living communities in order to bolster the Company's financial metrics and enrich members of Management.

The Weiser Law Firm, P.C.
22 Cassatt Ave. Berwyn, PA 19312
www.weiserlawfirm.com

P: (610) 225-2677
F: (610) 408-8062

Case 3:21-cv-00373   Document 47-1   Filed 01/21/22   Page 2 of 7 PageID #: 1258

## I. FACTUAL BACKGROUND

### A. Background of the Company

According to its public filings, Brookdale is the nation's largest senior-living community operator, with $4 billion in reported revenue in 2019. As of February 1, 2020, Brookdale owned 356 communities, leased 307 communities and manages seventy-seven communities on behalf of third parties. The Company operates independent living, assisted living and dementia-care communities and continuing care retirement centers. Through its ancillary services programs, the Company also offers a range of outpatient therapy, home health, personalized living and hospice services.

Brookdale markets its senior living facilities to individuals and their families on a promise of tailored services that meet the individualized and personal needs of residents, and touting an army of "passionate associates ready to work for you."

Deliberately woven through the Company's sales and marketing materials is language assuring elderly and dependent individuals and their families that caring for and meeting the needs of residents was of paramount importance to Brookdale. The Company's website promotes such care:

> "[a]t Brookdale, we believe in delivering senior care that's tailored to you and your loved one based on those unique needs and desires. That's why we provide a variety of options. This personalized approach ensures that you and your family get exactly what you need without paying for what you don't."

Brookdale requires its facilities to conduct individualized assessments (called Personal Service Assessments or "PSAs") of each resident's care and service needs upon admission and periodically thereafter. Based on their needs, residents are placed within "Care Groups" which Brookdale represents corresponds to the amount of caregiver time required to meet the resident's needs. Further, in its uniform Resident Agreements that Brookdale mandates must be used by each facility, Brookdale promises to provide the services and assistance required for each resident as specified by their PSAs. Monthly charges for these services are purportedly based on the quantity of services and the amount of the staff time required to deliver them.

Brookdale promises residents and their families that its use of the Personal Service Assessments enables it to deliver "exceptional care and service" by finding out "exactly what your loved one needs" and determining the amount of staff required to deliver those care services. Anchoring consumers' reasonable belief that Brookdale would have staff sufficient to provide these contracted services was the claim set forth in Brookdale's uniform Residency Agreement that "associates are available 24 hours a day, 7 days a week."

### B. Management' Budgeting System Limits Care in Search of Profits

Brookdale's method of determining and limiting staffing levels at its facilities is done via a staffing algorithm known as its Service Alignment Software. As described by Brookdale, its

2

Service Alignment Software consists of two main categories of data. First, it includes assumptions regarding the amount of time required to perform daily living services which are purportedly based on time studies Brookdale itself conducted; and the aggregate assess care needs of all residents. Second, the Service Alignment Software consists of algorithms and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to set the number of staffing hours on a daily basis. In other words, the Service Alignment Software determines the number of staffing hours in each of its facilities by multiplying (1) the aggregate assessed care needs to be delivered by staff to residents by (2) the associated task times Brookdale claims are required for each assessed care need.

As alleged in recent litigation against the Company, Brookdale reduced either or both of these variables to reduce labor costs and achieve a staffing output to hit its financial performance thresholds and profit benchmarks. In other words, Brookdale's Service Alignment Software systematically underestimates the staffing needs at each facility by, inter alia, deliberately embedding false and inaccurate assumptions about the time required to carry out personal need services and/or the amount of services to be provided to its collective resident populations.

Brookdale's use of its Service Alignment Software results in willfully and chronically understaffed facilities. Brookdale purposefully uses its Service Alignment Software to justify understaffing in order to meet pre-determined labor budgets designed to achieve corporate profit objectives and predetermined financial performance thresholds. Moreover, knowing the impact that its understaffing has on the delivery of required services, Brookdale deliberately fails to properly, accurately and fully document the services actually provided to its residents so as to avoid a paper trail that would reveal the extent of the improper conduct.

Staffing decisions are not made at the facility level, but at the corporate level. From Brookdale's corporate headquarters, Management exercises absolute and exclusive control over staffing determinations at the Company's facilities, monitoring each facility's staffing and budgetary compliance and measuring any variance in the corporate determined budget on a frequent or daily basis. Moreover, Brookdale prohibits its facilities from making staffing decisions at the local level or modifying Brookdale's corporate determined staffing levels without corporate approval. That is, executive directors and facility level staff cannot modify the corporate-determined staffing levels without express permission from several layers of Brookdale corporate management. Any such request for permission to modify or customize must be documented.

### C. Management Strictly Enforces the Management Determined Staffing Levels

Brookdale begins the budgeting process with its corporate financial planning and analysis team members ("FP&A"), determining and preloading the budgets on its internal server with near final amounts. Once preloading is complete, each assisted living facility has one week to review the budget and respond to the Brookdale Regional Vice President, Regional Director of Operations and corporate FP&A with comments and any requests for change. The employees working at each assisted living facility only have read-only access to the budgets, meaning they cannot change any of the preloaded amounts. All changes and final approval of the budgets are made by Management.

Once the budgets have been approved by Brookdale, they are locked in for the entire year. The employees working at each assisted living facility have not been able to make changes to the budget.

Brookdale has strictly enforced its budgets, including the staffing expense limits, at its facilities through frequent emails, telephone calls, conference calls, and meetings. As alleged in a class action filed against the Company, the executive directors at each of Brookdale's assisted living facilities have been routinely admonished by corporate officers in emails demanding that:

a. they strictly comply with the staffing budget,

b. they make reductions in staffing needed to eliminate budget variances,

c. they comply with each facility's staffing expense savings commitment,

d. they "do a better job managing our labor, as this is by far our largest expense,"

e. they make the necessary adjustments to get staffing within budget or be forced to make reductions,

f. everyone will be held accountable for labor control,

g. Brookdale does not tolerate an assisted living facility running over its approved staffing budget,

h. Brookdale management strenuously emphasizes the importance of managing labor and eliminating overtime, and

i. Brookdale does not tolerate an assisted living facility "dropping the ball" on labor controls.

To entice its employees to stay at or below Brookdale's limits for staffing and expenses, Brookdale created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale'S financial performance targets. These programs provided facility department heads and Brookdale's senior management significant bonuses for staying at or below Brookdale's budgeted expense limits—the largest of which was staffing.

### D. Brookdale's Expansion Increases its Debt Obligations

Brookdale's ascension to its position as the largest senior living operator in the United States was solidified by (a) its acquisition of Horizon Bay, the then-ninth largest operator of senior living communities in the United States, on September 1, 2011; and (b) its acquisition by merger of Emeritus Corporation, the then second largest operator of senior living communities in the United States, for $2.8 billion on July 31, 2014.

According to representations made by Management in annual filings with the United States Security and Exchange Commission ("SEC") between 2014 and 2018, Brookdale's aggressive growth and purchase strategy required massive financing and infusions of cash. As a result, Brookdale shackled itself with enormous loan obligations, debt, and lease obligations to financing institutions and real estate investment companies.

To secure such significant loans, financing agreements, and lease contracts, Brookdale agreed to designate profit and financial performance thresholds for its assisted living facilities both on an individual basis and on a consolidated, portfolio-wide and multicommunity basis, as stated in Brookdale 10-K filings with the SEC between 2014 and 2018:

> Our outstanding indebtedness and leases contain restrictions and covenants and require us to maintain or satisfy specified financial ratios and coverage tests, including maintaining prescribed net worth levels, leverage ratios and debt service and lease coverage ratios on a consolidated basis, and on a community or communities basis based on the debt or lease securing the communities. In addition, certain of our leases require us to maintain lease coverage ratios on a lease portfolio basis (each as defined in the leases) and maintain stockholders' equity or tangible net worth amounts.
>
> \*\*\*
>
> Certain of our debt and lease documents contain restrictions and financial covenants, such as those requiring us to maintain prescribed minimum net worth and stockholders' equity levels and debt service and lease coverage ratios, and requiring us not to exceed prescribed leverage ratios, in each case on a consolidated, portfolio-wide, multi-community, single-community and/or entity basis.
>
> \*\*\*
>
> We operate certain of our communities pursuant to management agreements. In some cases, subject to our rights, if any, to cure deficiencies, community owners may terminate us as manager if … we do not satisfy certain designated performance thresholds.

In addition, Brookdale guaranteed and pledged the individual and aggregate assets and revenues of its assisted living facilities as collateral for such loan and lease agreements. Therefore, in order to meet its enormous debt obligations, financial covenants, and financial performance thresholds and to minimize the risk of defaulting on widespread portions of its portfolio of assisted living facilities and other communities, Brookdale closely monitored and tightly controlled every aspect of the operations and management of its assisted living facilities, including the largest line-item expense—day-to-day staffing.

## II.     THE TRUTH EMERGES

On April 30, 2020, *Nashville Business Journal* reported that a proposed class action lawsuit had been filed against Brookdale, which accused the Company of, among other things, purposeful "chronically insufficient staffing" at its facilities in an effort to meet financial benchmarks since at least April 24, 2016. According to the lawsuit, Brookdale misled residents and their families

5

Case 3:21-cv-00373   Document 47-1   Filed 01/21/22   Page 6 of 7 PageID #: 1262

when it promised to provide basic care and daily living services. The lawsuit also claims that the proposed class of plaintiffs "have not received the care and services they paid for." The lawsuit asks for damages and for Brookdale to "stop the unlawful and fraudulent practices."

On this news, Brookdale's stock price fell $0.56 per share, or 15.22%, over two trading sessions, closing at $3.12 per share on May 1, 2020.

## II.     DEMAND PURSUANT TO DEL. CT. CH. R. 23.1

Based on these events, the Stockholder contends that Management breached its fiduciary duties of loyalty and good faith by compromising patient care through the intentional understaffing of Brookdale's facilities. As a result of the foregoing breaches of duty, Brookdale has sustained damages.

Accordingly, pursuant to Del. Ct. Ch. R. 23.1, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Pursuant to Delaware law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

THE WEISER LAW FIRM, P.C.

*/s/ James M. Ficaro*
James M. Ficaro

RM LAW, P.C.

*/s/ Richard A. Maniskas*
Richard A. Maniskas