# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| STEFANIE ANDERS and PATRICIA TEMPLIN, derivatively on behalf of Brookdale Senior Living Inc., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:21-cv-0373 Judge Aleta A. Trauger |
| LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, LEE S. WIELANSKY, VICTORIA L. FREED, and JORDAN R. ASHER, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| BROOKDALE SENIOR LIVING INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM

The defendants have filed a Motion to Dismiss Plaintiffs' Verified Consolidated Amended Stockholder Derivative Complaint (Doc. No. 51), to which the plaintiffs have filed a Response (Doc. No. 54), and the defendants have filed a Reply (Doc. No. 55). For the reasons set out herein, the motion will be granted in part and denied in part.

# I. BACKGROUND[1]

Brookdale Senior Living Inc. ("Brookdale") is "the nation's largest senior-living community operator, owning 350 communities, leasing 301 communities, managing 75 communities on behalf of third parties, and holding an equity interest in three." (Doc. No. 47 ¶ 16.) The individual defendants are current and former Brookdale executives and members of its Board of Directors ("Board"). (*Id.* ¶¶ 17–34.) In recent years, Brookdale, which is incorporated in Delaware, has faced a number of allegations regarding (1) the quality of its services and (2) the honesty of its and its executives' representations to the public. (*Id.* ¶¶ 16, 79–101.)

Although the details of the various allegations that have been made are considerably more complicated than that summary might suggest, most of those details are of only secondary importance to the pending motion, which addresses not the substance of the allegations, but the proper mechanism for bringing suit. As part of that inquiry, the pending motion calls on the court to consider the relationship between this consolidated lawsuit and two others, which the court will, for reasons that will become clear, refer to as the "Investor Class Action" and the "Demand-Futile Derivative Action."[2] Specifically, the court must consider whether the pendency of the Investor Class Action—and, later, the pendency of the Demand-Futile Derivative Action—sufficiently justified the Board's deferral of its investigation of the allegations at issue in this case or whether, instead, that deferral opened the door to shareholder-initiated litigation on behalf of the company over the Board's objection.

---

[1] These facts are taken primarily from the plaintiffs' Verified Consolidated Amended Stockholder Derivative Complaint (Doc. No. 47) and are accepted as true for the purpose of the Motion to Dismiss.

[2] The court is permitted to, and does, take judicial notice of the contents of filings in those other cases. *See Benton v. Joyner*, No. 7:20-CV-131-GFVT, 2022 WL 1433454, at *3 n.1 (E.D. Ky. May 5, 2022) (citing *Granader v. Pub. Bank*, 417 F.2d 75, 82 (6th Cir. 1969)).

2

**A. The Investor Class Action**

The Investor Class Action, which alleged securities fraud by Brookdale and some of its executives, was filed on June 25, 2020, as *Posey v. Brookdale Senior Living Inc. et al.*, Case No. 3:20-cv-00543 (M.D. Tenn.). The original Complaint alleged that the defendants had

> made false and/or misleading statements and/or failed to disclose that: (i) Brookdale's financial performance was sustained by, among other things, the Company's purposeful understaffing of its senior living communities; (ii) the foregoing conduct subjected Brookdale to an increased risk of litigation and, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; (iii) as a result, the Company's financial results were unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

(*Posey*, Doc. No. 1 ¶ 4.) A number of shareholders sought to be appointed lead plaintiff, and, after one was appointed, he filed an Amended Complaint based on the same general theory of liability. (*Posey*, Doc. No. 35.)

The defendants filed a Motion to Dismiss (*Posey*, Doc. No. 42), raising a number of arguments in support of dismissal. The court found most of those arguments unpersuasive, but, on September 7, 2021, did grant the motion based on the one argument that the court found to be meritorious. (*Posey*, Doc. No. 52). Specifically, the court rejected the defendants' arguments that the lead plaintiff had failed to sufficiently plead that Brookdale's quality issues existed or that the defendants acted with the requisite scienter. (*Id.* at 31–37.) The court, however, held that the lead plaintiff had failed to sufficiently plead that the investors' underlying losses were the result of the relevant allegedly fraudulent statements and omissions under a fraud-on-the-market theory. (*Id.* at 22–31.)

The court's conclusion was not premised on any holding that the defendants' allegedly false statements were true or even non-actionable. Rather, the court dismissed the claims because the specific theory of liability that the plaintiffs wished to pursue was inconsistent with the facts

3

as pleaded. Liability in a fraud-on-the-market case must be premised on the existence of an "efficient market" for the underlying stock, and an efficient market, by definition, incorporates all publicly available information into a stock's price at any given moment. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 458 (2013). Accordingly, by the time of the alleged losses in the Investor Class Action, an efficient market would have already incorporated information about the alleged deficiencies in Brookdale's services, which, at least as described in that case, had already been revealed—albeit less dramatically—in prior litigation. Accordingly, while some individuals and/or entitites may still have been deceived, and ultimately harmed, by the alleged statements, that harm did not occur through fraud-on-the-market. The market— unlike, potentially, individual investors—simply knew too much to have been defrauded.

As the court explained, "[e]ven quite damning allegations . . . cannot serve as a corrective disclosure for causation purposes in a fraud-on-the-market case if those allegations were already 'old news' to the market prior to the ostensible revelation that preceded the relevant drop in stock price." (*Posey*, Doc. No. 35 at 27 (quoting *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014)).) The court accordingly concluded that the defendants were entitled to dismissal, but not because the behavior described in the Amended Complaint was permissible. Rather, the court concluded that the lead plaintiff had not alleged facts sufficient to support a conclusion that a fraud-on-the-market securities fraud class action was an appropriate legal mechanism for targeting that particular alleged wrongdoing.

The court stayed entry of judgment for 21 days, in case the lead plaintiff wished to seek leave to amend his allegations, which he had suggested in his briefing that he might. (*Posey*, Doc. No. 53 at 1.) The lead plaintiff, however, chose not to do so, and judgment was entered on September 29, 2021. (*Posey*, Doc. No. 54.) No appeal was filed.

**B. The Demand-Futile Derivative Action**

The Demand-Futile Derivative Action, like this litigation, consists of multiple consolidated cases filed by shareholders on Brookdale's behalf against Brookdale executives and directors. The first of those cases, *Davis v. Baier et al.*, Case No. 3:20-cv-00929 (M.D. Tenn.), was initiated by shareholder Brian Davis on October 29, 2020. (*Davis*, Doc. No. 1.) Davis alleged largely the same flaws in Brookdale's business that had been cited in the Investor Class Action. The alleged victim in the Demand-Futile Derivative Action was not, however, the general mass of investors who traded Brookdale stock on the open market; the victim was Brookdale itself, on whose behalf Davis purported to be suing, in what is typically referred to as a shareholder derivative suit. (*Id.* ¶¶ 394–431.) Davis's Complaint argued that he should be permitted to act on behalf of Brookdale, without first asking the Board of Directors to bring the same claims in the name of the corporation directly, because posing such a request to the Board—many of whose members were named defendants and therefore presumably would have opposed suing themselves—would have been futile. (*Id.* ¶ 369.)

Other shareholders filed similar complaints making the same general allegations and arguing, like Davis, that filing a formal litigation demand to the board would have been futile. Those cases were consolidated into the Demand-Futile Derivative Action as it stands today. (*Davis*, Doc. Nos. 28, 33.) On July 22, 2022, the defendants filed a Motion to Dismiss, arguing that the plaintiffs should have "elected . . . to submit a pre-suit demand to Brookdale's board of directors . . . [,] as is required before filing a derivative suit." (*Davis*, Doc. No. 46 at 2.) Pursuant to the briefing schedule agreed to by the parties and adopted by the court, that motion is expected to be ripe in early October of this year. (*See Davis*, Doc. No. 45 at 1–2.)

**C. This Litigation**

This consolidated litigation also involves shareholder derivative claims, but these plaintiffs—Stefanie Anders and Patricia Templin—did what the plaintiffs in the Demand-Futile Derivative Action are being faulted for not doing: they asked the Board to direct Brookdale to sue on its own behalf and only filed their claims once they believed that those requests had effectively been rejected. (Doc. No. 47 ¶ 10.) The defendants, however, argue that the Board merely deferred, but did not reject, Anders' and Templin's demands and that its decision to do so was within its protected discretion in directing the corporation.

1. The Derivative Plaintiffs' Initial Demands

On November 11, 2020, counsel for Templin sent a letter to Brookdale Chairman of the Board Guy P. Sansone, with the subject line "Re: Shareholder Demand Pursuant to Del. Ct. Ch. R. 23.1."[3] (Doc. No. 47-1 at 1.) The purpose of the letter, Templin's counsel explained, was "to demand that the Company's Board of Directors . . . take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company," whom the letter listed. (*Id.*)

The letter outlined the allegations against Brookdale and its executives, most of which should be familiar to anyone who has followed any of the underlying lawsuits. At the core of the allegations is the contention that Brookdale, which controlled facility staffing levels from its central corporate headquarters, chronically understaffed its facilities through its reliance on an internal software algorithm, the Service Alignment Software ("SAS"), that produced staffing-level recommendations that minimized costs by significantly underestimating patient and facility needs. (*See* Doc. No. 47-1 at 3.) Templin ultimately demanded that the board take the following steps:

---

[3] Rule 23.1 of the Delaware Chancery Court Rules governs shareholder derivative actions.

6

> (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law; and (ii) commence a civil action against each member of [identified] Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

(*Id.* at 6.)

On December 16, 2020, counsel for Anders sent Sansone a similar, but significantly longer, letter. (Doc. No. 47-2.) Among the detailed allegations were the assertions that Brookdale's widespread understaffing had risen to the level of being "[i]nhumane" and that Brookdale had been misleading potential residents and their families about the care that residents would receive. (*Id.* at 11–13.) Much of Anders' 61-page letter was devoted to identifying specific alleged misstatements by individual directors and executives, which Templin had addressed more generally. The underlying allegations regarding SAS and chronic understaffing, however, were largely the same. Like Templin, Anders demanded that the board

> (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law; and (ii) commence a civil action against each member of [identified] Management (and any others who may be similarly liable for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, aiding and abetting breaches of fiduciary duties, contribution, and indemnification against Management) to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

(*Id.* at 60 (footnote omitted).) Templin concluded with the following instructions/warning:

> We trust the Board, consistent with its fiduciary duties of care and loyalty, will undertake the actions demanded above promptly.
>
> Please confirm, as soon as possible, but no later than 30 days from the date of this letter, that a copy of this letter was provided to each member of the Board. As part of your response, please disclose whether the Company has commenced an independent investigation into the serious misconduct set forth herein. Please also state who has been appointed to conduct any such investigation, whether they have retained outside counsel (and if so, who), and the scope of their authority.

7

Pursuant to Delaware law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a stockholder's derivative action on behalf of the Company seeking appropriate relief.

(*Id.* at 61.)

### 2. The Board's Response

On March 11, 2021, Brookdale Executive Vice President, General Counsel and Secretary Chad C. White sent effectively identical letters to Templin and Anders, respectively, reading as follows:

On February 22, 2021, the Board of Directors of Brookdale Senior Living Inc. (the "Company") considered the shareholder demand letter, dated [November 11/December 16], 2020, that you submitted on behalf of [Patricia Templin/Stefanie Anders] (the "Demand Letter").

In light of the substantial overlap between the Demand Letter and the subject matter of a pending securities class action against the Company, captioned *Posey v. Brookdale Senior Living Inc.*, et al., No. 3:20-cv-00543 (M.D. Tenn.), the Board determined that it is in the Company's interest to defer consideration of the Demand Letter at present. The Board noted that pursuit by the Company of the claims alleged in the Demand Letter, while the *Posey* case is pending, could prejudice the Company's defense of the *Posey* matter, inasmuch as the Demand Letter and the *Posey* complaint make similar allegations of misconduct.

The purpose of this letter is to inform you of the Board's determination. At the conclusion of the *Posey* matter, the Board will further address the Demand Letter if Ms. [Templin/Anders] still desires to pursue it then.

(Doc. No. 47-3 at 1; Doc. No. 47-4 at 1.) The "*Posey* case," as the court has explained, was the Investor Class Action. The letters made no mention of the Demand-Futile Derivative Action, despite the fact that that litigation was already pending.

### 3. The Original Complaints

On May 10, 2021—before the Investor Class Action was resolved—Anders filed a Verified Stockholder Derivative Complaint on behalf of Brookdale against a number of individual defendants, asserting claims under the Exchange Act and claims for breach of

8

fiduciary duty and waste of corporate assets. (Doc. No. 1 ¶¶ 348–62.) Anders asserted that the Board's "indefinite deferral" of investigating and acting on her demand threatened to "irreparably prejudice" the company and was "a violation of Delaware law," resulting in a right by Anders, as a shareholder, to sue on the company's behalf. (*Id.* ¶¶ 345, 347.) Anders argued that urgent action was called for, in light of the nature of the allegations raised, because "the harms complained of . . . are actively ongoing and remain unremedied by the Board, causing further damage to [Brookdale] with each passing day." (*Id.* ¶ 346.) Anders also noted that, "while the Board [was] refusing to consider the allegations in the Demand, it [was] also actively forcing [Brookdale] to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the Company in the first place." (*Id.*)

Templin filed her Verified Stockholder Derivative Complaint not long thereafter, on May 21, 2021. (*Templin v. Baier*, Case No. 3:21-cv-00407. Doc. No. 1.) Templin pleaded claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment, but no claim under the Exchange Act. (*Id.* ¶¶ 347–56.) Like Anders, Templin alleged that the Board had "abdicated" its responsibility to investigate a litigation demand by electing, "without any investigation, to defer consideration of the Demand indefinitely." (*Id.* ¶¶ 344–45.) On June 21, 2021, the parties filed a Joint Motion requesting that the court consolidate Anders' and Templin's actions, which the court granted. (Doc. Nos. 33–34.) On August 20, 2021, Anders and Templin jointly filed a Verified Consolidated Stockholder Derivative Complaint, which repeated the previously-pleaded allegations regarding the Board's allegedly wrongful deferral of consideration of the demand letters. (Doc. No. 36 ¶¶ 337–49.)

4. Events Following the Conclusion of the Investor Class Action

As the court has already recounted, judgment was entered in favor of the defendants in the Investor Class Action on September 29, 2021, and there was no appeal. (*Posey*, Doc. No. 54.) As such, the original grounds on which the Board had relied to defer consideration of Anders' and Templin's demands no longer existed. On December 14, 2021, White sent a letter to counsel for Anders on behalf of the Board, acknowledging that change in circumstances as well as the fact that this litigation was pending. (Doc. No. 47-5.) White informed Anders that the Board intended to continue deferring consideration of the demand—this time, because of the pendency of the Demand-Futile Derivative Action:

> The Board disagrees with the contention that a pre-suit demand on the Board was futile and intends to contest this issue in the Demand Futile Litigation. Given the fact that the Demand Futile Litigation will necessarily address the issue of whether the Board is able to consider a demand, the Board determined that it would not be a sensible expenditure of time and resources to conduct a full investigation into the allegations raised in your client's Demand Letter at this time. Rather, because the Company intends to devote time and resources to defend against the allegations in the first-filed Demand Futile Litigation that a demand on the Board is futile, the Board determined that it is in the best interests of the Company to first litigate the issue of demand futility before addressing the issues set forth in your client's Demand Letter. . . . Accordingly, the Board decided to defer further consideration of your Demand Letter until the issue of demand futility has been decided in the Demand Futile Litigation.

> The purpose of this letter is to inform you of the Board's determination. The Board will closely monitor all developments in the Demand Futile Litigation and will advise you if and when, depending on the resolution of the demand futility issue, it determines that your Demand Letter is ripe for consideration.

(*Id.* at 2.)

On January 11, 2022, the plaintiffs filed a motion seeking to amend their Verified Consolidated Stockholder Derivative Complaint, either as a matter of course pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure or, in the alternative, with leave of the court pursuant to Rule 15(a)(2). (Doc. No. 43 at 1.) The plaintiffs expressly stated that such an

amendment was necessary in order to add allegations addressing the conclusion of the Investor Class Action. (*Id.*) Regarding the defendants' position on the amendment, the plaintiffs wrote, "Prior to filing the instant motion, the parties met and conferred, and Defendants indicated they would need to review the [proposed amended complaint] prior to consenting to its filing. As a result, the parties agreed that Plaintiffs would file a motion to amend attaching a draft" of that proposed new operative complaint. (*Id.* at 2 n.2.) The plaintiffs attached a redlined copy of the proposed Amended Verified Stockholder Derivative Complaint, which included new language describing the disposition of the Investor Class Action and the subsequent letter to Anders. (Doc. No. 44-1 ¶¶ 131–33.)

A week later, on January 18, 2022, the parties filed a Joint Stipulation, stating, among other things, that the defendants "do not oppose Plaintiffs' Motion to Amend, and instead intend to file a motion to dismiss the amended complaint once it is filed." (Doc. No. 45 at 3.) The court accordingly granted the motion, and the Amended Verified Stockholder Derivative Complaint was docketed as the operative complaint in this case. (Doc. Nos. 46–47.) Shortly thereafter, the defendants filed the currently pending Motion to Dismiss, in which they argue that the court should dismiss the plaintiffs' derivative claims because their pleaded allegations fail to "establish that the board wrongfully refused to bring the claims asserted in the demand on the company's behalf." (Doc. No. 51 at 2.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must, generally speaking, "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007);

*Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court's evaluation of the sufficiency of those facts, however, depends on the applicable pleading standard. Most ordinary civil claims are governed by the relatively forgiving requirements of Rule 8. Shareholder derivative actions, however, are subject to the more demanding pleading standard of Rule 23.1(b), which requires that the complaint:

> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
>
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
>
> (3) state with particularity:
>
>> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>>
>> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1; *see McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001).

Although Rule 23.1(b)(3) requires the plaintiff to plead with particularity what pre-litigation efforts, if any, she undertook to sway the company to her preferred course of action, the rule does not, on its face, tell the court what to do with that information. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) ("[A]lthough Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, it does not *create* a demand requirement of any particular dimension."). The Supreme Court has held that, faced with this "gap in the federal securities laws," a federal court should apply the "scope of the demand requirement" that exists "under state law." *Id.* at 108. The parties agree that the relevant state, for the purposes of this case, is Delaware.

12

## III. ANALYSIS

### A. Significance of Events After Filing of Initial Complaints

Before the court can address the substantive issues raised by the pending motion, the court must consider a procedural anomaly for which the court itself bears some responsibility. As the preceding description of this case's procedural history makes clear, some of the events relevant to the question of whether the Board wrongfully deferred consideration of the plaintiffs' demands actually occurred *after* the plaintiffs filed their initial Complaints. Allegations regarding those events are nevertheless before the court because they were pleaded in the Verified Consolidated Amended Stockholder Derivative Complaint, which was filed, with the consent of the defendants, at a later date, based, supposedly, on Rule 15(a). The court granted leave to file that amended pleading, but, in hindsight, it is apparent that that was an error, albeit in a very technical sense. Although the court continues to believe that it was appropriate to allow the plaintiffs to plead all of the relevant allegations, *amendment* of the operative Complaint was not the appropriate mechanism for doing so. Rather, when a party wishes to plead facts about "any transaction, occurrence, or event that happened after the date of the" initial pleading, that party should rely on a *supplemental* pleading pursuant to Rule 15(d).

"Amended and supplemental pleadings differ in [that the] former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading," while "the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.). "The purpose of supplemental pleadings under Rule 15(d) is to allow a plaintiff to update [its] complaint to add allegations of later events relating to [its] original complaint." *Cage v. Harry*, No. 09–512, 2010 WL 1254562, at *1 (W.D. Mich. Mar. 26, 2010) (magistrate judge's

order). In this instance, the court should have considered the plaintiffs' request under both Rule 15(a) and 15(d), rather than merely under Rule 15(a) alone, as it involved a requested for leave both to replace the plaintiffs' original pleading of pre-filing facts and to add the pleading of new facts that arose later. The court, accordingly, will rectify that error now by construing the Verified Consolidated Amended Stockholder Derivative Complaint to include both allegations and claims as of the date of the original filing and supplementally pleaded allegations and claims that arose later.

What that means, in essence, is that there are two sets of largely identical, but differently timed, claims pending before the court. The first set consists of claims that relate back to the original Complaints and that are premised on the plaintiffs' alleged rights to sue derivatively as of the initial filing dates. The second set of claims is substantively identical, at least as far as the allegations of wrongdoing and grounds for liability. These supplemental claims, however, cannot be treated as having been filed contemporaneously with the other claims, because they are based on the plaintiffs' rights in light of later events. Whether these hair-splitting distinctions will end up having any kind of significance aside from the court's consideration of the present motion is beyond the court's power to know. Still, it is necessary to acknowledge and address the issue in order to place the court's analysis on firmer ground and to avoid the absurdity of considering the plaintiffs' rights to sue on one date based on events that did not occur until later.

Although this course of action may be somewhat unusual, it is, as far as the court can tell, both (1) the only way to square the full contents of the consented-to Verified Consolidated Amended Stockholder Derivative Complaint with the Federal Rules of Civil Procedure and (2) permissible, even if the supplementally pleaded allegations turn out to be the only viable ones. Rule 15(d) expressly states that "[t]he court may permit supplementation even though the

original pleading is defective in stating a claim or defense." Fed. R. Civ. P. 15(d). Admittedly, there are nevertheless some defects that, if they existed at the time a case was initiated, cannot be remedied by later-arising events. That "time-of-filing rule," however, typically applies to jurisdictional issues, *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004), which the issues raised by the pending motion are not. Although the parties have, at times, discussed these arguments as involving "standing," they do not implicate standing in the constitutional sense of satisfying the constitutional case-or-controversy requirement. Rather, this type of so-called "standing" bears solely on the non-constitutional question of "who has the power to control" the underlying litigation. *Kamen*, 500 U.S. 101. The Supreme Court has emphasized, in recent years, that such doctrines of who can sue under a particular cause of action are substantive limitations on the cause of action itself, not jurisdictional limitations on the court's power to hear a case. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Such an approach is consistent with the longstanding principle that issues of real-party-in-interest—that is, issues "relate[d] only to the proper parties and the capacity to sue"—are "not jurisdictional." *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 43 n.1 (6th Cir. 1994).

The court, therefore, sees no reason why a shareholder derivative plaintiff cannot file some claims premised on her right to sue as of one date and then, after the occurrence of additional intervening events, file supplemental claims in the same case premised on her right to sue as of a later date—even if the originally filed claims turn out to have been filed prematurely. Moreover, insofar as such an approach is procedurally irregular, the defendants' decision not to object to the filing of the Verified Consolidated Amended Stockholder Derivative Complaint represented a waiver of all waivable procedural objections. The court, accordingly, will consider

15

the substantive issues raised by the defendants as they apply to both claims filed before the conclusion of the Investor Class Action and claims filed thereafter.

## B. Principles of the Delaware Demand Requirement

Delaware law provides that "[t]he business and affairs of every corporation organized [under the laws of the state] shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Del. Code Ann. tit. 8, § 141(a). Pursuant to that rule, "[w]hether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 (1984) (quoting *United Copper Secs. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263 (1917)). The law theoretically *could* treat that right of control by directors, in the absence of a shareholder vote, to be inviolable, allowing directors to manage or mismanage a corporation however they wish, until they are constrained by the entity's owners acting collectively. That, though, is not the status quo that Delaware has chosen to adopt with regard to the initiation of litigation.

Rather, Delaware law recognizes that a solitary shareholder may bring suit on a corporation's behalf if she can establish "either that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or, if no demand was made, that such a demand would [have been] a futile gesture and is therefore excused." *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (citations omitted). That rule—typically referred to as the "demand requirement"—reflects the primary allocation of responsibility to directors, while leaving open a narrow path through which a shareholder of a corporation whose directors have abdicated their responsibilities may seize

16

that responsibility from them by "articulat[ing] a reasonable basis" for that shareholder "to be entrusted with a claim that," by right, "belongs to the corporation." *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

The Demand-Futile Derivative Action presents the question of whether a shareholder can defeat the demand requirement with regard to these allegations by alleging that a demand would have been futile. In this case, however, demands *were* made, and, "[u]nder Delaware law, where a plaintiff makes a litigation demand on the board," she is considered to have "effectively concede[d] that the board is independent and able to respond. The board's decision to refuse that demand is thus protected" by the doctrine known as "the business judgment rule."[4] *Lowinger v. Oberhelman*, 924 F.3d 360, 366 (7th Cir. 2019) (citing *Spiegel v. Buntrock*, 571 A.2d 767, 775–76 (Del. 1990)). "Under the business judgment rule, when a party challenges the decisions of a board of directors, the Court begins with the 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 36 (Del. Ch. 2010) (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995)). The business judgment rule creates a "powerful presumption[]" that a "'conscious decision by directors to act or refrain from acting'" was made within their broad discretion. *McCall*, 239 F.3d at 816 (quoting *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993)). That powerful presumption, however, does not overcome the ordinary rule that, in order to defeat

---

[4] The court notes the important work being done by the phrase "under Delaware law" and the word "effectively" in this frequently repeated formulation. The court is aware of no principle of reason, evidence, or ordinary human behavior that would suggest that making a request necessarily amounts to a concession that the person to whom the request was addressed will respond competently and independently. Rather, this narrow principle is simply one of law, specific to this area, that has been embraced by Delaware courts.

17

a motion to dismiss, "the pleader is not required to plead evidence," but rather only "particularized factual statements" sufficient to carry her burden. *Brehm*, 746 A.2d at 255.

The court, in evaluating whether the plaintiffs have pleaded facts supporting a finding of wrongful refusal of a demand, is not called on to determine whether the "board made the right decision by not bringing [the requested] litigation." *Lowinger*, 924 F.3d at 366. Rather, the court's inquiry "is confined to whether the Board's decision not to litigate is protected by the wide bounds of the business judgment rule, or if the [plaintiffs] have managed to allege with particularity facts suggesting that the Board's decision was irrational or the result of a grossly negligent process." *Id.* at 366–67. Viewed from one perspective, that standard plainly favors defendants; they are not required to show that they handled plaintiffs' requests in the ideal way or even particularly wisely, but rather only that they acted within their broad discretion. The narrowness of the court's inquiry, however, also offers some benefits to plaintiffs. A plaintiff is not required to show or plead that, if the defendants had heeded her demand, everything would have worked out exactly as she had hoped. *See McCall*, 239 F.3d at 816 (noting that a plaintiff seeking to overcome the demand requirement is not required to "demonstrate a reasonable probability of success on the merits"). Rather, she must only establish that the rejection of her request was wrongful.

The aforementioned principles dictate what the plaintiffs, in their opposition to the pending motion, are required to establish (that their demand was wrongfully refused); how they are required, at this stage, to establish it (through assertions of fact, pleaded with particularity); and what the primary impediment to such a showing is (the broad discretion protected by the business judgment rule). Those substantive rules do not, however, answer the question of just how convincing a shareholder plaintiff's theory of wrongful refusal needs to be in order for a

18

motion to dismiss based on the demand requirement to be denied. The law of securities litigation, moreover, does sometimes dictate that courts apply unique—and unusually demanding—burdens when considering a motion to dismiss. *See, e.g.*, *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) (discussing the requirement that a securities fraud plaintiff "state with particularity facts giving rise to a strong inference" of scienter (quoting 15 U.S.C. § 78u-4(b)(2)(A))). The court accordingly must consult the relevant law to determine the weight of the plaintiff's burden.

A review of the relevant caselaw[5] reveals that the plaintiff's burden of persuasion under the demand requirement at the pleading stage is, unlike the substantive standard itself, relatively forgiving. A plaintiff can defeat a motion to dismiss based on a board's ostensibly permissible refusal of a demand to sue by "creat[ing] reasonable doubt that the board upheld its duties of care and loyalty by making an informed decision and acting in good faith." *Lowinger*, 924 F.3d at 366 (citing *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, No. CV 9714-VCG, 2015 WL 2270673, at *24 (Del. Ch. May 8, 2015)). A plaintiff can do so by, for example, establishing sufficient support for a reasonable inference that the relevant "decision 'cannot be attributed to a rational business purpose'" or was reached through "a grossly negligent process that include[d] the failure to consider all material facts reasonably available." *Id.* at 367 (quoting *Brehm*, 746 A.2d at 264 n.66). In other words, Delaware law sets a high bar for what a pleading must establish in order to satisfy the demand requirement, but it does not require the plaintiff to make that showing in a resounding or overwhelming fashion.

---

[5] The principles relevant to this inquiry are set out, in the first instance, in Delaware's own statutes, rules, and precedents. However, the widespread popularity of Delaware as a state of incorporation has resulted in those principles' being applied in numerous federal cases in other districts. The court will cite to federal cases where appropriate, with the understanding that the persuasiveness of those cases depends on the Delaware law that they apply.

19

**C. Application to the Plaintiffs' Claims**

The court therefore must consider whether the Verified Consolidated Amended Stockholder Derivative Complaint alleges facts, with particularity, that are sufficient to create reasonable doubt regarding whether the Board, in its decision to delay consideration of the demands, departed from the broad discretion afforded by the business judgment rule. Although the protection afforded by the business judgment rule is expansive, it is not unlimited, and courts have recognized some touchstones of rational corporate decision-making that companies are generally expected to observe. Prominent among these principles—and particularly relevant to this case—is that, "[u]pon receipt of the demand, a board 'must investigate' the alleged wrongdoing and decide on a course of action." *Lowinger ex rel. Caterpillar, Inc. v. Oberhelman*, No. 115-cv01109-SLD-JEH, 2017 WL 1224524, at *3 (C.D. Ill. Mar. 31, 2017) (quoting *Maccoumber v. Austin*, No. 03 C 9405, 2004 WL 1745751, at *3 (N.D. Ill. Aug. 2, 2004)).

That does not mean that a shareholder who sends a demand letter has a right to an instantaneous decision. "The shareholder must . . . afford[] the board sufficient time to investigate the allegations and decide whether to bring suit or reject the demand." *Piven v. Ryan*, No. 05 CV 4619, 2006 WL 756043, at *2 (N.D. Ill. Mar. 23, 2006) (citing *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985)). Courts, moreover, have recognized that there are legitimate reasons for delaying an investigation for a limited period of time, including reasons related to other ongoing litigation. *See Lowinger*, 924 F.3d at 368. That said, "the board may not simply 'brush-off' the demand letter," *Maccoumber v. Austin*, No. 03 C 9405, 2004 WL 1745751, at *4 (N.D. Ill. Aug. 2, 2004) (citing *Allison*, 604 F. Supp. at 1117)), and it is well-established that a company cannot render itself immune to shareholder derivative suits by simply labeling all of its denials as mere indefinite delays. In a case such as this one, in which the Board

20

took "*some* action in response" to a shareholder's request but did "not ma[k]e a formal decision," the standard for evaluating that decision is largely the same as the standard for evaluating an express denial: "the suit may proceed if the plaintiff raises 'a reasonable doubt that the board's lack of response is consistent with its fiduciary duties.'" *Lowinger*, 2017 WL 1224524, at *3 (citing *Rich ex. rel. Fuqi Intern., Inc. v. Yu Kwai Chong*, 66 A.3d 963, 976–77 (Del. Ch. 2013)) (emphasis added). If the plaintiff clears that bar, she may proceed based on the wrongful constructive refusal of her demand, even if consideration of the demand was ostensibly merely put off to some later date. *Id.*

The court is unable to conclude that the plaintiffs have established reasonable doubt regarding the decision to defer action, at least for some period of time, while the Investor Class Action was pending. Brookdale itself was a defendant in that action, and there are reasonable arguments that would support its reluctance to, in essence, do its opponents' work for them by aggressively investigating itself. It may be that, if the Investor Class Action had dragged on, it would have gone beyond the scope of the business judgment rule to keep delaying an investigation indefinitely—particularly given that, at some point, Brookdale's duties to comply with discovery in the Investor Class Action would have amounted to a parallel internal investigation anyway. The plaintiffs, however, did not wait for such a situation to arise; they filed their Complaints when the Investor Class Action was still new and before the parties even knew whether it would reach discovery—which, ultimately, it did not. At that early point—that is, in May of 2021, when Anders and Templin first filed their claims in this court—there was simply too much of a colorable basis for delay for the court to find reasonable doubt. *See Baca v. Insight Enters., Inc.*, No. CIV.A. 5105-VCL, 2010 WL 2219715, at *5 (Del. Ch. June 3, 2010) (discussing legitimate business reasons for not pursuing claims on behalf of a company when

shareholder class action claims based on the same allegations are subject to a pending motion to dismiss).

As the court has noted, however, claims based on the status quo as of May of 2021 are not the only ones that the plaintiffs have pleaded. The plaintiffs, over no objection by the defendants, filed a Verified Consolidated Amended Stockholder Derivative Complaint detailing the Board's continued refusal to move forward with an investigation, even after the Investor Class Action had been fully resolved. Although the procedural mechanism through which those allegations were made may have originally been muddled, the best interpretation of events is that the plaintiffs supplementally pleaded additional claims based on their right to sue on behalf of the corporation after the conclusion of the Investor Class Action. With regard to those claims, the court does find reasonable doubt about whether the Board's deferral decision was within the bounds protected by the business judgment rule, for a number of reasons.

First, it is impossible to ignore the fact that the Board, when faced with a complete cessation of its original reason for delay, simply announced another, different reason that it could have, but did not, cite the first time around. Courts have observed in other areas that a decisionmaker's "changing rationale" for a decision may be evidence of pretext. *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 847 (6th Cir. 2015) (quoting *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)). The court sees no reason to ignore that common sense rule here. If a person tells you that he cannot investigate alleged wrongdoing for one reason, then that reason wholly evaporates, only for the person to find another reason counseling the exact same course of action, it is suspect. That does not mean that the person who gave two reasons for the same decision has necessarily done anything wrong, but it raises a red flag.

22

The natural suspicion associated with such a situation is bolstered by the fact that the defendants' second rationale in this case is noticeably less convincing than the first. It makes a certain amount of sense that Brookdale would not want to launch an investigation of these allegations while it was defending itself from claims regarding the same issues. The Demand-Futile Derivative Action, however, is not a lawsuit against Brookdale, other than as a nominal defendant. It is, rather, a lawsuit to *vindicate* Brookdale against allegedly derelict executives and directors. While a delay premised on the pendency of the Investor Class Action could plausibly be defended in light of Brookdale's potential liability in that case, the shareholder derivative suits are instead focused on Brookdale's own "potential recovery." *Ingrao v. Stoppelman*, No. 20-CV-02753-EMC, 2020 WL 7025083, at *6 (N.D. Cal. Nov. 30, 2020). The argument that a delay is in Brookdale's best interests is therefore inherently less persuasive, hinging solely on a supposed desire to avoid wasted resources.

As for the potential length of the delay, the court acknowledges that there is "no precise rule as to how much time a Board must be given to respond to a demand." *Lowinger*, 2017 WL 1224524, at *3 (quoting *Allison*, 604 F. Supp. at 1117). Nevertheless, it stands to reason that a long delay—particularly a long, indefinite delay—requires stronger justification than a brief one. Over a year elapsed between Templin's original demand and the Board's second decision to defer an investigation. That deferral, moreover, could continue to stretch much longer, depending on the course of the Demand-Futile Derivative Action.

In considering whether a lengthy delay of that sort was defensible within the business judgment rule, a court must consider what would be a "reasonable response time" in light of the "complexity of the issues presented by the demand and the surrounding circumstances." *Maccoumber*, 2004 WL 1745751, at *4 (citing *Allison*, 604 F. Supp. at 1117–18); *see also Piven*,

2006 WL 756043, at *3 ("Courts determine what constitutes an adequate amount of time to respond on a case-by-case basis by examining the complexity of the issues presented as well as the surrounding circumstances.") (citing *Allison*, 604 F. Supp. at 1117; *Mozes v. Welch*, 638 F. Supp. 215, 220 (D. Conn. 1986)). The defendants in this case do not claim, nor does the Amended Complaint suggest, any kind of technological or logistical hurdles that are holding up the Board's response to the demand. Indeed, as far as the court can tell, the Board has not even taken steps to consider what the technological and logistical details of investigating the plaintiffs' demands would be. Rather, the Board seeks to delay commencing an investigation until at least the still-unknown time at which the question of demand futility is resolved in other, ongoing litigation. The defendants, however, have no idea how long that will be, and it could plausibly be a significant length of time.

Moreover, the defendants do not merely suggest that they should be permitted to wait until the issue of demand futility is resolved before reaching a final decision regarding the demands in this case. They want to wait even to investigate, on the assumption that a court decision stating that a demand would have been futile would also mean that investigating the allegations would be a waste of resources. Some courts have found versions of that argument convincing, and maybe, in some situations, it is. *See Lowinger*, 924 F.3d at 368 ("The Board's decision to delay responding to their demand while the Demand Futility Action was pending does not create a reasonable doubt with respect to the Board's business judgment. If anything, that was a prudent business decision."); *Maccoumber*, 2004 WL 1745751, at *6 ("The Board's decision to postpone its investigation is reasonable given that it is currently litigating related issues in state court. If the plaintiffs in the State Court Litigation prevail, then demand and investigation in this case will be unnecessary."). But why, in this instance, would the pendency

of the Demand-Futile Derivative Action make it a good, or even reasonably defensible, idea not to at least look into the underlying allegations raised in the demand letters? If the court finds that demand futility was sufficiently pleaded in the Demand-Futile Derivative Action, then that lawsuit will presumably proceed—meaning that Brookdale will be in active litigation regarding these very allegations and will therefore have a powerful reason to want to understand them. And if, instead, the court determines in that litigation that a demand would *not* have been futile, then the defendants' excuse will be gone and they will have to investigate those same allegations anyway. The pending parallel litigation justifies, at most, a delayed final decision—not the indefinite refusal to take even preparatory steps. *Cf. Piven*, 2006 WL 756043, at *1 (describing board decision to retain counsel to look into allegations in demand letter, before reaching a final decision). The Board's apparent refusal to consider or take *any* steps in response to the demand letters—other than voting to ignore those demands for now, first for one reason and then for another—significantly undercuts the presumption that the Board was exercising ordinary business judgment, as opposed to merely seeking to frustrate shareholders' attempts to enforce accountability on the Board's own members and the executives who have the Board's support.

The court therefore holds that the plaintiffs have pleaded with particularity facts sufficient to give rise to reasonable doubt about whether the Board acted within the discretion protected by the business judgment rule in continuing to defer full investigation of the demands after the conclusion of the Investor Class Action. The court does not find sufficient reasonable doubt regarding the deferral prior to that point, and, if the plaintiffs were only pursuing claims that they had the right to assert as of the date that these cases commenced, the court would dismiss their claims in full. However, because the plaintiffs—with the consent of the defendants—pleaded supplemental, later-arising allegations sufficient to support a later-arising

right to sue, the court will only dismiss the plaintiffs' claims insofar as they are premised on a right to sue that arose at the earlier date. Dismissing this case in its entirety, just to allow the plaintiffs to sue again under their now-accrued rights, would be a poor use of the court's and the parties' resources, and the defendants have identified no rule that would require such a result. The court therefore will permit the case to proceed.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss Plaintiffs' Verified Consolidated Amended Stockholder Derivative Complaint (Doc. No. 51) will be granted in part and denied in part. The court will dismiss any allegations premised on the plaintiffs' right to sue on behalf of Brookdale prior to December 14, 2021.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge