# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| PATRICIA TEMPLIN, Derivatively on behalf of Brookdale Senior Living Inc., <br><br> Plaintiff, <br><br> v. <br><br> LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, LEE S. WIELANSKY, VICTORIA L. FREED, and JORDAN R. ASHER, <br><br> Defendants, <br><br> and <br><br> BROOKDALE SENIOR LIVING INC., a Delaware Corporation, <br><br> Nominal Defendant. | Civil Action No.: 3:21-cv-00373 <br><br> Judge Aleta A. Trauger |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF STOCKHOLDER DERIVATIVE SETTLEMENT AND AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND <u>SERVICE AWARDS</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................. 1

II.   THE ALLEGATIONS, PROCEDURAL HISTORY, SETTLEMENT NEGOTIATIONS, AND SETTLEMENT CONSIDERATION ................................................................. 2

III.  THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ........... 3

    A. Applicable Standard ........................................................................................... 3

    B. The Settlement Satisfies the Criteria for Final Approval ................................. 5

        1.    The Settlement Confers Substantial Benefits on the Company ................................. 5

        2.    The Absence of a Risk of Fraud or Collusion Favors Approval ................................. 9

        3.    The Complexity, Expense, and Likely Duration of the Litigation Supports Approval ................................................................................................................. 10

        4.    The Amount of Discovery Engaged in by the Settling Parties Supports Approval . 12

        5.    A Review of the Strengths and Weaknesses Supports Approval ........................... 12

        6.    The Recommendations of Experienced Counsel Favor Approval .......................... 14

        7.    Shareholder Reaction to the Settlement Supports Approval .................................. 15

        8.    The Public Interest Favors Approval ..................................................................... 16

IV.   THE AGREED-TO FEE AND EXPENSE AMOUNT IS FAIR AND SHOULD BE FINALLY APPROVED ............................................................................................. 17

    A.   Application of the Legal Standard Supports Approval of the Requested Fee and Expense Amount ......................................................................................................................... 20

        1.    The Value of the Benefits Conferred Upon the Company ........................................ 21

        2.    Society's Stake in Rewarding Attorneys Who Produce Substantial Results and the Contingent Nature of the Fee ................................................................................. 22

        3.    The Value of the Services on an Hourly Basis ........................................................ 23

        4.    The Complexity of the Litigation ........................................................................... 26

        5.    The Professional Skills and Standing of All Counsel ............................................. 27

V.    THE SERVICE AWARDS SHOULD BE APPROVED ........................................................ 27

VI.   CONCLUSION ......................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Anixter v. Home-Stake Prod. Co.,*
  77 F.3d 1215 (10th Cir. 1996) ............................................................................... 11

*Arp v. Hohla & Wyss Enterprises, LLC,*
  No. 3:18-cv-119,
  2020 WL 6498956 (S.D. Ohio Nov. 5, 2020) ........................................................ 25

*Blanchard v. Bergeron,*
  489 U.S. 87 (1989) ................................................................................................. 19

*Blum v. Stenson,*
  465 U.S. 886 (1984) .......................................................................................... 24, 26

*Brotherton v. Cleveland,*
  141 F. Supp. 2d 894 (S.D. Ohio 2001) ................................................................. 15

*Chun-Hoon v. McKee Foods Corp.,*
  716 F. Supp. 2d 848 (N.D. Cal. 2010) .................................................................. 25

*City of Planation Police Officers' Employees; Ret. Sys. v. Jeffries,*
  No. 2:14-cv-1380,
  2014 WL 7404000 (S.D. Ohio Dec. 30, 2014) ........................................................ 4

*Cohn v. Nelson,*
  375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................................ passim

*D'Amato v. Deutsche Bank,*
  236 F.R.D. 78 (2d Cir. 2001) .............................................................................. 9, 10

*Dick v. Sprint Commc'ns Co., L.P.,*
  297 F.R.D. 283 (W.D. Ky. 2014) .......................................................................... 12

*Flinn v. FMC Corp.,*
  528 F.2d 1169 (4th Cir. 1975) ............................................................................... 14

*Gascho v. Global Fitness Holdings, LLC,*
  No. 2:11-cv-436,
  2014 WL 1350509 (S.D. Ohio April 4, 2014) ......................................................... 5

*Glickenhous & Co. v. Houshold Int'l, Inc.,*
  787 F.3d 408 (7th Cir. 2015) ................................................................................. 11

*Granada Invs., Inc. v. DWG Corp.*,
   962 F.2d 1203 (6th Cir. 1992) ................................................................. 4, 5

*Granada Invs., Inc. v. DWG Corp.*,
   No. 1:89CV0641,
   1991 WL 338233 (N.D. Ohio Feb. 12, 1991) ....................................... 3, 16

*Hainey v. Parrott*,
   617 F. Supp. 2d 668 (S.D. Ohio 2007) .................................................... 10

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ............................................................................... 17

*Hyland v. Homeservices of Am., Inc.*,
   No. 3:05-cv-612-R,
   2012 WL 1575310 (W.D. Ky. May 3, 2012) .......................................... 16

*In re AOL Time Warner S'holder Derivative Litig.*,
   No. 02 Civ. 6302 (SWK),
   2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ......................................... 10

*In re AOL Time Warner S'holder Derivative Litig.*,
   No. 02 Civ. 6302(CM),
   2010 WL 363113 (S.D.N.Y. Feb 1, 2010) .............................................. 18

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ........................................................ 9

*In re Bear Sterns Cos., Inc. Sec. Derivative, and ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012) ............................................... 15, 25

*In re Broadwing, Inc. ERISA Litig.*,
   252 F.R.D. 369 (S.D. Ohio 2006) ..................................................... 11, 17

*In re Cardinal Health Inc. Sec. Litigations*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) ........................................ 21, 23, 25

*In re Cardizem CD Antitrust Litig.*,
   218 F.R.D. 508 (E.D. Mich. 2003) .......................................................... 13

*In re Cendant Corp., Deriv. Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002) .......................................................... 27

*In re Chambers Dev. Sec. Litig.*,
   912 F. Supp. 822 (W.D. Pa. 1995) .......................................................... 11

*In re Comverse Tech., Inc. Sec. Litig.*,
   No. 06–CV–1825 (NGG)(RER),
   2010 WL 2653354 (E.D.N.Y. June 24, 2010) ............................................... 26

*In re Delphi Corp. Sec. Derivative & "ERISA" Litig.*,
   248 F.R.D. 483 (E.D. Mich. 2008) .................................................... 9, 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   No. 02–CV–3400 (CM)(PED),
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .............................................. 26

*In re Infinity Broad. Corp. S'holders Litig.*,
   802 A.2d 285 (Del. 2002) ................................................................. 22

*In re Johnson & Johnson Derivative Litig.*,
   900 F. Supp. 2d 467 (D.N.J. 2012) ................................................... 18, 21

*In re Marsh & McLennon Cos., Inc. Sec. Litig.*,
   No. 04 Civ. 8144 (CM),
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................. 25

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
   Nos. 2:03-md-1565, 3:03-cv-467, 3:03-cv-656,
   2009 WL1473975 (S.D. Ohio May 27, 2009) .............................................. 23

*In re Nationwide Fin. Servs. Littig.*,
   No. 2:08-cv-00249,
   2009 WL 8747486 (S.D. Ohio Aug. 19, 2009) ...................................... passim

*In re NTL, Inc. Sec. Litig.*,
   No. 02 Civ. 3013 (LAK),
   2007 WL 1294377 (S.D.N.Y. May 2, 2007) ............................................... 25

*In re NVIDIA Corp. Derivative Litig.*,
   No. C-06-06110-SBA (JCS),
   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ............................................ 22

*In re PAC. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ......................................................... 10, 12

*In re Pfizer Inc. S'holder Derivative Litig.*,
   780 F. Supp. 2d 336 (S.D.N.Y. 2011) ................................................... 22

*In re Polyurethane Foam Antitrust Litig.*,
   No. 1:10-MD-2196,
   2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) ............................................ 13

v

*In re Regions Morgan Keegan Sec. Derivative & ERISA Litig.*,
  No. 08-2260,
  2015 WL 11145134 (W.D. Tenn. Nov. 30, 2015) ................................................................ 3, 4

*In re Se. Milk Antitrust Litig.*,
  No. 2:08-MD-1000,
  2009 WL 3747130 (E.D. Tenn. Nov. 3, 2009) .................................................................... 3

*In re Se. Milk Antitrust Litig.*,
  No. 2:08-MD-1000,
  2012 WL 2236692 (E.D. Tenn. June 15, 2012) ........................................................ 10, 12, 15

*In re Sunbeam Sec. Litig.*,
  176 F. Supp. 2d 1323 (S.D. Fla. 2001) ............................................................................ 14

*In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*,
  591 F. Supp. 2d 1023 (D. Minn. 2008) ............................................................................ 15

*In re Veeco Instruments Sec. Litig.*,
  No. 05 MDL 01695 (CM),
  2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .................................................................... 25

*In re: Skelaxin (Metaxalone) Antitrust Litig.*,
  No. 2343,
  2014 WL 11669877 (E.D. Tenn. Apr. 30, 2014) .............................................................. 14

*In the Matter of Cont'l Ill. Sec. Litig.*,
  962 F. 2d 566 (7th Cir. 1992) ........................................................................................ 19

*Ingram v. The Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001) .................................................................................... 17

*Jeffboat, LLC v. Dir., Off. of Workers' Comp. Programs*,
  553 F.3d 487 (7th Cir. 2009) ........................................................................................ 26

*Jermyn v. Best Buy Stores, L.P.*,
  No. 08 Civ. 214 (CM),
  2012 WL 2505644 (S.D.N.Y. June 27, 2012) .................................................................. 25

*Johnson v. Ga. Highway Express, Inc.*,
  488 F. 2d 714 (5th Cir. 1974) ........................................................................................ 19

*Karpik v. Huntington Bancshares Inc.*,
  No. 17-CV-1153,
  2021 WL 757123 (S.D. Ohio Feb. 18, 2021) .................................................................. 25

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ...................................................................................... 6, 18

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ........................................................................ 5, 21

*Monday v. Meyer*,
   No. 1:10 CV 1838,
   2011 WL 5974664 (N.D. Ohio, Nov. 29, 2011) ................................ 23

*Officers for Justice v. Civil Ser. Comm'n of City and Cty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982) ........................................................... 17

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*,
   636 F. 3d 235 (6th Cir. 2011) ............................................................ 4

*Ramey v. Cincinnati Enquirer*,
   508 F.2d 1188 (6th Cir. 1974) .......................................................... 20

*Rawlings v. Prudential- Bache Props., Inc.*,
   9 F.3d 513 (6th Cir. 1993) .......................................................... 19, 20

*Roberti v. OSI Sys., Inc.*,
   No. CV-13-09174 MWF (MRW),
   2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ................................... 26

*Satchell v. Fed. Express Corp.*,
   No. C03-2659 SI, C 03–2878 SI,
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ................................. 10

*Shlensky v. Dorsey*,
   574 F.2d 131 (3d Cir. 1978) ............................................................. 18

*Smillie v. Park Chem. Co.*,
   710 F.2d 271 (6th Cir. 1983) ........................................................... 20

*Thacker v. Chesapeake Appalachia*, L.L.C.,
   695 F. Supp. 2d 521 (E.D. Ky. 2010) .............................................. 15

*UAW v. Gen. Motors Corp.*,
   497 F.3d 615 (6th Cir. 2007) ...................................................... 4, 5, 9

*Unite Nat'l Ret. Fund v. Watts*,
   No. 04CV3603DMC,
   2005 WL 2877899 (D.N.J. Oct. 28, 2005) ................................. 21, 22

*Williams v. Vukovich*,
   720 F.2d 909 (6th Cir. 1983) ........................................................... 14

**STATUTES, RULES AND OTHER AUTHORITIES**

2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* §11.48 (3d ed. 1992) ................. 15

Fed. R. Civ. P. 23(e)(2) ...................................................................................................... 4

Fed. R. Civ. P. 23.1(c) ..................................................................................................... 1, 3

Pursuant to Federal Rule of Civil Procedure 23.1(c), Patricia Templin ("Plaintiff"), plaintiff in the above-captioned Action,[1] respectfully submits this memorandum in support of Plaintiff's Unopposed Motion for Final Approval of the Settlement of the Action brought on behalf of nominal defendant Brookdale Senior Living, Inc. ("Brookdale").[2] The Court preliminarily approved the Settlement on May 5, 2025. ECF No. 120.

## I. INTRODUCTION

The Settlement represents an excellent resolution of a highly complex and long running shareholder derivative action and is the product of months-long, vigorous, and arm's-length negotiations among the Settling Parties, following mediation with a highly experienced mediator, Robert A. Meyer ("Mr. Meyer" or the "Mediator"), of JAMS ADR. As explained herein and in the Ficaro Declaration, filed herewith, the Settlement provides substantial benefits and value to Brookdale and Brookdale stockholders.

Specifically, the Reforms detailed in Exhibit A to the Stipulation directly address the alleged wrongdoing in the Action and provide for, *inter alia*, enhanced management reporting to the Board to ensure Board oversight over the Company's disclosures, risk controls, and compliance issues, and introduce a robust set of operational reforms aimed at ensuring compliance with applicable law. The Reforms address critical aspects of the Company's operations, addressing issues ranging from risk oversight, staffing, resident care and safety, and compliance. The

---

[1] Capitalized terms are defined in the Stipulation and Agreement of Settlement ("Stipulation" or "Stip."), dated April 30, 2025 (ECF No. 117). Citations, internal quotation marks, and footnotes are omitted unless otherwise indicated.

[2] Defendants do not oppose the relief requested by the Motion; however, Defendants do not endorse or adopt the characterization of the allegations set forth herein or in the Declaration of James M. Ficaro in Further Support of Plaintiff's Unopposed Motion for Final Approval of Stockholder Derivative Settlement and Award of Attorney's Fees, Reimbursement of Expenses, and Service Awards ("Ficaro Decl." or "Ficaro Declaration"), and deny all allegations of fault, wrongdoing, liability, or damages whatsoever. *See* Stip. § III.

Reforms also address how the Company is governed at its highest levels, including the oversight responsibilities of the Board and its subcommittees, thereby ensuring the Board has the necessary reporting lines to effectively oversee the Company.

After the Settling Parties reached an agreement in principle on the material substantive terms to resolve the Action, the parties commenced negotiations regarding an appropriate award of attorneys' fees and expenses commensurate with the value of the Settlement benefit and the contributions of Plaintiff's Counsel to the Settlement. The fee negotiations were facilitated and supervised by the Mediator, who was familiar with the complexity of the issues, risks, and challenges confronted by Plaintiff, as well as Plaintiff's Counsel's efforts in securing the Settlement benefit. After contested and arm's length negotiations through the Mediator, the Settling Parties accepted the Mediator's proposal, agreeing on the Fee and Expense Amount of $1.9 million. The agreed-upon Fee and Expense Amount is in recognition of Plaintiff's Counsel's efforts "[i]n light of the substantial corporate benefits conferred upon Brookdale and the Current Brookdale Shareholders by the Settlement." Stip., ¶5.1.

Consistent with the requirements of Rule 23.1 and due process standards, and in accordance with the process approved by the Court (ECF No. 120), Brookdale disseminated notice of the Settlement to Current Brookdale Stockholders by the Notice deadline. Ficaro Decl., ¶31.

For all these reasons, and as more fully discussed below and in the accompanying submissions, Plaintiff respectfully submits that the Settlement should be approved in its entirety.

## II. THE ALLEGATIONS, PROCEDURAL HISTORY, SETTLEMENT NEGOTIATIONS, AND SETTLEMENT CONSIDERATION

A detailed summary of the allegations and procedural history of the Action, Plaintiff's Counsel's investigation and litigation efforts, the settlement negotiations, and the Settlement consideration is set forth in Plaintiff's Memorandum of Law in Support of Plaintiff's Unopposed

Motion for Preliminary Approval of Stockholder Derivative Settlement ("Preliminary Approval Memorandum") (ECF No. 116), the Stipulation, and the Ficaro Declaration. To avoid repeating matters already presented, Plaintiff incorporates those filings by reference and respectfully refers the Court to them for a more thorough description of: (i) the factual background and summary of the allegations; (ii) the procedural history of the Action; (iii) Plaintiffs' Counsel's investigation and litigation efforts; (iv) the Settling Parties' settlement negotiations; and (v) the substantive consideration for the Settlement. *See* Ficaro Decl., ¶¶14–28; Preliminary Approval Memorandum at § II; Stip., §§ I–II .

### III. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

#### A. Applicable Standard

Federal Rule of Civil Procedure 23.1 governs a district court's analysis of the fairness of a settlement of a stockholder derivative action. *In re Regions Morgan Keegan Sec. Derivative & ERISA Litig.,* No. 08-2260, 2015 WL 11145134, at *2 (W.D. Tenn. Nov. 30, 2015) ("Rule 23.1(c) governs derivative action settlements."). Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c); *Regions Morgan*, 2015 WL 11145134, at *3. The strong federal policy favoring compromises that resolve litigation is even stronger in complex cases where substantial judicial resources can be conserved by avoiding formal litigation. *In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2009 WL 3747130, at *3 (E.D. Tenn. Nov. 3, 2009). "Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" *Granada Invs., Inc. v. DWG Corp.*, No. 1:89CV0641, 1991 WL 338233, at *6 (N.D. Ohio Feb. 12, 1991).

Courts routinely recognize that derivative settlements providing non-monetary benefits (such as material changes to corporate governance and compliance) provide the real-party-in-interest, the company, with substantial benefits that warrant judicial approval. In *Granada Investments*, the Sixth Circuit, while affirming the district court's final approval of a settlement comprised of corporate governance reforms, recognized "it is not far-fetched to consider governance changes . . . as genuinely beneficial." *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992); *see also, e.g.*, *City of Planation Police Officers' Employees; Ret. Sys. v. Jeffries*, No. 2:14-cv-1380, 2014 WL 7404000, at *6 (S.D. Ohio Dec. 30, 2014) (granting final approval of derivative settlement providing for only corporate governance reforms and finding that "the proposed settlement will confer a substantial benefit upon [the company] and upon its shareholders").

When evaluating a proposed shareholder derivative settlement, "courts have borrowed from the law governing class actions under Rule 23.'" *Regions Morgan*, 2015 WL 11145134, at *2 (*quoting City of Plantation,* 2014 WL 7404000, at. *5*). In doing so, "[t]he pertinent inquiry is whether the proposed settlement is 'fair, reasonable, and adequate.'" *Id.* at *3 (quoting Fed. R. Civ. P. 23(e)(2)). In determining whether a settlement warrants final approval, the Court considers seven factors: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinion of class counsel and class representatives; (6) the reaction of absent class members and (7) the public interest." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F. 3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). "In considering these factors, the task of the court 'is not to decide whether one side is right or even has the better of these arguments. . . . The question rather is whether the parties

are using settlement to resolve a legitimate legal and factual disagreement.'" *Gascho v. Global Fitness Holdings, LLC*, No. 2:11-cv-436, 2014 WL 1350509, at *16 (S.D. Ohio April 4, 2014) (quoting *UAW*, 497 F.3d at 632). Moreover, the Court "enjoys wide discretion in assessing the weight and applicability of these factors." *Granada Invs.*, 962 F.2d at 1205–06.

### B. The Settlement Satisfies the Criteria for Final Approval

#### 1. The Settlement Confers Substantial Benefits on the Company

The Settlement provides significant benefits to Brookdale and its stockholders through the implementation and maintenance of the Reforms. *See* Stip., ¶57. Specifically, as discussed in detail in the Ficaro Declaration, the Reforms are tailored to directly address the alleged wrongdoing that gave rise to the Action, providing for: (a) improved risk oversight and compliance controls, through relevant enhancements to the Company's management-level risk committee, including with respect to resident safety, clinical and operational enhancements, and compliance with applicable laws; (b) improved disclosure procedures and controls designed to ensure Board- and appropriate management-level oversight and the issuance of timely and accurate public disclosures; (c) enhanced Board independence requirements to ensure effective and disinterested decision-making and oversight by the Board; (d) implementation of a free-standing whistleblower policy; and (e) enhancements to the Company's executive compensation program. *See* Ficaro Decl., ¶58.

Non-pecuniary benefits in the form of material corporate governance improvements like those provided for in the Settlement here can confer significant economic value that, over time, will far exceed the value of any likely one-time monetary award, particularly when discounted by the low probability of securing a sizable monetary award, and the substantial costs, delay, and management disruption attending further litigation. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("corporation may receive a 'substantial benefit' from a derivative suit . . .

regardless of whether the benefit is pecuniary in nature"); *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor . . . ."). The Reforms here confer economic value in at least three ways.

*First*, the Reforms substantially reduce the likelihood that the alleged failures will recur. While the value of preventing future missteps cannot be estimated with precision, the value of the Reforms in significantly reducing the chances that Brookdale will suffer similar consequences from similar alleged misconduct in the future can be measured against the cost to the Company from the current alleged misconduct. The alleged inadequate oversight regime and failure of internal controls at the Company allegedly caused Brookdale to incur damages as a direct result of these alleged failures, not to mention loss in market capitalization and potential loss of valuable business opportunities caused by Defendant's alleged breaches of fiduciary duty. The alleged misconduct resulted in a clear, tangible, and adverse economic impact on Brookdale, and a repeat of this alleged misconduct would almost certainly expose the Company to additional liability. The Reforms effectively address the alleged lapses in internal controls and oversight that led to these alleged losses, which will help to avoid a recurrence of the alleged deficient resident care and safety issues, deficient staffing, and alleged misstatements and omissions regarding the same— and the resulting litigation against the Company—in the future. By reducing materially the risk that Brookdale may suffer similar or greater harm to what allegedly occurred here, this Settlement confers valuable economic benefits on the Company. *See* Ficaro Decl., ¶¶60–61.

*Second*, the Reforms will improve the Company's practices at its facilities and ensure more rigorous, independent, and effective oversight, which will improve the Company's operations and

Board- and management-level decision-making; reduce risks, enhance compliance with appliable laws and regulations, and hasten the corporation's adoption of mitigation strategies to address material risks; and reduce the costs associated with the alleged failure to comply with disclosure and other regulatory requirements. While it would be difficult to estimate the value of these benefits with precision, that does not make them any less real or substantial. *See* Ficaro Decl. ¶¶62–63. The Reforms equip Brookdale with the kind of governance and internal controls that produce better decisions and reduce relevant risks of the harms alleged here—*e.g.*, targeted reforms to the Company's Risk Committee in order to enhance resident care and safety, enhanced Board independence, enhanced compliance oversight, and whistleblower reforms. Together, the Reforms will help to ensure better disclosure decisions and superior disclosures (thus restoring investor confidence in Brookdale's disclosures) and promote more deliberate and better-informed decision-making at the Company. *Id.*

**Third**, the Reforms confer significant economic value by laying the foundation necessary to repair the alleged damage to investor confidence in Brookdale's corporate governance and enhance effectiveness of the Board's oversight, the propriety of the Company's operations, and the integrity of its public disclosures. Research by academics and leading business advisors confirms what directors of leading corporation and institutional investors know from experience: investors pay a premium for stock in companies with strong corporate governance relative to peer companies perceived to have weaker governance because strong governance correlates with long-term value creation. *See* Ficaro Decl., ¶¶64–65. When investors pay a premium for stock in well-governed corporations, their market capitalization increases and long-term shareholder value is enhanced, as confirmed by numerous studies using various statistical approaches. *Id.* at ¶66. Here, the enhancements to the Company's Risk Committee, Audit Committee, whistleblower policy,

7

and Board independence, among other targeted Reforms, as well as the improved overall governance resulting from the Reforms, will be seen as major value drivers by investors because they are central to the Company's ability to maintain adequate facility staffing, safety, and health standards, and to issue accurate public disclosures related thereto. The Reforms lay the foundations for ensuring investor confidence in the Company's public disclosures and the rigor of Brookdale's Board oversight and internal controls environment and provide a comprehensive and effective remedial response that will help reverse any lingering discount to the stock price. Even if the Reforms' precise value cannot be estimated, Plaintiffs submit that it is substantial. *See* Ficaro Decl., ¶¶103–108.

Brookdale has agreed to maintain these governance measures for a minimum of four (4) years—a meaningful amount of time intended to ensure the Reforms become embedded in the Company's policies, practices, and corporate culture, thus protecting against discontinuation of these measures following the four-year period. *See, e.g.*, *Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (finding that corporate governance measures which must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

Further, the independent non-defendant members of the Company's Board have unanimously approved a resolution reflecting their determination, in a good faith exercise of their business judgement, that: (a) Plaintiff's litigation and Settlement efforts in the Action caused the adoption, implementation, and/or maintenance of the Reforms for the Commitment Period; (b) the Reforms adopted, implemented, or maintained confer substantial corporate benefits on the Company and its shareholders; and (c) the Settlement is fair, reasonable, and in the best interests of the Company and its shareholders. Stip., §IV,

The substantial benefits conferred on Brookdale as a result of the Reforms, which were only achieved through the Settling Parties' hard-fought negotiations, demonstrate that the Settlement is fair, reasonable, adequate, and within the range of possible approval.

### 2. The Absence of a Risk of Fraud or Collusion Favors Approval

Where, as here, experienced counsel have investigated the factual background of the case, evaluated the strengths and weaknesses of the claims, taken the risks, expense, and uncertainties of continued litigation into account, and negotiated at arm's-length with the opposing party, the settlement should be approved. *UAW*, 497 F.3d at 632. Where "the [c]ourt finds that the [s]ettlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex . . . litigation, the [s]ettlement will enjoy a presumption of fairness." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173–74 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.R.D. 78 (2d Cir. 2001). In fact, "[w]ithout evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreements were reached without collusion." *In re Delphi Corp. Sec. Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 501 (E.D. Mich. 2008).

The proposed Settlement here was reached after hard-fought negotiations between experienced counsel via a lengthy process. *See* Ficaro Decl., ¶¶69–74. Each element of the Settlement here was extensively negotiated among the Settling Parties' counsel with a firm understanding of the strengths and weaknesses of the claims and defenses asserted. *See* Declaration of Robert Meyer ("Meyer Decl."), ¶¶10–11, attached to the Ficaro Decl. as Ex. 8. The process was hard fought, arduous, and overseen by Mr. Meyer, a highly regarded mediator with significant experience mediating complex shareholder derivative and other representative actions. *Id.* at ¶74. Courts recognize that "[t]he participation of an independent mediator in the settlement negotiations virtually insures that the negotiations were conducted at arm's length and without

collusion between the parties." *Hainey v. Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007); *see also Satchell v. Fed. Express Corp.*, No. C03-2659 SI, C 03–2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (SWK), 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) (A "'mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."') (quoting *D'Amato*, 236 F.3d at 85).

### 3. The Complexity, Expense, and Likely Duration of the Litigation Supports Approval

Representative actions like this one "'are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *In re Se. Milk Antitrust Litig.,* No. 2:08-MD-1000, 2012 WL 2236692, at *3 (E.D. Tenn. June 15, 2012). Shareholder derivative actions in particular are incredibly complicated actions involving varied legal as well as factual considerations that necessitate extended, and therefore expensive, litigation in order to reach a conclusion on the merits. *In re PAC. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("[T]he odds of winning the derivative lawsuit were extremely small. . . . Even if it had gone to trial, derivative lawsuits are rarely successful."); *see also Cohn*, 375 F. Supp. 2d at 852 ("Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'").

The complexity, expense, and duration of this litigation also supports approval. The case was filed nearly four years ago. During the litigation, approximately 600,000 documents were produced, from which relevant documents were identified and reviewed through targeted searches. But even with compelling documents, the inevitable trial would be incredibly complicated for jurors as it still would involve extensive expert testimony and the presentation of arcane legal

concepts regarding derivative and fiduciary duties, in addition to health and senior care regulations. Trial would also require thousands of pages of documentary and deposition evidence in addition to the numerous and highly contested *in limine* and other pre- and post-trial motions. "It is safe to say, in a case of this complexity, the end of that road might be miles and years away." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 837 (W.D. Pa. 1995). Thus, without this Settlement, enormous amounts of both judicial and party resources would continue to be expended. The Settlement eliminates these and other risks. Based on their evaluation, Plaintiff's Counsel determined that the Settlement is in the best interest of Brookdale given its substantial and immediate benefits.

In addition, even if Plaintiff was able to prevail and obtain a judgement at trial, Defendants would almost certainly appeal the verdict and the award. This process would likely take several years, prolonging the implementation of any governance benefits at the Company. *See In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 373–74 (S.D. Ohio 2006) (explaining "the difficulty [p]laintiffs would encounter in proving their claims, the substantial litigation expenses, and a possible delay in recovery due to the appellate process, provide justifications for this [c]ourt's approval of the proposed [s]ettlement"). Furthermore, an appeal of any verdict would carry the risk of reversal, jeopardizing the entire recovery even if Plaintiffs prevailed at trial. *See, e.g., Glickenhous & Co. v. Houshold Int'l, Inc.*, 787 F.3d 408, 412–13 (7th Cir. 2015) (vacating in part $2.46 billion judgment against securities fraud defendants and remanding for a new trial on limited issues—after 13 years of litigation); *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215, 1233 (10th Cir. 1996) (overturning securities fraud class action jury verdict for plaintiff after over 20 years of litigation).

### 4. The Amount of Discovery Engaged in by the Settling Parties Supports Approval

Plaintiff and her counsel were well positioned to understand and intelligently evaluate her claims as well as the propriety of the proposed Settlement. In response to Plaintiff's requests for production, Defendants produced over 600,000 documents. Ficaro Decl., ¶¶26, 70, 83, 91. Indeed, where, as is the case here, "'significant discovery has been completed, the [c]ourt should defer to the judgment of experienced trial counsel who has evaluated the strength of his case.'" *In re Se. Milk,* 2012 WL 2236692, at *3; *see also Dick v. Sprint Commc'ns Co., L.P.,* 297 F.R.D. 283, 296 (W.D. Ky. 2014) ("[T]he thorough discovery exchanged by the parties points toward approval of the [s]ettlement [a]greement.").

Thus, given the significant amount of information obtained by Plaintiff and Plaintiff's Counsel before and during the nearly four years of litigation, both are in an excellent position to evaluate the strengths and potential weaknesses of the claims asserted and defenses raised. These efforts, in turn, have placed the Settling Parties in a position to clearly evaluate the proposed Settlement—an agreement that is unquestionably favorable to Brookdale, eliminates the substantial expense, risk, and uncertainty of trial, and warrants the approval of the Court.

### 5. A Review of the Strengths and Weaknesses Supports Approval

As discussed above, derivative actions are complex and fraught with risk, and this case is no exception. Indeed, "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful." *Pac. Enters.*, 47 F.3d at 378 (affirming the district court's approval of a settlement of a derivative action). Although Plaintiff remains confident that the claims asserted are meritorious, Plaintiff nonetheless faced numerous obstacles if the litigation were to continue because liability was by no means a foregone conclusion.

Although Plaintiff believes that she would present sufficient evidence to prevail, Defendants would surely present a formidable defense. *See Delphi Corp.*, 248 F.R.D. at 496 (discussing "the risk that [d]efendants could prevail with respect to certain legal or factual issues, which could result in the reduction or elimination of [p]laintiffs' potential recoveries"). These issues would be further tested through Defendants' anticipated motion for summary judgment and, ultimately, argued at trial—a costly and lengthy process whose only guarantee is an uncertain outcome.

Moreover, demonstrating the allegedly illicit nature of Brookdale's disclosures concerning its business, financial prospects, and operational and compliance practices would be difficult and strongly disputed by Defendants. The issue of damages was similarly hotly disputed and would be the subject of expert testimony. These crucial assessments likely would devolve at summary judgement and trial to a proverbial "battle of the experts." *In re Nationwide Fin. Servs. Littig.*, No. 2:08-cv-00249, 2009 WL 8747486, at *3 (S.D. Ohio Aug. 19, 2009) ("The [s]ettlement agreement reached by the parties avoids the risks attendant to this 'battle of experts,' which could result in a ruling against [p]laintiffs."). Indeed, a jury's reaction to competing expert testimony is exceedingly unpredictable and could, for example, be swayed by an expert opinion that there were no damages or a mere fraction of the amount Plaintiff contends. *In re Polyurethane Foam Antitrust Litig.*, No. 1:10-MD-2196, 2015 WL 1639269, at *5 (N.D. Ohio Feb. 26, 2015) (approving settlement and noting that "[plaintiffs], who carry the burden of proof, face the threat that their experts will fail to communicate their testimony in a way that is comprehensible to laypeople"); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) ("no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict").

Plaintiff was able to avoid these inherent uncertainties and secured significant and comprehensive corporate governance and internal control improvements designed to prevent future problems related to Brookdale's disclosures and operations without the risk of trial. As such, Plaintiff was able to obtain significant concessions, all while avoiding a determination of sharply contested issues and dispensing with further expensive litigation. *See Flinn v. FMC Corp.,* 528 F.2d 1169, 1172 n.4 (4th Cir. 1975). The Reforms, as outlined in the Stipulation, are at least as comprehensive and valuable as any benefits that would be achieved through trial, and the Settlement permits Brookdale and its stockholders to immediately realize these substantial benefits. Stip., § II; Ficaro Decl., ¶¶32–56.

### 6. The Recommendations of Experienced Counsel Favor Approval

The view of experienced counsel favoring the Settlement is entitled to significant weight. *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983). Where, as here, a settlement is endorsed as fair by experienced and sophisticated counsel who have participated in years of contested litigation and engaged in rigorous arm's-length negotiations, there is a strong presumption that the compromise is fair and reasonable. *In re: Skelaxin (Metaxalone) Antitrust Litig.*, No. 2343, 2014 WL 11669877, at *3 (E.D. Tenn. Apr. 30, 2014).

Here, counsel have concluded that the Settlement is not just fair, but rather represents an exceptional result for Brookdale and its stockholders. The Settling Parties were represented by nationally recognized leaders in complex shareholder litigation. *See* Ficaro Decl., Exhibits 9–10. Indeed, Defendants were represented by leading corporate defense firms whose lawyers zealously and effectively represented their interests. Meyer Decl., ¶11; *see also In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1334 (S.D. Fla. 2001) (quality of opposing counsel substantiates quality of plaintiff's counsel's work).

14

Plaintiff's Counsel's decision to resolve the litigation was based on a thorough understanding of the strengths and potential weaknesses of the claims. Each claim and defense was considered when arriving upon the decision to settle the Action. In addition, the assistance of a neutral, well-respected mediator like Mr. Meyer further assured a sound result for Brookdale and its stockholders. *In re Bear Stearns Cos., Inc. Sec. Derivative, and ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012); *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 591 F. Supp. 2d 1023, 1034 (D. Minn. 2008). With the assistance of an experienced mediator, counsel was fully informed and in a position to effectively, adequately, and fairly consider the substantial benefits available to Brookdale and its stockholders through the Settlement of the litigation. Meyer Decl., ¶14. Thus, the support of counsel should be given great weight and supports final approval.

### 7. Shareholder Reaction to the Settlement Supports Approval

Courts also consider the reaction of the affected stockholders when analyzing a proposed settlement of a derivative action. *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001). "The lack of objections by class members in relation to the size of the class also highlights the fairness of the settlements to unnamed class members and supports approval of the settlements." *In re Se. Milk*, 2012 WL 2236692, at *4. Of course, "[t]he fact that some class members object to the [s]ettlement does not by itself prevent the court from approving the agreement." *Brotherton*, 141 F. Supp. 2d at 906; *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 533 (E.D. Ky. 2010) ("'A certain number of . . . objections are to be expected in a class action[.]'"). Nevertheless, "a relatively small number of class members who object is an indication of a settlement's fairness." *Brotherton*, 141 F. Supp. 2d at 906 (citing 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* §11.48 (3d ed. 1992)).

In the May 5, 2025 Preliminary Approval Order, the Court approved both the form and manner of notice. ECF No. 120. Specifically, pursuant to the Preliminary Approval Order,

Brookdale (i) published the Summary Notice in *Investor's Business Daily*; (ii) posted the Notice and the Stipulation (including exhibits) on the "Investor Relations" portion of the Company's website; and (iii) attached the Summary Notice as an exhibit to its most recent quarterly report on Form 10-Q filed with the SEC. The Notice provided a detailed history of the Action, the Settlement, disclosed the time and location of the Settlement Hearing, the Fee and Expense Amount and the Service Awards, and advised Current Brookdale Stockholders of the procedures for objecting to the proposed Settlement. While the deadline for objection has not yet passed, to date, no Brookdale shareholder has objected to the Settlement or any of its terms. Ficaro Decl., ¶¶13, 31, 96.

### 8. The Public Interest Favors Approval

"'[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources.'" *Hyland v. Homeservices of Am., Inc.*, No. 3:05-cv-612-R, 2012 WL 1575310, at *7 (W.D. Ky. May 3, 2012). In fact, "[s]ettlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" *Granada Invs.*, 1991 WL 338233, at *6.

As discussed above, the Settlement is an excellent result for Brookdale in a case of substantial complexity and cost. As a result of the Settlement, Brookdale will implement extensive corporate governance enhancements designed to address the alleged internal control and disclosure issues that gave rise to the Action. *See* Ficaro Decl. at ¶¶34–56. Among other things, as is detailed *infra* at III.B.1 and in the Ficaro Declaration (¶¶34–56), the Reforms provide for enhanced management reporting to the Board to ensure Board oversight over the Company's disclosures, any disclosure issues, risk controls, and compliance issues, and introduce a robust set of operational reforms aimed at ensuring compliance with applicable contract terms and applicable

16

law. The Settlement also puts an end to the Action, which otherwise would have continued in this Court and in other courts for the foreseeable future. *See Broadwing,* 252 F.R.D. at 376 ("[T]here is certainly a public interest in settlement of disputed cases that require substantial federal judicial resources to supervise and resolve.")

The Settlement is fair, reasonable, and adequate and warrants the Court's approval.

## IV.    THE AGREED-TO FEE AND EXPENSE AMOUNT IS FAIR AND SHOULD BE FINALLY APPROVED

The U.S. Supreme Court has endorsed the consensual resolution of the amount of attorneys' fees to be paid to plaintiff's counsel in representative litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally . . . litigants will settle the amount of a fee.").  "[T]he court's intrusion upon what is otherwise a private consensual agreement . . . must be limited to the extent necessary to reach a reasoned judgement that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Ser. Comm'n of City and Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).  Where there is no evidence of collusion, courts accord substantial deference to fee and expense amounts determined by the parties. *See Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording "substantial weight to a negotiated fee amount"); *Cohn*, 375 F. Supp. 2d at 861 ("where . . . the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference").

Here, the Court is not called upon to fashion a fee and expense award, but rather to evaluate the reasonableness and fairness of an agreed amount recommended by an experienced mediator following arm's-length negotiations among sophisticated parties represented by competent counsel.  Meyer Decl., ¶¶4–14; Ficaro Decl., ¶¶105–107.

The negotiations were based on an informed analysis of the appropriate fee range in light of the Settlement benefits' value, contingency risk, and fees approved by courts in comparable cases, and were facilitated and supervised by Mr. Meyer, who was familiar with the complexity of the issues, risks, and challenges confronted by Plaintiff, as well as the magnitude and quality of Plaintiff's Counsel's efforts in securing the Settlement benefit. Ficaro Decl., ¶104; Meyer Decl., ¶¶4–9. After contested and arm's length negotiations through the Mediator, the Settling Parties accepted the Mediator's proposal, agreeing on the Fee and Expense Amount of $1.9 million. Stip., § I.C; Ficaro Decl., ¶105. Mr. Meyer's role in the negotiations provides further assurances that the process was fair and the amount reasonable. *See In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302(CM), 2010 WL 363113, at *24 (S.D.N.Y. Feb 1, 2010) ("[M]ediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"); *see also* Meyer Decl., ¶¶4–14.

Where the benefit is non-pecuniary in nature, the payment of attorneys' fees is justified pursuant to the substantial benefit doctrine. *Shlensky v. Dorsey*, 574 F.2d 131, 149 (3d Cir. 1978) ("The plaintiffs in a shareholders' derivative action may, thus, recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case."); *see also, e.g., In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 488 (D.N.J. 2012) ("corporate governance reforms, unaccompanied by monetary damages, may form the basis for an attorney's fee award where the reforms confer a 'substantial benefit' on the plaintiff corporation"); *Maher*, 714 F.2d at 461 ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment"); *Cohn*, 375 F. Supp. 2d at 853 (approving derivative settlement

and finding that "[a]s a result of the implementation of the [s]ettlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors").

Applying these principles to derivative settlements, federal courts across the country have approved separately negotiated attorneys' fees provisions and have shown significant deference to corporate directors' business judgment with respect to the amount of attorneys' fees to be paid to plaintiffs' counsel where a substantial benefit has been conferred upon a corporation. *See In the Matter of Cont'l Ill. Sec. Litig.*, 962 F. 2d 566, 568–70 (7th Cir. 1992) (market factors best understood by the negotiating parties should determine the quantum of attorneys' fees); *Johnson v. Ga. Highway Express, Inc.*, 488 F. 2d 714, 720 (5th Cir. 1974) ("we encourage counsel . . . to utilize their best efforts to . . . arrive at a settlement as to attorneys' fees"), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); Ficaro Decl. at Ex. 22 (*In re comScore S'holder Derivative Litig.*, 1:16-cv-09855-JGK, Excerpts from Final Approval Hearing Transcript (S.D.N.Y. June 7, 2018) at 20–21 (approving settlement and fees approved by disinterested directors)). Indeed, the end result of the Settling Parties' informed negotiations, which was arrived at following the Mediator's proposal, is entitled to great weight in evaluating Plaintiff's Counsel's request for approval of the agreed-to Fee and Expense Amount. *Johnson*, 488 F.2d at 720 (encouraging counsel to "arrive at a settlement as to attorneys' fees.").

Moreover, "[t]he Court must ensure that [] counsel are fairly compensated for the amount for work done and the results achieved," as "[a]bsent adequate compensation, counsel will not be willing to undertake the risk" of representative litigation. *Nationwide*, 2009 WL 8747486, at *12 (citing *Rawlings v. Prudential- Bache Props., Inc.,* 9 F.3d 513, 516 (6th Cir. 1993)). Indeed, "[a] litigant who creates a . . . 'substantial benefit' allocable with some exactitude to a defining group

of persons may acquire an equitable claim against that group for the costs incurred in creating the . . . benefit." *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983). The Court is required only to determine whether a fee award is "reasonable under the circumstances." *Rawlings*, 9 F.3d at 516 (citing *Smillie*, 710 F.2d at 275).

The Settling Parties mutually agree that the Fee and Expense Amount is fair and reasonable in light of the substantial benefits conferred by the Settlement. Stip., ¶5.1. Indeed, the independent non-defendant members of Brookdale's Board have approved a resolution reflecting their determination, in a good faith exercise of business judgment, among other things, that: (a) Plaintiff's litigation and Settlement efforts in the Action caused the adoption, implementation, and/or maintenance of the Reforms for the Commitment Period; (b) the Reforms adopted, implemented, or maintained confer substantial corporate benefits on the Company and its shareholders; and (c) the Settlement is fair, reasonable, and in the best interests of the Company and its shareholders. Stip., § IV. As such, the Fee and Expense Amount should be approved.

### A. Application of the Legal Standard Supports Approval of the Requested Fee and Expense Amount

In assessing the reasonableness of a fee award, courts in the Sixth Circuit apply the six factors identified in *Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974). Those factors are: "(i) the value of the benefit rendered; . . . (ii) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (iii) whether the services were undertaken on a contingent fee basis; (iv) the value of the services on an hourly basis; (v) the complexity of the litigation; and (iv) the professional skill and standing of all counsel[.]" *Id.*[3]

---

[3] *See also In re Cardinal Health Inc. Sec. Litigations,* 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007) ("There is no formula for weighing these factors. Rather, the [c]ourt should be mindful that each case presents a unique set of circumstances and arrives at a unique settlement, and thus different factors could predominate depending on the case.").

Here, the *Ramey* factors support approval of the agreed-upon Fee and Expense Amount of $1.9 million.

### 1. The Value of the Benefits Conferred Upon the Company

The first *Ramey* factor requires the Court to evaluate the benefit of the settlement. "District courts in this Circuit widely regard the first *Ramey* factor as the most important." *In re Cardinal Health*, 528 F. Supp. 2d at 764. "For a benefit to be considered substantial, it must be more than technical in consequence, and must be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or would affect the enjoyment or protection of an essential right to the shareholder's interest." *Unite Nat'l Ret. Fund v. Watts,* No. 04CV3603DMC, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005). Corporate reforms specifically tailored to redress the wrongful conduct that gave rise to the derivative claim provide substantial benefits to a corporation. *Johnson & Johnson*, 900 F. Supp. 2d at 488.

The reasonableness of the Fee and Expense Amount negotiated by the parties is underscored by the substantial benefits achieved for Brookdale by and through Plaintiff's Counsel's efforts. Under the "substantial benefit" doctrine, counsel who prosecute a shareholder derivative case that confers benefits on a corporation are entitled to an award of attorneys' fees and costs. In *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375 (1970), the United States Supreme Court stated that "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," and that "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." *Id.* at 395–96 (citations omitted); *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008

WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) ("[S]trong corporate governance is fundamental to the economic well-being and success of a corporation."); *In re F5 Networks, Inc. Derivative Litig.*, No. 2:06-cv-00794-RSL, slip op. (W.D. Wash. Jan. 6, 2011) at ¶¶ 6–7 (same) (attached to Ficaro Decl. as Ex. 18).

Here, as discussed in detail in the Ficaro Declaration and in § III.B.1, Plaintiff's Counsel, through hard-fought and persistent negotiations and with the assistance of the Mediator, were able to craft corporate governance reforms and enhancements that directly address the alleged wrongdoings that gave rise to the Action. Ficaro Decl., ¶¶34–68. The Reforms will improve and strengthen the Company's corporate governance and Brookdale's ability to oversee, prevent, address, and remediate Brookdale's business, financial prospects, and operational and compliance practices and risk for years to come—benefits which Plaintiff submits may range into the hundreds of millions of dollars. *Id.*; *see In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative settlement predicated on "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund*, 2005 WL 2877899, at *2 (corporate governance benefits designed "to prevent future harm" support settlement); *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 289–90 (Del. 2002) (settlement's future impact properly considered in evaluating fairness and adequacy).

In sum, the Reforms confer significant value upon the Company, which Plaintiff submits justifies the agreed Fee and Expense Amount.

### 2. Society's Stake in Rewarding Attorneys Who Produce Substantial Results and the Contingent Nature of the Fee

Courts routinely recognize that rewarding attorneys who successfully prosecute actions on behalf of shareholders in class or derivative actions "is important because . . . most individuals

would lack the resources to litigate cases, and individual recoveries are often too small to justify the burden and expense of such litigation." *Nationwide*, 2009 WL 8747486, at *14; *see also In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, Nos. 2:03-md-1565, 3:03-cv-467, 3:03-cv-656, 2009 WL1473975, at *4 (S.D. Ohio May 27, 2009) ("granting the fee request will serve society's interest in rewarding attorneys who produce such benefits in order to maintain an incentive to others"). Similarly, a fee award is warranted when counsel absorbed the risk of the litigation and proceeded with the representation on a wholly contingent basis. *See In re Cardinal Health*, 528 F. Supp. 2d at 766 (the third *Ramey* factor "stands as a proxy for the risk that attorneys will not recover compensation for the work they put into a case. . . . Several courts consider the risk of non-recovery the most important factor in the fee determination.") (citation omitted).

Here, Plaintiff's Counsel were able to achieve an excellent result for Brookdale and its stockholders. Absent Plaintiff's Counsel's willingness to pursue the Action in search of corporate reform for Brookdale, the alleged wrongful conduct giving rise to the Action may continue. Ficaro Decl, ¶¶76–77. In addition to pursuing claims on behalf and for the benefit of Brookdale and its stockholders, Plaintiff's Counsel undertook this formidable task on a wholly contingent basis. *Id.* at ¶12. Plaintiff's Counsel vigorously represented Plaintiff's interests, despite substantial obstacles, on behalf of and for the betterment of the Company and its stockholders. *See Monday v. Meyer*, No. 1:10 CV 1838, 2011 WL 5974664, at *4 (N.D. Ohio, Nov. 29, 2011). Plaintiff's Counsel achieved a substantial result while bearing all risk of success or failure. Thus, the second and third *Ramey* factors support the Fee and Expense Amount.

### 3. The Value of the Services on an Hourly Basis

Co-Lead Counsel, all of whom are experienced and skilled in shareholder litigation (*see, e.g.*, Ficaro Decl. Exhibits 9–10), committed significant time and money to the Action, including

a collective 3,455.9 hours, yielding a combined lodestar amount of $2,737,640.50, and over $106,337 in expenses.[4] Ficaro Decl. ¶¶ 114–121. Counsel expended significant time, fees, and costs associated with, *inter alia*, (i) inspecting, analyzing, and reviewing Brookdale's public filings with the Securities and Exchange Commission ("SEC"), press releases, announcements, transcripts of investor conference calls, news articles and analyst reports; (ii) reviewing and analyzing the complaints, proceedings, and relevant documents associated with other lawsuits filed relating to the Company; (iii) researching, drafting, and serving the Demands; (iv) researching, drafting, and filing multiple shareholder derivative complaints; (v) successfully opposing Defendants' Motion to Dismiss, two Motions for Judgment on the Pleadings, and Motion to Stay Discovery; (vi) reviewing internal corporate documents produced to Plaintiff by Defendants in the Action; (vii) researching the applicable law with respect to the claims asserted (or which could be asserted) in the Action and the potential defenses thereto; (viii) researching corporate governance issues and issues relating to the senior living industry; (ix) attending and participating in mediation in New York, New York; (x) participating in extensive settlement discussions with the mediator and counsel for Defendants; (xi) preparing and negotiating settlement-related documentation including the Stipulation and its exhibits; and (xii) drafting the memoranda and declarations filed in support of Plaintiff's motions for preliminary and final settlement approval. Ficaro Decl. ¶ 114. Nonetheless, when considering a fee and expense award paid to plaintiff's counsel in shareholder derivative actions, courts should look beyond a simple lodestar calculation in making a fee award. *Cohn*, 375 F. Supp. 2d at 862 (citing *Blum v. Stenson*, 465 U.S. 886 (1984)).

---

[4] Liaison Counsel's time expended and expenses incurred in connection with prosecuting the Action are not included in these figures.

Further, it is common in complex cases such as the Action for courts in this Circuit and throughout the country to award substantial multipliers. *See, e.g.*, *Karpik v. Huntington Bancshares Inc.*, No. 17-CV-1153, 2021 WL 757123, at *8 (S.D. Ohio Feb. 18, 2021) (approving 3.3 lodestar multiplier); *In re Cardinal Health,* 528 F. Supp. 2d at 767 (approving 5.9 multiplier); *Arp v. Hohla & Wyss Enterprises, LLC,* No. 3:18-cv-119, 2020 WL 6498956, at *7 (S.D. Ohio Nov. 5, 2020) (approving 5.29 multiplier). Here, however, Co-Lead Counsel have a ***negative*** multiplier of .69.[5] Ficaro Decl. ¶118. Indeed, a "multiplier of less than one, (sometimes called a negative multiplier) suggests that the negotiated fee award is a reasonable and fair valuation of the services rendered [] by [] counsel." *Chun-Hoon v. McKee Foods Corp.,* 716 F. Supp. 2d 848, 854 (N.D. Cal. 2010); *see also In re Bear Stearns*, 909 F. Supp. 2d. at 271 ("[T]he lodestar cross-check results in a negative multiplier of less than 0.92 – a strong indication of the reasonableness of the proposed fee."); *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK), 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007) (negative multiplier "is reasonable because it will not bring a windfall to co-lead plaintiffs' counsel"); *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 (CM), 2012 WL 2505644, at **9–10 (S.D.N.Y. June 27, 2012) ("negative" lodestar multiple indicates reasonableness of fee); *In re Marsh & McLennon Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009) (fee request constituting "deep discount" from lodestar "unquestionably" supports the award); *In re Veeco Instruments Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *4 (S.D.N.Y. Nov. 7, 2007) (same).

---

[5] $1,900,000.00 (Fee and Expense Amount) ÷ $2,737,640.50 (Co-Lead Counsel's total lodestar) = .69. The multiplier is further reduced if expenses, which are deducted from the Fee and Expense Amount, are considered. In that instance, the multiplier is .67 ($1,900,000.00 (Fee and Expense Amount) ÷ $2,843,977.80 ($7,737,640.50 (Co-Lead Counsel's total lodestar) + $106,337.30 (Co-Lead Counsel's total expenses)) = .67). Ficaro Decl., ¶¶115–118.

25

Additionally, shareholder derivative settlements comprised of therapeutic relief and governance benefits similar to those achieved by the Action often produce fees comparable to those sought here, further underscoring the reasonableness of the Fee and Expense Amount. Ficaro Decl. ¶¶116–119. As such, the value of the services rendered supports final approval of the Fee and Expense Amount.[6]

### 4. The Complexity of the Litigation

Shareholder derivative litigation is notoriously complex, which further supports the agreed-upon Fee and Expense Amount, given that the claims involved "complex questions of law and fact, including the fiduciary duties owed by [Brookdale's] directors to their shareholders." *Nationwide*, 2009 WL 8747486, at \*15. As detailed *supra*, § IV.A.3., in the Stipulation (§ II), and the Ficaro Declaration (¶¶103–125), Plaintiff's Counsel spent substantial time through, among

---

[6] In cases involving a high degree of expertise and specialization, such as this derivative action, a court should assess the reasonableness of counsel's hourly rates based on the national market for such services. *Jeffboat, LLC v. Dir., Off. of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009). Co-Lead Counsel's current rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11; *see also, e.g.*, *Roberti v. OSI Sys., Inc.*, No. CV-13-09174 MWF (MRW), 2015 WL 8329916, at \*7 (C.D. Cal. Dec. 8, 2015) (holding rates between $525 to $975 as reasonable); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06–CV–1825 (NGG)(RER), 2010 WL 2653354, at \*4 (E.D.N.Y. June 24, 2010) (noting that hourly rates of $125 to $880 were "not extraordinary"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02–CV–3400 (CM)(PED), 2010 WL 4537550, at \*25 (S.D.N.Y. Nov. 8, 2010) ("In complex securities class actions in this Circuit and around the country, courts have repeatedly found rates similar to those charged by [l]ead [c]ounsel here to be reasonable; indeed, the American Lawyer recently reported that the *median* billing rate for partners at many leading law firms exceeds $900/hour."). More recent analyses demonstrate that the hourly rates charged by Co-Lead Counsel are comparable to the fees charged by Defendants' counsel. *See* BTI Consulting Group, The 32 Firms with the Highest Rates (Nov. 14, 2024), https://bticonsulting.com/themadclientist/the-32-firms-with-the-highest-rates (reporting billing rates in 2024 at firms, including Defendants' counsel at Jones Day, between $1,170 and $2,620 per hour).

other things, investigating their respective claims prior to and following the filing of the Action. The complexity of the Action thus favors final approval of the Fee and Expense Amount.

### 5. The Professional Skills and Standing of All Counsel

The litigation included the participation of highly skilled and specialized attorneys for the Settling Parties. *See* Ficaro Decl., ¶71. As the *Nationwide* court recognized, "highly experienced" Plaintiffs' counsel, "faced with formidable opposition [including] very skilled and experienced counsel in securities and transaction litigation, who could draw upon the exceptional resources of their nationally recognized law firm [] . . . [are] factor[s] that may be considered when evaluating a fee request." *Nationwide*, 2009 WL 8747486, at *7, *15. Thus, this factor supports the Fee and Expense Amount.

Each *Ramey* factor therefore supports final approval of the agreed-upon Fee and Expense Amount, supporting Court approval.

## V. THE SERVICE AWARDS SHOULD BE APPROVED

The Settlement proposes the payment of Service Awards to Plaintiff and former plaintiff Stefanie Anders in the amount of $2,000 each, which will be paid out of the Fee and Expense Amount. "An incentive payment to come from attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant Corp., Deriv. Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (approving incentive award from counsel to plaintiff because plaintiff performed a public service by stepping forward to represent corporation and its shareholders). Likewise, the payment of Service Awards in the Action, to be paid to each of the Plaintiff and former plaintiff Anders in the Action out of the Fee and Expense Amount, is justified in recognition of their efforts in pursuing and successfully resolving the Action. *In re CoreCivic, Inc. S'holder Derivative Litig.*,

No. 3:16-cv-03040, Final Order and Judgment (M.D. Tenn. Dec. 2, 2022) (Hon. Trauger) (approving $2,000 service awards per plaintiff).[7]

## VI.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant final approval of the Settlement and approve the Fees and Expense Amount and Service Awards.

Respectfully submitted,

DATED: June 4, 2025

*s/ Michael I. Fistel, Jr*
MICHAEL I. FISTEL, JR.

**JOHNSON FISTEL, PLLP**
MICHAEL I. FISTEL, JR.
MARY ELLEN CONNER
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com
Email: maryellenc@johnsonfistel.com

**THE WEISER LAW FIRM, P.C.**
JAMES M. FICARO
Four Tower Bridge
200 Barr Harbor Dr., Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-0206
Facsimile: (610) 408-8062
jmf@weiserlawfirm.com

*Co-Lead Counsel for Plaintiff*

**DAVIES, HUMPHREYS, HORTON & REESE, PLC**
Wade B. Cowan
P.O. Box 50617
Nashville, Tennessee 37205
Telephone: (615) 352-2331
Facsimile: (615) 242-7853

---

[7] All unreported decisions/orders cited in this paragraph are attached hereto at Ficaro Declaration Exhibits 11–22, respectively.

Email: wcowan@dhhrplc.com

***Liaison Counsel for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 4, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Michael I. Fistel, Jr.*
MICHAEL I. FISTEL, JR.